**EXHIBIT Q**

ØŠÒÖ
GªGI ÁÙÒÚÆÇÈÇÊÇÁÚT
SÇÕÖÁÕÙWÞVŸ
ÙWÚÒÜÙQÜÚÕÙWÜVÁÕŠÒÜS
ÒÈZŠÒÖ
ÔŒÜÒÁÄÆGIÉGŒFJÌÏFÉÁÙÒŒ

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| FIRST FED BANK, a Washington state commercial bank, | Case No. |
| Plaintiffs, | COMPLAINT FOR DECLARATORY RELIEF |
| v. | |
| PACIFIC WATER TECHNOLOGY, LLC, a Washington limited liability company; KWANSOO LEE, DDS, PLLC, a Washington limited Liability company; and KWANSOO LEE, an individual, | |
| Defendants. | |

Plaintiff First Fed Bank (First Fed) brings this action against Defendants Pacific Water Technology, LLC; Kwansoo Lee, DDS PLLC; and Kwansoo Lee (PWT Defendants) under Civil Rule 57 and the Uniform Declaratory Judgments Act, RCW 7.24, *et seq.* In support of its complaint and petition for declaratory judgment, First Fed alleges as follows:

## I.    PRELIMINARY STATEMENT

1.    This declaratory judgment action arises from a dispute between First Fed and the PWT Defendants regarding the validity and enforceability of a loan agreement.

2.    In December 2021 and May 2022, Defendant Pacific Water Technology, LLC executed Business Loan and Security Agreements (Loan Agreements) with First Fed and made and delivered Promissory Notes (Notes) in the principal amount of $752,250 and $1,310,222.21, respectively (Loans). Under a separate Unconditional Guaranty of Payment and Performance (Guaranty), Defendant Kwansoo Lee and Kwansoo Lee, DDS PLLC are guarantors of the Loans. "Loan Documents," as used herein, refers to the Loan Agreements, the Notes, and the Guarantees

COMPLAINT - 1
Case No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

134777.0006/9856816.4

collectively.

3. Certain PWT Defendants have called into question the validity and enforceability of the Loan Documents by filing an action in Snohomish County Superior Court (Snohomish Action) asserting, among other things, that the Loan Documents are invalid and unenforceable. After First Fed removed the Snohomish Action to federal court, *Pacific Water Technology LLC, et. al. v. Wear, et. al.,* No. 24-cv-01164-TL (U.S. District Court for the Western District of Washington), the PWT Defendants voluntarily dismissed all of their claims against First Fed without prejudice under Rule 41(a)(1)(A)(i) on August 6, 2024 (Dkt. 10).

4. While the PWT Defendants currently have no claims pending against First Fed, they continue to maintain that the Loan Documents are invalid and unenforceable. First Fed brings this declaratory judgment action to clarify and settle the rights and obligations of the parties under the Loan Documents. Specifically, First Fed seeks a declaratory judgment that the Loan Documents are valid and enforceable against the PWT Defendants.

## II.    PARTIES, JURISDICTION AND VENUE

5. First Fed Bank is incorporated in Washington and has its principal office in Port Angeles, Washington. First Fed Bank is therefore a citizen of Washington.

6. Defendant Pacific Water Technology, LLC is a limited liability company organized under the laws of Washington with its principal office in Puyallup, Washington. Kwansoo Lee, DDS PLLC is a Washington company, with its principal office in Spanaway, Washington. In the Snohomish Action, PWT Defendants alleged facts suggesting that their owner, Kwansoo Lee, is a resident of Washington and is licensed to practice dentistry in Washington. Therefore, upon information and belief, Defendants Pacific Water Technology, LLC and Kwansoo Lee, DDS PLLC are citizens of Washington where they are organized and where their owner, who is a natural person, is domiciled.

7. Upon information and belief, Defendant Kwansoo Lee is a citizen of Washington.

8. Jurisdiction and venue are proper based on the forum selection clause of the Loan

COMPLAINT - 2
Case No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

134777.0006/9856816.4

Agreement executed by the parties. The forum selection clause designates King County Superior Court as the venue governing any lawsuits between the parties.

## III. FACTS

### A. Loan History

9. On May 19, 2022, Pacific Water Technology, LLC executed the Loan Agreements with First Fed Bank in the principal amounts of $752,250 and $1,310,222.21 for the purchase or refinance of one or more water dispensing systems. Copies of the Loan Agreements, the Notes, and the Guaranties are attached as Exhibits A-F, respectively, to this complaint.

10. Kwansoo Lee is a personal guarantor of the Loans. A copy of the Guaranties are attached as Exhibits C and F to this complaint.

11. First Fed has fulfilled its own obligations under the Loan Documents.

12. No conditions exist in regard to the negotiation, terms, execution, or enforcement of the Loan Documents that would render any of them void, invalid, unenforceable, or subject to the equitable remedy of recission.

### B. The Snohomish Action

13. On June 21, 2024, Pacific Water Technology Parties filed a complaint in Snohomish County Superior Court, naming First Fed as a defendant. A copy of the complaint in the Snohomish Action is attached as Exhibit D to this complaint.

14. The complaint in the Snohomish Action asserted that the Loan Agreements and Notes between Pacific Water Technology, LLC and First Fed, and the Guaranties between Kwansoo Lee and First Fed, are "void and/or should be rescinded." Ex. D. ¶¶ 205, 221.

15. The complaint in the Snohomish Action sought, among other things, an order that the Loan Agreements, Notes, and Guaranties are "void, invalid, rescinded, and/or unenforceable under applicable law." Ex. D, Request for Relief, ¶ 7; *see also id.* at ¶¶ 210, 225, 241, 277 (seeking rescission).

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

16.     The complaint in the Snohomish Action sought "temporary, preliminary, and permanent injunctive relief staying further disputed loan payments to … First Fed" under the Loan Agreement, and "preventing [First Fed] from defaulting or accelerating the loans in [PWT Defendants'] names pending the outcome of this litigation." Ex D, Request for Relief, ¶ 8

17.     On August 2, 2024, First Fed removed the Snohomish Action to this U.S. District Court for the Western District of Washington.

18.     On August 6, 2024, PWT Defendants dismissed their claims against First Fed Parties without prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(i).

**C.     Actual Controversy**

19.     PWT Defendants do not have any claims pending against First Fed in state or federal court as of the filing of this action.

20.     Notwithstanding their voluntary dismissal without prejudice of their claims against First Fed as first asserted in the Snohomish Action, PWT Defendants continue to dispute the validity and enforceability of the Loan Agreements, the Notes, and the Guaranties.

21.     There is an immediate, concrete, and existing controversy between the parties as to the validity and enforceability of the Loan Documents. This could be resolved through the issuance of the declaratory judgment sought by First Fed in this case. Such a judgment would bring specific, legal certainty to parties with adverse legal interests—namely, First Fed on the one hand, and the PWT Defendants on the other.

## IV.     FIRST CAUSE OF ACTION – DECLARATORY RELIEF

22.     First Fed incorporates by reference paragraphs 1 through 17, above, as though fully set forth herein.

23.     An actual controversy currently exists between the parties concerning the validity and enforceability of the Loan Documents. PWT Defendants have asserted—and continue to maintain—that the Loan Documents are invalid and unenforceable, and that First Fed is legally barred from calling a default or accelerating the Loan. First Fed contends that the Loan Documents

COMPLAINT - 4
Case No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

134777.0006/9856816.4

are each valid and enforceable. This controversy would be resolved if the Court were to award First Fed the definite and concrete declaratory relief sought in this action.

5. First Fed seeks a declaratory judgment under RCW 72.24.010 and 72.24.020 that:

    **a.** The Loan Agreements and Notes are valid and enforceable against Defendant Pacific Water Technology , LLC.

    **b.** The Guaranties are valid and enforceable against Defendants Kwansoo Lee and Kwansoo Lee, DDS PLLC as the guarantors of the Loan.

    **c.** The Loan Documents are not void or voidable by PWT Defendants under any doctrine or provision of state or federal law; and

    **d.** PWT Defendants are not entitled to recission of the Loan Documents under any doctrine or provision of state or federal law, including, but not limited to, the Washington Franchise Investment Protection Act, RCW 19.100 the Washington State Securities Act, RCW 21.20, and the Uniform Voidable Transactions Act, RCW 19.40.

## **REQUEST FOR RELIEF**

Plaintiff First Fed Bank respectfully requests judgment in its favor and against PWT Defendants as follows:

1. A declaratory judgment in favor of First Fed and against PWT Defendants that the Loan Documents are valid and enforceable in accordance with their express written terms;

2. An order awarding First Fed its attorneys' fees and costs; and

3. Any other remedy that the Court deems just and proper.

//
//
//
//

COMPLAINT - 5
Case No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

DATED: September 3, 2024

LANE POWELL PC

By: _s/ Gregory R. Fox_
Gregory R. Fox, WSBA No. 30559
foxg@lanepowell.com

_s/ Andrew G. Yates_
Andrew G. Yates, WSBA No. 34239
yatesa@lanepowell.com

_s/ Devon J. McCurdy_
Devon J. McCurdy, WSBA No. 52663
mccurdyd@lanepowell.com

_s/ Dailey Koga_
Dailey Koga, WSBA No. 58683
kogad@lanepowell.com

1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, Washington 98111-9402
Telephone:  206-223-7000

*Attorneys for Plaintiff First Fed Bank*

COMPLAINT - 6
Case No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

134777.0006/9856816.4

# EXHIBIT A

# BUSINESS LOAN AND SECURITY AGREEMENT



LOAN NO: ███1403

THIS BUSINESS LOAN AND SECURITY AGREEMENT (**"Agreement"**), dated December 3, 2021, is made by and between Pacific Water Technology, LLC a Washington Limited Liability Company (**"Borrower"**), whose address is:

> Pacific Water Technology, LLC
> 20709 Mountain Hwy E, Suite 101,
> Spanaway, WA 98387
> Attn: Kwansoo Lee

and FIRST FED BANK, a Washington chartered stock savings bank, and its successors, participants, and assigns (**"Lender"**), whose address is:

> FIRST FED BANK
> P.O. Box 351
> Port Angeles, WA 98362
> Attn: Kasi O'Leary

**Borrower has applied to Lender for a commercial loan to finance the purchase or refinance of one or more water dispensing Systems (each, a "System") described herein. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement, together with the security interest in the Collateral (defined below) granted by this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole discretion and Lender's application and underwriting criteria, as amended from time to time by Lender; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

        1.      **TERM.** This Agreement shall be effective as of the date first set forth above, and shall continue in full force and effect until such time as the Loan evidenced hereby has been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges.

        2.      **LOAN**. Subject to the terms and conditions of this Loan Agreement, the Note, and all of the other Related Documents (each as defined below), Lender agrees to extend to Borrower a Loan in the principal amount of $752,250.00 (the "**Loan**").

        3.      **CONDITIONS PRECEDENT TO LOAN CLOSING.** Lender's obligation to make an Advance of Loan proceeds under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents, including, without limitation, the following conditions:

        3.1.      **Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) this Agreement, (2) the Note; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) the guaranties required hereunder; (6) a Disbursement Request and Authorization; and (7) all Related Documents as Lender may require for the Loan; all fully executed and in form and substance satisfactory to Lender.

        3.2.      **Third-Party Documents**. Borrower shall provide to Lender fully executed copies of the Service and Management Agreement(s) between Borrower and Water Station Management, LLC (the "**Service and Management Agreement**") applicable to the System(s) that are financed by, and that are collateral for, the Loan.

        3.3.      **Deposit Account.** Borrower shall have opened a deposit account with Lender (the "**Deposit**

Exhibit A to Complaint
Page 8

**Account**") and deposited therein funds in an amount equal to up to thirty percent (30%) of the original invoice price of the System(s) financed by the Loan *plus* the amount necessary to pay two months' principal and interest due under the Loan, each as designated by Lender in its discretion. Borrower acknowledges and agrees that, upon the closing of the Loan hereunder, funds in the Deposit Account will be used to pay the balance of the amount necessary to purchase or refinance the System(s) financed by the Loan.

3.4. **Loan Fee and Other Closing Costs**. Borrower shall have paid to Lender the loan fee and all other closing costs set forth on the Disbursement Request and Authorization executed concurrently herewith.

3.5. **Payment of Any Other Fees and Expenses.** Borrower shall have paid to Lender all other fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

3.6. **Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender, may require.

3.7. **Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

3.8. **No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

4. **GRANT OF SECURITY INTEREST, COLLATERAL DESCRIPTION. In connection with the Loan, Borrower hereby grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.** The word "**Collateral**" as used in this Agreement means all of Borrower's right, title, and interest in and to all of Borrower's property of any nature whatsoever, tangible and intangible, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, and all products, profits, rents, proceeds, and accessions of such property, including, without limitation the personal property described on Exhibit A hereto. In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

4.1. All accessions, attachments, accessories, replacements of and additions to any of the Collateral described herein, whether added now or later.

4.2. All products and produce of any of the property described in this Collateral section.

4.3. All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

4.4. All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

4.5. All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Borrower's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

4.6. All of Borrower's right, title, and interest in and to any and all contracts, agreements, documents, and instruments related to the Collateral, including, without limitation, the Service and Management Agreement(s) related thereto.

5. **REPRESENTATIONS AND WARRANTIES GENERALLY.** Borrower represents and warrants to Lender, as of the date of this Agreement and as of the date of Lender's Advance of Loan proceeds, and at all times any Indebtedness exists: **Organization.** Borrower is a Limited Liability Company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Washington. Borrower is duly authorized to transact business in all states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each

---

state in which Borrower is doing business. Borrower maintains an office at 20709 Mountain Hwy E, Suite 101, Spanaway WA 98387. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name.

5.1. **Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or the Collateral.

5.2. **Single-Purpose.** Borrower was formed for the sole purpose of owning and operating one or more Systems. Borrower has not, and shall not, engage in any business activity other than owning and operating the System(s).

5.3. **Restricted Persons.** Neither Borrower, nor any person owning any interest in any Borrower, is (or will be) a person with whom Lender is restricted from doing business under regulations of the Office of Foreign Asset Control of the U.S. Department of the Treasury ("**OFAC**") (including, those persons named on OFAC's Specially Designated Nationals and Blocked Persons List) or under any statute, executive order (including, without limitation, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons. In addition, Borrower hereby agrees to provide Lender with any additional information that Lender may deem necessary from time to time to ensure compliance with Lender's OFAC or any other applicable laws requiring Lender to collect customer identification materials, including, without limitation, home addresses, telephone numbers, birthdates, social security and other tax identification numbers, and the like.

6. **BORROWER'S REPRESENTATIONS AND WARRANTIES REGARDING THE COLLATERAL.** With respect to the Collateral, Borrower represents and promises to Lender that:

6.1. **Perfection of Security Interest.** Borrower agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing security agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.**

6.2. **Notices to Lender.** Borrower will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Borrower's name; (2) change in Borrower's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Borrower; (4) change in the authorized signer(s); (5) change in Borrower's principal office address; (6) change in Borrower's state of organization; (7) conversion of Borrower to a new or different type of business entity; or (8) change in any other aspect of Borrower that directly or indirectly relates to any agreements between Borrower and Lender. No change in Borrower's name or state of organization will take effect until after Lender has received notice.

6.3. **Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

6.4. **Location of the Collateral.** Borrower agrees to keep the Collateral at Borrower's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Borrower will deliver to Lender in form satisfactory to Lender a schedule of Collateral locations relating to Borrower's operations, including without limitation the location(s) of all System(s) owned by Borrower.

---

DocuSign Envelope ID: 39E1897B-4C74-47E1-8C2B-FC779C659479

6.5. **Removal of the Collateral.** Borrower shall not remove any System from its existing location without Lender's prior written consent. Borrower shall, whenever requested, advise Lender of the exact location of the System(s) owned by Borrower.

6.6. **Transactions Involving Collateral.** Without Lender's prior written consent, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Borrower shall immediately deliver any such proceeds to Lender.

6.7. **Title.** Borrower represents and warrants to Lender that Borrower holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

6.8. **Repairs and Maintenance.** Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

6.9. **Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

6.10. **Taxes, Assessments and Liens.** Borrower will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents.

6.11. **Compliance with Governmental Requirements.** Borrower shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral. Borrower may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

6.12. **Maintenance of Casualty Insurance.** Borrower shall procure and maintain special form (formerly known as all risk) all risk insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, together with any insurance required by the Service and Management Agreement, each in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Borrower will provide Lender with such loss payable or other endorsements as Lender may require. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

6.13. **Application of Insurance Proceeds.** Borrower shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $5,000.00, whether or not such casualty or loss is covered by insurance. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Borrower from the proceeds for the reasonable cost of repair or restoration. If Lender does

not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Borrower.

6.14. **Financing Statements.** Borrower authorizes Lender to file one or more UCC financing statements, or alternatively, a copy of this Agreement to perfect Lender's security interest granted hereby. At Lender's request, Borrower additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Collateral. Borrower will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Borrower irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

7. **AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

7.1. **Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

7.2. **Financial Records.** Maintain its books and records in accordance with accounting principles acceptable to Lender, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

7.3. **Financial Statements.** Furnish Lender with such financial statements and other related information of Borrower or any Guarantor at such frequencies and in such detail as Lender may reasonably request.

7.4. **Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loan in favor of Lender, executed by each guarantor named below, on Lender's forms, and in the amount and under the conditions set forth in those guaranties.

| Name of Guarantor | Amount |
|---|---|
| Kwansoo Lee | **Unlimited** |
| Kwansoo Lee DDS PLLC | **Unlimited** |

7.5. **Loan Proceeds.** Use all Loan proceeds solely for the purchase or refinance of System(s) that will be owned and operated by Borrower in accordance with the terms of this Agreement.

7.6. **Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

7.7. **Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

7.8. **Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's businesses and operations, and to the use of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

7.9. **Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

7.10. **Single-Purpose Entity.** Engage exclusively in the business of owning and operating the System(s), and in no other business or activity without Lender's prior written consent. Without limiting the foregoing, Borrower will not (i) engage in any business or activity other than the ownership and operation of the System(s), (ii) acquire or own any assets other than the System(s), (iii) own any subsidiary or make any investments in any other entity, (iv) comingle its assets with the assets of any other entity, or (v) make any loans or guaranty the indebtedness of any other person or entity.

7.11. **Service and Management Agreement.** At all times comply with the terms and conditions of the Service and Management Agreement(s) to which Borrower is a party. Furthermore, Borrower shall immediately notify Lender of any breach of or default under the Service and Management Agreement(s), either by Borrower or any other party thereto.

7.12. **Deposit of Funds**. Cause all proceeds of the Service and Management Agreement to be deposited directly into the Deposit Account.

7.13. **Automatic Withdrawal of Funds**. Execute any and all documents requested by Lender to permit, authorize and direct Lender to automatically debit amounts due under the Note or any of the other Loan Documents directly from the Deposit Account without further notice to, or authorization from, Borrower.

8. **RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the Loan to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

9. **BORROWER'S RIGHT TO POSSESSION.** Until default, Borrower may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Borrower shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Borrower shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

10. **LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

DocuSign Envelope ID: 39E1897B-4C74-47E1-8C2B-FC779C659479

11.     **NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

11.1.     **Indebtedness and Liens.** (1) Except for indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of the Collateral or Borrower's assets, or (3) sell with recourse any of Borrower's accounts, except to Lender.

11.2.     **Continuity of Operations.** (1) Engage in any business activities except in accordance with the single-purpose entity covenants set forth herein, (2) cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise, that would result in a breach of the terms of this Agreement or Borrower's inability to make payments under the Loan as and when they become due.

11.3.     **Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

11.4.     **Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

12.     **RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account), including, without limitation, the Deposit Account. This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

13.     **DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

13.1.     **Payment Default.** Borrower fails to make any payment when due under the Loan.

13.2.     **NSF Notification.** Lender, upon initiating any payment from the Deposit Account pursuant to this Agreement, receives an NSF notification or other similar notification that there are insufficient amounts in the Deposit Account to make the required payment.

13.3.     **Other Default.** Borrower fails to comply with any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents.

13.4.     **Default Under Service and Management Agreement.** Borrower fails to comply with the terms of the Service and Management Agreement(s) applicable to the Collateral and Borrower does not remedy such failure within the applicable cure period, if any.

13.5.     **Default in Favor of Third Parties.** Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Loan or perform Borrower's obligations under this Agreement or any Related Document.

13.6.     **False Statements.** Any representation or statement made by Borrower to Lender is false in any material respect.

13.7.     **Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death

of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

13.8. **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan.

13.9. **Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

13.10. **Insecurity.** Lender in good faith believes itself insecure.

14. **RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Washington Uniform Commercial Code. In addition, and without limitation, Lender may exercise any one or more of the following rights and remedies:

14.1. **Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower.

14.2. **Assemble Collateral.** Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Borrower to take possession of and remove the Collateral.

14.3. **Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale, including, without limitation, a private sale to Water Station Management, LLC, or an affiliate thereof, on terms acceptable to Lender it its discretion. In such event, Lender shall endeavor to, but shall have no obligation to, give Borrower reasonable notice of the sale of the Collateral. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

14.4. **Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding or pending foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness.

14.5. **Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral, whether under the Service and Management Agreement or otherwise. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and, regardless of any such transfer, Lender may receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, direct payments be made in accordance with Lender's instructions, endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

14.6. **Assign Service and Management Agreement.** Cause Borrower to execute any and all documents necessary, in Lender's discretion, to assign, transfer, and convey Borrower's interest in the Service and Management Agreement to Lender or its designee and, if Borrower fails to execute any and all such documents within ten (10) days following Lender's demand, exercise the power of attorney granted by this Agreement to cause such assignment, transfer, and conveyance on behalf of Borrower.

14.7. **Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

14.8. **Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

14.9. **Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under this Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

15. **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

15.1. **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

15.2. **Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. The foregoing costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

15.3. **Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington.**

15.4. **Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of King County, State of Washington.

15.5. **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, shall constitute a waiver of any of Lender's rights or of any of Borrower's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

15.6. **Notices.** Subject to applicable law, and except for notice required or allowed by law to be given in another manner, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered in-person, when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the address(es) set forth on the first page of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address.

15.7. **Participation and Syndication.** Lender may assign its rights and obligations under this Agreement or the Loan, in whole or in part, or sell the Loan or a participation interest in the Loan to any affiliate of Lender or third party. Borrower agrees that Lender may provide any successor, Loan purchaser, or participant in the Loan with copies of any financial

statements, credit reports and other information relating to Borrower, any Guarantor, or the Collateral. Borrower shall provide any successor, purchaser, or participant with such additional information regarding Borrower, any Guarantor, the Collateral, or the Loan as Lender may request.

15.8. **Power of Attorney.** Borrower hereby appoints Lender as Borrower's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement, to demand termination of filings of other secured parties, and to exercise any of the other powers Lender is specifically authorized to exercise on behalf of Borrower hereunder. The power of attorney granted hereby is irrevocable during the term of this Agreement and shall be deemed coupled with an interest. Furthermore, the power of attorney granted hereby may be exercised by Lender in accordance with the terms of this Agreement and the Related Documents without further notice to, or authorization from, Borrower.

15.9. **Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

15.10. **Successors and Assigns.** Borrower may not assign, transfer, or convey all or any portion of its rights hereunder without Lender's prior written consent. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

15.11. **Survival of Representations and Warranties.** All representations, warranties, and agreements made by Borrower in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

15.12. **Time is of the Essence.** Time is of the essence in the performance of this Agreement.

15.13. **Indemnification**. If a claim arises for which Borrower has a duty to defend Lender under this Agreement or any of the other Loan Documents, Lender shall have the right to choose its own legal counsel (at Borrower's expense) and make all decisions relating to its defense, including, without limitation, the litigation strategy and the terms of any settlement.

15.14. **Counterparts.** This Agreement may be signed in one or more counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument.

15.15. **JURY TRIAL WAIVER.** BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY BORROWER, AND BORROWER ACKNOWLEDGES THAT NO PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. BORROWER FURTHER ACKNOWLEDGES THAT BORROWER HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF BORROWER'S OWN FREE WILL, AND THAT BORROWER HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL**.**

15.16. **Errors and Omissions.** Borrower, for and in consideration of the Loan, agrees, if requested by Lender, to fully cooperate in modifying the Loan Documents to adjust for clerical errors, if any, in some or all of the Loan Documents or if deemed necessary or desirable in the reasonable discretion of Lender to enable Lender to sell, convey, seek guaranty or market said Loan to any entity, including but not limited to an investor, Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Government National Mortgage Association, Federal Housing Authority or the Department of Veteran Affairs, or any Municipal Bonding Authority; *provided, however*, that the terms and conditions of such modified Loan Documents

will be materially equal to the Loan Documents as they apply to Borrower and Guarantor. Borrower agrees to comply with all above noted requests by Lender within ten (10) days from date of mailing said requests. Borrower agrees to assume all costs including, by way of illustration and not limitation, actual expenses, reasonable legal fees, and marketing losses for failing to comply with correction requests in above noted time period.

16.    **DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

16.1.    **Advance.** The word "Advance" means the disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

16.2.    **Agreement.** The word "Agreement" means this Business Loan and Security Agreement, as it may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

16.3.    **Borrower.** The word "Borrower" means Pacific Water Technology, LLC and includes all co-signers and co-makers signing the Note and its and their respective successors and assigns.

16.4.    **Collateral.** The word "Collateral" means the System(s) financed by the Loan and any other property and assets granted as collateral security for the Loan, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, assignment, pledge, chattel mortgage, collateral chattel mortgage, conditional sale, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

16.5.    **Deposit Account.** The words "Deposit Account" mean the account opened with Lender and maintained with Lender in accordance with the terms of this Agreement throughout the term of the Loan.

16.6.    **Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

16.7.    **GAAP.** The word "GAAP" means generally accepted accounting principles.

16.8.    **Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

16.9.    **Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

16.10.    **Indebtedness.** The word "Indebtedness" means the Loan and any other indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

16.11.    **Lender.** The word "Lender" means First Federal Savings & Loan Association of Port Angeles, its successors, particpants and assigns.

16.12.    **Loan.** The word "Loan" means the loan in the principal amount of $752,250.00 made by Lender to Borrower pursuant to the terms of this Agreement, the Note, and the other Related Documents, as they may be amended and restated from time to time.

16.13.    **Note.** The word "Note" means the Note of even date herewith executed by Borrower in the principal amount of $750,250.00 together with all renewals, extensions, amendments, or modifications thereof.

---

16.14.    **Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; and (3) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing.

16.15.    **Related Documents.** The words "Related Documents" mean all promissory notes, guaranties, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

16.16.    **Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, assignment, pledge, chattel mortgage, collateral chattel mortgage, conditional sale, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

16.17.    **Service and Management Agreement.** The words "Service and Management Agreement" mean the agreement between Borrower and Water Station Management, LLC, an affiliate thereof, or its or their respective successors or assigns, relating to the servicing, management, and operation of the System(s) financed by the Loan.

16.18.    **System or Systems.** The words "System" or "Systems" mean the water dispensing systems described as part of the "Collateral" hereunder and financed by the Loan evidenced by this Agreement.

*[Signature page follows.]*

DocuSign Envelope ID: 39E1897B-4C74-47E1-8C2B-FC779C659479

**ORAL AGREEMENTS. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON STATE LAW**.

Executed as of the date first set forth above.

**BORROWER:**                                                           **LENDER:**

Pacific Water Technology, LLC                                 FIRST FED BANK PORT ANGELES,
a Washington Limited Liability Company              a Washington chartered stock savings bank

By: _____         By: _____
    Name: Kwansoo Lee                                               Authorized Representative
    Its: Member/Manager

# EXHIBIT A

## Collateral Description

Water Station alkaline vending machine model no. WST700, serial number 111307
Water Station alkaline vending machine model no. WST700, serial number 111308
Water Station alkaline vending machine model no. WST700, serial number 111309
Water Station alkaline vending machine model no. WST700, serial number 111310
Water Station alkaline vending machine model no. WST700, serial number 111311
Water Station alkaline vending machine model no. WST700, serial number 111312
Water Station alkaline vending machine model no. WST700, serial number 111313
Water Station alkaline vending machine model no. WST700, serial number 111314
Water Station alkaline vending machine model no. WST700, serial number 111315
Water Station alkaline vending machine model no. WST700, serial number 111316
Water Station alkaline vending machine model no. WST700, serial number 111317
Water Station alkaline vending machine model no. WST700, serial number 111318
Water Station alkaline vending machine model no. WST700, serial number 111319
Water Station alkaline vending machine model no. WST700, serial number 111320
Water Station alkaline vending machine model no. WST700, serial number 111321
Water Station alkaline vending machine model no. WST700, serial number 111322
Water Station alkaline vending machine model no. WST700, serial number 111323
Water Station alkaline vending machine model no. WST700, serial number 111324
Water Station alkaline vending machine model no. WST700, serial number 111325
Water Station alkaline vending machine model no. WST700, serial number 111326
Water Station alkaline vending machine model no. WST700, serial number 111551
Water Station alkaline vending machine model no. WST700, serial number 111552
Water Station alkaline vending machine model no. WST700, serial number 111553
Water Station alkaline vending machine model no. WST700, serial number 111554
Water Station alkaline vending machine model no. WST700, serial number 111555
Water Station alkaline vending machine model no. WST700, serial number 111556
Water Station alkaline vending machine model no. WST700, serial number 111557
Water Station alkaline vending machine model no. WST700, serial number 111558
Water Station alkaline vending machine model no. WST700, serial number 111559
Water Station alkaline vending machine model no. WST700, serial number 111560
Water Station alkaline vending machine model no. WST700, serial number 111561
Water Station alkaline vending machine model no. WST700, serial number 111562
Water Station alkaline vending machine model no. WST700, serial number 111571
Water Station alkaline vending machine model no. WST700, serial number 112063
Water Station alkaline vending machine model no. WST700, serial number 112064
Water Station alkaline vending machine model no. WST700, serial number 112065
Water Station alkaline vending machine model no. WST700, serial number 112066
Water Station alkaline vending machine model no. WST700, serial number 112067
Water Station alkaline vending machine model no. WST700, serial number 112068
Water Station alkaline vending machine model no. WST700, serial number 112069
Water Station alkaline vending machine model no. WST700, serial number 112070
Water Station alkaline vending machine model no. WST700, serial number 112071
Water Station alkaline vending machine model no. WST700, serial number 112072
Water Station alkaline vending machine model no. WST700, serial number 112221
Water Station alkaline vending machine model no. WST700, serial number 112222
Water Station alkaline vending machine model no. WST700, serial number 112223
Water Station alkaline vending machine model no. WST700, serial number 112224
Water Station alkaline vending machine model no. WST700, serial number 112225

DocuSign Envelope ID: 39E1897B-4C74-47E1-8C2B-FC779C659479

Water Station alkaline vending machine model no. WST700, serial number 112226
Water Station alkaline vending machine model no. WST700, serial number 112227
Water Station alkaline vending machine model no. WST700, serial number 112228
Water Station alkaline vending machine model no. WST700, serial number 112229
Water Station alkaline vending machine model no. WST700, serial number 112230
Water Station alkaline vending machine model no. WST700, serial number 112386
Water Station alkaline vending machine model no. WST700, serial number 112387
Water Station alkaline vending machine model no. WST700, serial number 112388
Water Station alkaline vending machine model no. WST700, serial number 112389
Water Station alkaline vending machine model no. WST700, serial number 112390
Water Station alkaline vending machine model no. WST700, serial number 112391
Water Station alkaline vending machine model no. WST700, serial number 112392
Water Station alkaline vending machine model no. WST700, serial number 112393
Water Station alkaline vending machine model no. WST700, serial number 112394
Water Station alkaline vending machine model no. WST700, serial number 112395
Water Station alkaline vending machine model no. WST700, serial number 112616
Water Station alkaline vending machine model no. WST700, serial number 112617
Water Station alkaline vending machine model no. WST700, serial number 112618
Water Station alkaline vending machine model no. WST700, serial number 112619
Water Station alkaline vending machine model no. WST700, serial number 112620
Water Station alkaline vending machine model no. WST700, serial number 112621
Water Station alkaline vending machine model no. WST700, serial number 112622
Water Station alkaline vending machine model no. WST700, serial number 112623
Water Station alkaline vending machine model no. WST700, serial number 112624
Water Station alkaline vending machine model no. WST700, serial number 112625
Water Station alkaline vending machine model no. WST700, serial number 112841
Water Station alkaline vending machine model no. WST700, serial number 112842
Water Station alkaline vending machine model no. WST700, serial number 112843
Water Station alkaline vending machine model no. WST700, serial number 112844
Water Station alkaline vending machine model no. WST700, serial number 112845
Water Station alkaline vending machine model no. WST700, serial number 112846
Water Station alkaline vending machine model no. WST700, serial number 112847
Water Station alkaline vending machine model no. WST700, serial number 112848
Water Station alkaline vending machine model no. WST700, serial number 112849
Water Station alkaline vending machine model no. WST700, serial number 112850
Water Station alkaline vending machine model no. WST700, serial number 113408
Water Station alkaline vending machine model no. WST700, serial number 113409
Water Station alkaline vending machine model no. WST700, serial number 113410
Water Station alkaline vending machine model no. WST700, serial number 113411
Water Station alkaline vending machine model no. WST700, serial number 113412
Water Station alkaline vending machine model no. WST700, serial number 113413
Water Station alkaline vending machine model no. WST700, serial number 113414
Water Station alkaline vending machine model no. WST700, serial number 113415
Water Station alkaline vending machine model no. WST700, serial number 113416
Water Station alkaline vending machine model no. WST700, serial number 113417
Water Station alkaline vending machine model no. WST700, serial number 113561
Water Station alkaline vending machine model no. WST700, serial number 113562
Water Station alkaline vending machine model no. WST700, serial number 113563
Water Station alkaline vending machine model no. WST700, serial number 113564
Water Station alkaline vending machine model no. WST700, serial number 117852
Water Station alkaline vending machine model no. WST700, serial number 117853
Water Station alkaline vending machine model no. WST700, serial number 117854
Water Station alkaline vending machine model no. WST700, serial number 117855

DocuSign Envelope ID: 39E1897B-4C74-47E1-8C2B-FC779C659479

Water Station alkaline vending machine model no. WST700, serial number 117856
Water Station alkaline vending machine model no. WST700, serial number 117857
Water Station alkaline vending machine model no. WST700, serial number 117858
Water Station alkaline vending machine model no. WST700, serial number 117859
Water Station alkaline vending machine model no. WST700, serial number 117860
Water Station alkaline vending machine model no. WST700, serial number 117861
Water Station alkaline vending machine model no. WST700, serial number 117862
Water Station alkaline vending machine model no. WST700, serial number 117863
Water Station alkaline vending machine model no. WST700, serial number 117864
Water Station alkaline vending machine model no. WST700, serial number 117865
Water Station alkaline vending machine model no. WST700, serial number 117866
Water Station alkaline vending machine model no. WST700, serial number 117867
Water Station alkaline vending machine model no. WST700, serial number 117868
Water Station alkaline vending machine model no. WST700, serial number 117869
Water Station alkaline vending machine model no. WST700, serial number 117870
Water Station alkaline vending machine model no. WST700, serial number 117871
Water Station alkaline vending machine model no. WST700, serial number 117872

# EXHIBIT B

DocuSign Envelope ID: 88C1EF21-E45D-43F3-86E8-1D91E21EE398

# PROMISSORY NOTE



| | |
|---|---|
| **Date:** | December 3, 2021 |
| **Borrower:** | Pacific Water Technology, LLC |
| | 20709 Mountain Hwy E, Suite 101 |
| | Spanaway, WA 98387 |
| | Attn: Kwansoo Lee |
| **Lender:** | FIRST FED BANK |
| | PO Box 351 |
| | Port Angeles, WA 98362 |
| **Loan Amount:** | $750,250.00 |
| **Interest Rate:** | Fixed rate of 5-Year FHLB Rate plus Credit Spread, adjusted once on the Adjustment Date, but not less than a Floor Rate of five and ninety-five hundredths (5.95%) per annum. |
| **Maturity Date:** | December 3, 2031 |

FOR VALUE RECEIVED, Pacific Water Technology, LLC a Washington Limited Liability Company (**"Borrower"**), promises to pay to the order of FIRST FEDERAL BANK OF PORT ANGELES, a Washington chartered stock savings bank, or its successor or assignee (**"Lender"**), at the address set forth above or such other place as Lender may from time to time designate in writing, the sum of Seven Hundred Fifty-Two Thousand Two Hundred Fifty Dollars AND 00/100THS U.S. DOLLARS (U.S. $752,250.00) or so much thereof as may from time to time be disbursed hereunder, in lawful money of the United States of America, together with interest on the unpaid principal balance from time to time outstanding hereunder from the date of disbursement under this Promissory Note (this **"Note"**) until paid at the rate set forth below.  This Note is non-revolving.

1. **Loan and Loan Documents.**  This Note evidences a loan in the amount set forth above (the **"Loan"**) being made contemporaneously herewith from Lender to Borrower.  This Note is made pursuant to and is secured by that certain Business Loan and Security Agreement executed contemporaneously herewith between Borrower and Lender (the **"Loan Agreement"**).  The terms (including meanings given to defined terms) and conditions of the Loan Agreement are hereby adopted and incorporated herein to the extent not inconsistent herewith.  Among other things, the Loan Agreement grants Lender a first-lien position security interest in the Collateral described and defined therein.  The Loan Agreement, this Note, and any other written instruments evidencing, securing, or otherwise governing the Loan are referred to collectively as the **"Loan Documents"**.  Borrower hereby agrees to perform and comply with all of the agreements, terms, and conditions of all of the Loan Documents.

2. **Definitions.**

"**5-Year FHLB Rate**" means the interest rate designated by the Federal Home Loan Bank of Des Moines as the regular advance rate for fixed-rate advances of five (5) years as posted on the internet at FHLBDM.com under "Advances" and available to Lender as of the last Business Day immediately preceding the relevant Adjustment Date.

**"Adjustment Date"** means the date that is five (5) years after the date of this Note.

**"Business Day"** means any day on which the applicable Index is published other than Saturday, Sunday, or a day on which national banks are authorized or required by law to be closed in the city where Lender's office, as identified above, is located.

**"Credit Spread"** means three and one-half percent (3.50%).

**"Floor Rate"** means a per annum fixed rate equal to five and ninety-five hundredths (5.95%).

    **3.**    **Interest Rate.**  Subject to Section 7 below (regarding the Default Rate), the outstanding principal balance of this Note shall bear interest at a per annum fixed rate equal to the 5-Year FHLB Rate as of the date of this Note *plus* the Credit Spread. Beginning on the Adjustment Date, and continuing through the Maturity Date, the outstanding principal balance of this Note shall bear interest at a per annum rate equal to the 5-Year FHLB Rate plus the Credit Spread. Notwithstanding the foregoing, in no event shall the interest rate applicable to the Loan be less than the Floor Rate.

    **4.**    **Monthly Payments of Principal and Interest.**  Beginning on January 5, 2022 and continuing the same day of each month thereafter until the Maturity Date, Borrower shall make monthly payments of principal and interest, in equal monthly installments calculated by Lender based on a Ten (10) year amortization period (the **"Amortization Period"**) and such methodology as Lender may deem appropriate, in its sole discretion, with such monthly payments to be recalculated and adjusted on the first of each month following an Adjustment Date at the then applicable interest rate to re-amortize such payment over the remaining portion of the Amortization Period.

    **5.**    **Maturity Date.**  The entire principal balance, all accrued interest, and any other advances made or expenses incurred by Lender that are payable or reimbursable by Borrower hereunder, or under any of the other Loan Documents, shall become immediately due and payable on December 3, 2031 (the **"Maturity Date"**).

    **6.**    **Payments - General**.

        **6.1.**    **Application of Payments.**  Unless otherwise required by Lender, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower agrees, however, that upon the occurrence of an Event of Default and until such has been cured, Lender shall have the right, in its sole discretion, to modify the order in which payments are applied, and to apply payments to indebtedness owing under the Loan in a different order than that indicated above.

        **6.2**    **Payments from Deposit Account.**  All monthly payments must be made through the Borrower's Deposit Account. Lender is hereby authorized to pay any principal, interest, or other amount due under the Loan Documents when and as the same shall become due by automatically debiting funds on deposit in the Deposit Account.

        **6.3**    **Computation of Interest**. All interest calculated under this Note shall be computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. Any payment not received by 5:00 p.m. Pacific Time will be treated as having been received by Lender on the next day, and interest shall continue to accrue until the next day.

        **6.4**    **Late Charge**. In the event that any installment payment of principal or interest due hereunder is not paid within ten (10) days of the date it is due, Borrower shall pay, in addition to the delinquent payment, a late charge of five percent (5.0%) or $5.00, whichever is greater, of the amount overdue in order to defray the expense incident to handling such delinquent payment.

    **7.**    **Default Rate**. Following an uncured Event of Default in the payment of any installment of principal or interest when due hereunder, or an uncured Event of Default in the observance or performance of any other obligation hereunder or under any of the other Loan Documents, interest shall accrue hereunder from the date of such uncured Event of Default at an annual interest rate equal to eighteen percent (18%) per annum (the **"Default Rate"**). After the entire principal amount of the Loan shall become due and payable, whether by acceleration, at maturity, or otherwise, this Note shall bear interest at the Default Rate.

    **8.**    **Prepayment.**  Borrower may prepay Borrower's obligations under this Note in full or in part at any time or from time to time; *provided, however*, that except as set forth below, the Loan may be prepaid only upon payment of the applicable prepayment premium provided for below.

        **8.1**    **Prepayment Premium.**  Prepayments of all or any portion of the principal balance of the Loan, including any involuntary prepayments as described below (excluding, however, prepayments permitted under Section 8.5 below), shall be subject to a prepayment premium during each of the following periods (the "**Prepayment Periods**") of the term of the Loan commencing at closing of the Loan:

---

DocuSign Envelope ID: 88C1EF21-E45D-43F3-86E8-1D91E21EE398

| Prepayment Periods | Prepayment Premium Calculation As Percentage of Principal Prepaid |
|---|---|
| Through the date that immediately precedes the one-year anniversary of the date of this Note: | Three Percent (3.0%) |
| From the one-year anniversary of the date of this Note through the date that immediately precedes the two-year anniversary of the date of this Note: | Two Percent (2.0%) |
| From the two-year anniversary of the date of this Note through the date that immediately precedes the three-year anniversary of the date of this Note: | One Percent (1.00%) |
| Remaining Term of the Loan: | None |

**8.2     Involuntary Prepayment.**  Involuntary prepayment shall include, but is not limited to, prepayment in the event of a default or in connection with acceleration or foreclosure, or any prepayment pursuant to or in connection with any sale under court order or power of sale, whether in judicial or non-judicial foreclosure, bankruptcy, or other insolvency proceeding, any deed in lieu of foreclosure or sale, or any other method or proceeding whatsoever, excepting only prepayment through application of insurance or condemnation proceeds, to which no prepayment premium shall be applicable.  Any prepayment premium owing to Lender shall be due from Borrower in connection with any satisfaction allowed under applicable law relating to any foreclosure proceeding, and shall be due from any other lien holder or person who tenders payment of the amount owed by Borrower under applicable law, including principles of equitable subrogation.  Lender shall be entitled to include in its credit bid at any foreclosure any applicable prepayment premium.  Furthermore, Lender shall not be required to accept any such prepayment, whether from Borrower or any other party paying the Loan, if it does not include the prepayment premium, if applicable.

**8.3     Effect of Prepayment.**  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, they will reduce the principal balance due and may result in Borrower's making fewer payments.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  First Federal Savings & Loan Association of Port Angeles, ATTN: Loan Servicing, 105 W 8th St/P.O. Box 351, Port Angeles, WA 98362-0055.**

**8.4     Acknowledgment of Right as Bargained-For Compensation.**  BORROWER ACKNOWLEDGES LENDER'S RIGHT TO RECEIVE A PREPAYMENT PREMIUM IN ACCORDANCE WITH THE TERMS HEREOF AND HEREBY WAIVES ANY RIGHT OR PRIVILEGE TO PREPAY ALL OR ANY PORTION OF THIS NOTE EXCEPT AS SPECIFICALLY PROVIDED HEREIN.  BORROWER FURTHER ACKNOWLEDGES THAT THE PREPAYMENT PREMIUM, AS DUE UNDER THE CIRCUMSTANCES AND AS CALCULATED IN THE MANNER DESCRIBED ABOVE, REPRESENTS THE REASONABLE ESTIMATE OF LENDER AND BORROWER OF A FAIR AVERAGE COMPENSATION FOR THE LOSS THAT LENDER MAY SUSTAIN DUE TO THE PAYMENT OF ANY OF THE INDEBTEDNESS EVIDENCED BY THIS NOTE PRIOR TO ITS DUE DATE, DUE TO, AMONG OTHER REASONS, THE COSTS AND OVERHEAD OF LENDER IN INVESTIGATING AND PLACING THIS LOAN AND IN INVESTIGATING A SUBSTITUTE INVESTMENT OF FUNDS.  SUCH PREPAYMENT PREMIUM SHALL BE PAID WITHOUT PREJUDICE TO THE RIGHT OF LENDER TO COLLECT ANY OTHER AMOUNTS REQUIRED TO BE PAID HEREUNDER OR UNDER ANY OTHER DOCUMENTS EVIDENCING OR SECURING THE LOAN.  BORROWER CONFIRMS THE ACKNOWLEDGMENTS EXPRESSED HEREIN AND DECLARES THAT LENDER'S AGREEMENT TO MAKE THE LOAN IN ACCORDANCE WITH THE LOAN DOCUMENTS CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER, FOR THIS WAIVER AND AGREEMENT.

**8.5     Permitted Prepayment.**  Notwithstanding the foregoing, Borrower may prepay up to twenty percent (20.0%) of the principal balance of the Loan during each of the Prepayment Periods set forth in Section 8.1 without penalty or premium (including the prepayment premium required under Section 8.1). If and to the extent any prepayments exceed twenty percent (20.0%) of the principal balance of the Loan during any Prepayment Period, Borrower shall pay the corresponding prepayment premium set forth in Section 8.1 together with such prepayment(s).

**9.** **Business Purpose; Maximum Interest and Fees.** Borrower agrees to the applicable interest rate, plus any other charges to Borrower or benefit received by Lender under the Loan Documents that may be interpreted to be in the nature of interest. Borrower represents and warrants to Lender that the proceeds of this Note shall be used exclusively for commercial, business, or investment purposes, and that none of the proceeds of this Note shall be used by Borrower for personal, family, or household purposes. Notwithstanding any other provision of the Loan Documents, the interest, fees and charges under the Loan Documents shall not exceed the maximum amounts permitted by any applicable law, and should Lender ever receive as interest an amount that would exceed permissible rates, such amount shall be applied to the reduction of the unpaid principal balance and not to the payment of interest. This provision shall supersede every other provision of all the Loan Documents.

**10.** **Acceleration.** Upon the occurrence of an Event of Default resulting from Borrower's failure to pay any amount payable hereunder as and when due or upon the occurrence of any other Event of Default under this Note or under any of the other Loan Documents, Lender may declare, at its sole option and without notice to any party, the entire indebtedness evidenced hereby immediately due and payable in full. Failure to exercise this option or any other right Lender may have shall not constitute a waiver of the right to exercise such option or any other right in the event of any subsequent Event of Default.

**11.** **Costs and Fees of Collection; Interest on Judgments.** Borrower and every other person or entity at any time liable for the payment of the indebtedness evidenced hereby shall also be liable for all costs, expenses, and fees incurred by Lender in collecting any amounts owing hereunder, including, but not limited to, reasonable attorneys' fees. Any judgment recovered by Lender shall bear interest at the Default Rate.

**12.** **Waiver of Presentment.** Borrower and every other person or entity at any time liable for the payment of the indebtedness evidenced hereby each waive diligence, demand, presentment for payment, notice of protest, and notice of nonpayment of this Note. Every such person or entity further consents to any extension of the time of payment hereof or other modification of the terms of payment of this Note, the release of all or any part of the security for this Note, or the release of any party liable for the payment of the indebtedness evidenced hereby at any time and from time to time for any reason whatsoever. Any such extension or release may be made without notice to any of such persons or entities and without discharging their liability.

**13.** **Time is of the Essence.** Time is of the essence of this Note and the performance of each of the agreements and provisions contained herein.

**14.** **Joint and Several Liability.** The liability hereunder of multiple parties identified herein as Borrower shall be joint and several.

**15.** **Applicable Law.** This Note shall be construed in accordance with the laws of the State of Washington, without regard to that state's choice of law rules. Borrower hereby consents to the jurisdiction of the courts of King County, the State of Washington.

**16.** **Successors and Assigns.** Borrower may not assign any of its rights or obligations under this Note without the prior written consent of Lender. Subject to the preceding sentence, this Note shall be binding upon the respective heirs, legal representatives, successors, and assigns of Borrower and shall inure to the benefit of Lender and its successors and assigns, including, without limitation, each successive holder of this Note and any other lenders now or hereafter participating in the Loan.

**17.** **Recourse.** BORROWER ACKNOWLEDGES LIABILITY FOR PAYMENT OF ALL AMOUNTS OWING UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS AND AGREES THAT LENDER DOES NOT HAVE TO FORECLOSE ITS SECURITY INTEREST GRANTED BY THE LOAN AGREEMENT OR ANY OTHER COLLATERAL BEFORE DEMANDING FULL PAYMENT FROM BORROWER.

**18.** **Waiver of Trial by Jury.** Borrower hereby waives, to the fullest extent permitted by applicable law, the right to a trial by jury in any action or proceeding based upon, or related to, the subject matter of this Note. This waiver is knowingly, intentionally, and voluntarily made by Borrower, and Borrower acknowledges that no person acting on behalf of Lender has made any representations of fact to induce this waiver of trial by jury or in any way to modify or nullify its effect. Borrower further acknowledges that Borrower has been represented (or has had the opportunity to be represented) in the signing of this Note and in the making of this waiver by independent legal counsel, selected of Borrower's own free will, and that Borrower has had the opportunity to discuss this waiver with counsel.

**[Remainder of Page Intentionally Left Blank; Signature Appears on Following Page]**

DocuSign Envelope ID: 88C1EF21-E45D-43F3-86E8-1D91E21EE398

19.     **No Oral Agreements.**

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

DATED as of the date set forth above.

**BORROWER**:

Pacific Water Technology, LLC
a Washington Limited Liability Company

By: _____
Name: Kwansoo Lee
Its: Member/Manager

# EXHIBIT C

Exhibit C to Complaint
Page 30

DocuSign Envelope ID: 39E1897B-4C74-47E1-8C2B-FC779C659479



## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

This UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE (this *"Guaranty"*), is made as of December 3, 2021 by Kwansoo Lee (*"Guarantor"*), for the benefit of FIRST FED BANK OF PORT ANGELES, a Washington chartered stock savings bank (together with its successors, participants and assigns, "*Lender*").

### RECITALS

**A.** Guarantor has requested that Lender make a term loan to Pacific Water Technology, a Washington Limited Liability Company (*"Borrower"*) in the principal amount of Seven Hundred Fifty-Two Thousand Two Hundred Fifty Dollars AND 00/100THS U.S. DOLLARS (U.S. $752,250.00) (the "*Loan*").

**B.** The Loan is evidenced by a Promissory Note of even date herewith (the "*Note*"), governed by a Business Loan and Security Agreement between Borrower and Lender of even date herewith (the "*Loan Agreement*") which, among other things, grants Lender a first-lien security interest in the collateral described and defined therein (as defined below, the "*Collateral*").

**C.** Lender's agreement to make the Loan is conditioned on Guarantor's execution of this Guaranty, and Lender would not make the Loan to Borrower without the agreements of Guarantor set forth herein. Guarantor will receive direct and tangible financial benefits from the Loan.

**D.** Capitalized terms used but not defined herein shall have the meanings given to such terms in the Loan Agreement.

### AGREEMENTS

NOW, THEREFORE, intending to be legally bound, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to induce Lender to enter into the Loan, Guarantor hereby agrees as follows:

**1.** **Unconditional Guaranty of Payment and Performance.** Guarantor unconditionally, absolutely, and irrevocably guarantees the following "*Guaranteed Obligations*":

**1.1** the due and punctual payment of all amounts (collectively herein, the *"Indebtedness"*) payable by Borrower under the Loan Agreement, the Note, and other agreements and instruments that evidence, secure, or otherwise govern the Loan, but excluding the Indemnity Agreement (collectively, the *"Loan Documents"*); and

**1.2** the prompt payment of all obligations of Borrower to Lender arising from any interest rate hedging program, including, without limitation, any interest rate swap, cap, or such other interest rate protection product, whether now existing or entered into hereafter (each an "*Interest Rate Protection Product*"), including, without limitation, any Cash Settlement Amount or any payments on Early Termination payable by Borrower under any Swap Transaction or Confirmation; *provided, however*, the term "Interest Rate Protection Product" shall not include any interest rate swap, cap, or other interest rate protection product if, at the time Borrower enters into any such product, it is unlawful for Guarantor to guarantee the obligations of Borrower thereunder. Capitalized terms used in this subsection 1.2 but not otherwise defined in this Guaranty or in the Loan Agreement are defined in the *2006 ISDA Definitions* published by the International Swap and Derivatives Association, Inc.; and

**1.3** the full, complete and punctual observance, performance and satisfaction of all the obligations, duties, covenants and agreements of Borrower under the Loan Agreement and the other Loan Documents.

**2.** **Guarantor's Obligations are Absolute.** This is an absolute, present, and continuing guaranty of payment and performance and not of collection. This Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any Collateral (defined below) through foreclosure or sale proceedings, as the case may be, under the Loan Agreement or otherwise, or resorting to any other guaranties, and Guarantor hereby waives any right to require Lender to join Borrower or any other Guarantor in any action brought hereunder or to commence any action against or obtain any judgment against Borrower or to pursue any other remedy or enforce any other right. Guarantor further agrees that nothing contained herein or otherwise shall prevent Lender

from pursuing concurrently or successively all rights and remedies available to Lender at law or in equity or under any of the Loan Documents. Lender's exercise of any of its rights or remedies shall not constitute a discharge of Guarantor's obligations hereunder, it being the purpose and intent of Guarantor that the obligations of Guarantor hereunder shall be absolute, independent, and unconditional under all circumstances whatsoever. None of Guarantor's obligations under this Guaranty nor any of Lender's rights or remedies shall be impaired, modified, changed, or released in any manner whatsoever by any impairment, modification, change, release, or limitation of Borrower's liability under any of the Loan Documents or by reason of the insolvency, bankruptcy, dissolution, liquidation, or reorganization of Borrower or any Guarantor.

3.      **Rights of Lender.**

3.1      Guarantor agrees that Lender may deal exclusively with Borrower in all matters relating to the Loan without notice of any kind to or the approval of Guarantor. Specifically, Lender is not required to (a) notify Guarantor of Lender's acceptance of this Guaranty; (b) notify Guarantor when Lender advances Loan proceeds, extends credit to Borrower, or pays any obligations of Borrower; (c) notify Guarantor of any default under the Loan Documents; or (d) make presentment and demand for payment, protest, or notice of demand, protest, dishonor, and nonpayment. It is intended that Guarantor shall remain fully liable regardless of any act or omission by Lender that might otherwise directly or indirectly result, by operation of law or otherwise, in the discharge or release in whole or in part of Borrower, any other guarantor, or any other person, or the discharge, release, or impairment of any collateral now or hereafter held as security for any of the obligations under the Loan Documents (collectively herein, the "*Collateral*").

3.2      Lender shall have the right to set off the unpaid balance of the Guaranteed Obligations against any indebtedness owing to Guarantor by Lender or by any Lender Affiliate, including, without limitation, any obligation under a repurchase agreement or any funds held at any time by Lender or any Lender Affiliate, whether collected or in the process of collection, or in any time or demand deposit account maintained by Guarantor at, or evidenced by any certificate of deposit issued by, Lender or any Lender Affiliate. Guarantor agrees, to the fullest extent it may effectively do so under applicable law, that any holder of a participation in the Note may exercise rights of set-off or counterclaim and other rights with respect to such participation as fully as if such holder of a participation were a direct creditor of Guarantor pursuant to this Agreement in the amount of such participation.

4.      **Modifications and Actions by Lender.** Without limiting the generality of the foregoing, Guarantor agrees that Lender may do, or fail to do, any of the following one or more times, without notice to or the approval of Guarantor, without diminishing, altering, or otherwise affecting the liability of Guarantor hereunder, and even though Borrower's financial condition may have deteriorated or Guarantor may object: (a) Lender may renew, extend, or otherwise change the time for payment of the obligations of Borrower to Lender; (b) Lender may increase the amount of the Loan; (c) Lender may modify any other terms of the Loan; (d) Lender may release, surrender, substitute, or exchange any of the Collateral, or take and hold additional or other security for the payment of this Guaranty or any other indebtedness guaranteed, and exchange, enforce, waive, or release any such security; (e) Lender may release Borrower, any Guarantor, or any other guarantor from obligations under the Loan or any guaranty thereof; (f) Lender is not required to marshal assets and Lender may take a deed in lieu of foreclosure or foreclose or realize upon such security and direct the amount or manner of sale thereof as Lender in its discretion may determine; (g) Lender may apply the Collateral to the repayment of any amounts owing to Lender under the Loan Documents in any order Lender may determine in its discretion; (h) Lender may forbear from pursuing Borrower, any Guarantor, or any other guarantor or any other person, or forbear from foreclosing or otherwise realizing upon any of the Collateral; (i) Lender may impair or fail to perfect a security interest in any of the Collateral; (j) Lender may take actions that have the effect of diminishing Guarantor's subrogation rights; and (k) Lender may take any other actions with respect to the terms of or security for the Guaranteed Obligations. Notwithstanding any such action by Lender, Guarantor's obligations hereunder shall remain in full force and effect.

5.      **Guarantor Waivers.**

5.1      **Waiver of Suretyship Defenses.** Guarantor hereby waives any defenses based on the action or inaction of Lender that might otherwise be deemed a legal or equitable discharge of a surety, including, without limitation, any defense based on any of the following: (a) the lack of diligence or any delay in enforcing, or any waiver of or failure to enforce, any right or remedy under the Loan Documents; (b) the failure or invalidity of, or any defect in, the Loan Documents; (c) any disability or other defense of Borrower, any Guarantor, any other guarantor, or any other person; (d) the termination from any cause whatsoever of any of the obligations under the Loan Documents, except upon full satisfaction of the Guaranteed Obligations; (e) the loss or impairment of any right of subrogation; (f) any modification of any of the terms and conditions of the Loan Documents in any form whatsoever and without notice to Guarantor; or (g) the foreclosure of the Collateral or any portion thereof, it being intended that this Guaranty shall

survive the realization upon any of the Collateral, including, but not limited to, any nonjudicial foreclosure action and any deed in lieu of foreclosure, to the extent permitted under applicable law.

**5.2    Waiver of Right of Reimbursement.** Unless and until the Guaranteed Obligations have been fully satisfied, Guarantor hereby waives any right of reimbursement, contribution, recourse, or any other right or remedy of Guarantor against Borrower, any Guarantor, any other guarantor or any other person to recover amounts that Guarantor is obligated to pay under this Guaranty.

**5.3    Waiver of Right of Subrogation.** Unless and until the Guaranteed Obligations have been fully satisfied, Guarantor hereby waives any right of subrogation, any right to enforce any remedy Lender may have against Borrower, any Guarantor, any other guarantor, or any other person, and any benefit of, and the right to participate in, any of the Collateral.

**6.    Subordination of Debt.** Any debt of Borrower now or hereafter held by any Guarantor is hereby subordinated to the Indebtedness. Guarantor shall not seek, accept, or retain for its own account any payment from Borrower on account of any subordinated debt until the entire Indebtedness has been paid in full.  Any payment of such subordinated indebtedness by Borrower to Guarantor before payment in full of the Indebtedness shall be collected, enforced and received by Guarantor as trustee for Lender and promptly paid to Lender in payment of the Indebtedness.

**7.    Anti-Deficiency and One-Form-Of-Action Rules.**

**7.1**    Guarantor understands that certain statutes, commonly referred to as "anti-deficiency" and "one form of action" rules, may prevent or inhibit a lender, after completing a non-judicial foreclosure or accepting a deed in lieu of foreclosure, from obtaining a deficiency judgment against a borrower or from collecting the amount of the deficiency from a guarantor, unless such borrower or guarantor has knowingly waived the application of such statutes and the benefits that it would otherwise receive from such statutes.  This curtailment of a lender's rights to recover a deficiency from a guarantor is based in part on the fact that a lender's election of a non-judicial foreclosure or a deed in lieu of foreclosure from among other possible default remedies impairs or eliminates a guarantor's rights of subrogation and reimbursement against the borrower, the collateral, or any other surety for the borrower's obligations.

**7.2**    Guarantor understands that, unless it waives the protection that such rules would ordinarily confer, these "anti-deficiency" and "one form of action" rules might provide a defense to enforcement of this Guaranty if Lender elects to proceed with a non-judicial foreclosure or to accept a deed in lieu of foreclosure.  Nevertheless, as an inducement for Lender to make the Loan, Guarantor hereby knowingly waives, in advance and to the extent permitted under applicable law, all its rights to rely on the anti-deficiency and "one form of action rules" in connection with the impairment of its subrogation rights, as a defense to this Guaranty. Guarantor hereby acknowledges and agrees that Lender may, in its sole discretion, exercise any right or remedy whatsoever that it may have against Borrower or any security held by Lender, including, without limitation, the right to foreclose upon any collateral for the Loan by judicial or non-judicial sale or to take a deed in lieu of foreclosure, without affecting or impairing in any way the liability of Guarantor hereunder (except to the extent that the Guaranteed Obligations have been fully paid and performed), even if such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Guarantor against Borrower or any security for the Loan. Guarantor further waives any statutes that provide "fair value" protection by limiting a deficiency judgment to the difference between the property's fair market value (or foreclosure sale price, if greater) and the amount of the obligation being foreclosed.

**8.    Costs and Reasonable Attorneys' Fees.** Guarantor shall pay all of Lender's expenses incurred in any effort to enforce any terms of this Guaranty, whether or not any suit is filed, including, without limitation, reasonable attorneys' fees and disbursements, foreclosure costs, and title charges.  Such sums shall be immediately due and payable and shall bear interest from the date of disbursement at the Default Rate set forth in the Loan Documents, or the maximum rate that may be collected from Borrower under applicable law, if less.

**9.    Representations and Warranties.** To induce Lender to make the Loan, each Guarantor makes the representations and warranties to Lender set forth in this Section. Guarantor acknowledges that, but for the truth and accuracy of the matters covered by the following representations and warranties, Lender would not have agreed to make the Loan.

**9.1**    All representations and warranties relating to Guarantor set forth in the Loan Agreement are true and correct and made and affirmed by Guarantor as though set forth fully herein.

---

DocuSign Envelope ID: 39E1897B-4C74-47E1-8C2B-FC779C659479

**9.2** All balance sheets, net worth statements, bank and brokerage statements, and other financial data with respect to Guarantor that have been given to Lender by or on behalf of that Guarantor fairly and accurately represent the financial condition of that Guarantor as of the respective dates thereof.

**9.3** This Guaranty creates legal, valid, and binding obligations of Guarantor enforceable in accordance with its terms. The execution, delivery, and performance by Guarantor of this Guaranty does not and will not contravene or conflict with (a) any law, order, rule, regulation, writ, injunction, or decree now in effect of any government authority, or court having jurisdiction over Guarantor; (b) any contractual restriction binding on or affecting Guarantor or Guarantor's property or assets that may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty; (c) the instruments creating any trust holding title to any assets included in Guarantor's financial statements; or (d) the organizational or other documents of Guarantor.

**9.4** Except as disclosed in writing to Lender, there is no action, proceeding, or investigation pending or, to the knowledge of Guarantor, threatened or affecting Guarantor, that may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

**9.5** Guarantor is not in default under any agreements that may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

**9.6** Guarantor (a) has a financial interest in Borrower and the financial benefits to Guarantor from the Loan constitute reasonably equivalent value for the execution of this Guaranty; (b) is not insolvent and will not become insolvent as a result of this Guaranty; (c) is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which the property of Guarantor constitutes unreasonably small capital and that would leave Guarantor insolvent; (d) does not intend to or believe that it will incur debts that would be beyond Guarantor's ability to pay as such debts mature; (e) has reviewed and approved all of the terms and conditions of the Loan Documents; and (f) has established adequate means of obtaining, and will obtain from Borrower on a continuing basis, all financial and other information regarding Borrower, any other guarantor, and the Loan, without any obligation on the part of Lender to provide any such information.

All the foregoing representations and warranties shall survive so long as any of the Guaranteed Obligations have not been satisfied. Guarantor hereby agrees to indemnify, defend, and hold Lender free and harmless from and against all loss, cost, liability, damage, and expense, including reasonable attorneys' fees and costs that Lender may sustain by reason of the inaccuracy or breach of any of the foregoing representations and warranties.

**10.** **Insolvency.** So long as any of the Guaranteed Obligations are unpaid and this Guaranty remains in effect, Guarantor agrees to file all claims against Borrower in any bankruptcy or other proceeding in which the filing of claims is required by law relating to indebtedness owed by Borrower to Guarantor and to assign to Lender all rights of Guarantor thereunder up to the amount of such unpaid Guaranteed Obligations. In all such cases the Persons authorized to pay such claims shall pay to Lender the full amount thereof to the full extent necessary to pay the Guaranteed Obligations and Guarantor hereby assigns to Lender all of Guarantor's rights to all such payments to which Guarantor would otherwise be entitled. Notwithstanding the foregoing, and except to the extent that any sums owed by Borrower to Lender under the Loan Documents have been fully satisfied thereby, the liability of Guarantor hereunder shall in no way be affected by (a) the release or discharge of Borrower in any creditors', receivership, bankruptcy or other proceedings; or (b) the impairment, limitation or modification of the liability of Borrower or the estate of Borrower in bankruptcy resulting from the operation of any present or future statute, regulation, or from the decision of any court.

**11.** **Preferences, Fraudulent Conveyances, Etc.** If Lender is required to refund, or voluntarily refunds, any payment received from Borrower because such payment is or may be avoided, invalidated, declared fraudulent, set aside or determined to be void or voidable as a preference, fraudulent conveyance, impermissible setoff or a diversion of trust funds under applicable bankruptcy laws or for any similar reason, including, without limitation, any judgment, order or decree of any court or administrative body having jurisdiction over Lender or any of its property, or any settlement or compromise of any claim effected by Lender with Borrower or any other claimant ("***Rescinded Payment***"), then Guarantor's liability to Lender shall continue in full force and effect, or Guarantor's liability to Lender shall be reinstated, as the case may be, with the same effect and to the same extent as if the Rescinded Payment had not been received by Lender, notwithstanding the cancellation or termination of the Note or any of the other Loan Documents. In addition, Guarantor shall pay or reimburse Lender for all expenses (including all reasonable attorneys' fees, court costs and related disbursements) incurred by Lender in the defense of any claim that a payment received by Lender in respect of all or any part of the Guaranteed Obligations must be refunded. The provisions of this Section shall survive the termination of this Guaranty and any satisfaction and discharge of Borrower by virtue of any payment, court order or any federal or state law.

12. **Community Property.** Unless Guarantor's obligations hereunder are otherwise limited by a specific annotation either on the first page of this Guaranty or following Guarantor's signature below, any married person who signs this Guaranty as a Guarantor warrants that it is an obligation incurred on behalf of his or her marital community and agrees that this Guaranty shall bind the marital community.

13. **Lender's Election of Remedies.** This Guaranty may be enforced against any Guarantor without attempting to collect from Borrower, any other Guarantor, or any other guarantor, or any other person, and without attempting to enforce Lender's rights in any of the Collateral. Lender may join Guarantor in any suit relating to the Loan Documents or proceed against any Guarantor in a separate action. Lender shall have the right to exercise its remedies in such order as it determines in its sole discretion.

14. **Joint and Several Liability.** The liability of each Guarantor and any other guarantors of the Loan shall be joint and several.

15. **Guarantor's Ongoing Reporting Obligations.** Each Guarantor acknowledges that it has read or adequately understands the content of the Loan Documents. Each Guarantor agrees to promptly, and in any event within five (5) days after Lender's request, provide Lender with financial statements, certifications of liquidity, and other reports and information as required of Guarantor under the Loan Agreement or as requested by Lender from time to time. Guarantor shall further notify Lender in writing of any change of address, telephone number, fax number, marital status (if an individual), or legal organization (if an entity) within 10 days after such event.

16. **Guarantor Covenants.** Guarantor shall perform all covenants of Guarantor under the Loan Documents, including, without limitation, any financial covenants and reporting requirements applicable to Guarantor under the Loan Agreement.

17. **Notices.** Any notice, demand, request, or other communication that any party hereto may be required or may desire to give hereunder shall be given in writing to the addresses set forth below and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three Business Days after mailing; (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service; or (d) if confirmed e-mail transmission on the day of transmission so long as a copy is sent on the same day by overnight courier to the address set forth below:

|  |  |
|---|---|
| **If to Guarantor:** | Kwansoo Lee<br>2305 43rd Street SE<br>Puyallup, WA 98374<br>Telephone: (253) 448-3213<br>E-mail: oosnawk@gmail.com |
|  | Kwansoo Lee DDS PLLC<br>20709 Mountain Hwy E, Suite 101,<br>Spanaway, WA 98387<br>Telephone: (253) 448-3213<br>E-mail: oosnawk@gmail.com |
| **If to Lender:** | FIRST FED BANK<br>PO Box 351<br>Port Angeles, WA 98362<br>Attn: Kasi O'Leary<br>Email: kasi.oleary@ourfirstfed.com |

Any party may change its address for notices by notifying the others in writing of the change as set forth herein.

18. **Assignment.** The term *"Lender"* shall include any subsequent holder of or participant in any of the Loan Documents. Lender may assign the Loan Documents in whole or in part and grant participations therein, without notice and without affecting Guarantor's liability under this Guaranty. Lender may make available to any proposed assignee or participant all credit and financial data with respect to Guarantor as may be in the possession of Lender. Guarantor agrees to furnish any additional information that any proposed assignee or participant may reasonably request.

19. **Applicable Law**. This Agreement shall be construed in accordance with and governed by the laws of the State of Washington, without regard to that state's choice of law rules. The parties consent to the jurisdiction of the courts of King County, the State of Washington.

20. **Miscellaneous.** Guarantor agrees as follows: (a) this Guaranty shall be binding upon and enforceable against Guarantor's heirs, legal representatives, successors, and assigns; (b) this Guaranty constitutes the entire understanding between Lender and Guarantor regarding the subject matter hereof, and no course of prior dealing between the parties shall be used to supplement or modify the terms of this Guaranty; (c) this Guaranty may be changed, modified or supplemented only through a writing signed by Guarantor and Lender; (d) if any provision of this Guaranty is invalid, illegal, or unenforceable, such provision shall be considered severed from the rest of this Guaranty and the remaining provisions shall continue in full force and effect as if the invalid provision had not been included; and (e) this Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

21. **Waiver of Jury Trial.** GUARANTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS GUARANTY AND THE GUARANTEED OBLIGATIONS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY GUARANTOR, AND GUARANTOR ACKNOWLEDGES THAT NO PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. GUARANTOR FURTHER ACKNOWLEDGES THAT GUARANTOR HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS GUARANTY AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF GUARANTOR'S OWN FREE WILL, AND THAT GUARANTOR HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

22. **Independent Obligation.** Guarantor understands and agrees that (a) the obligations under this Guaranty are separate and independent from Borrower, any Guarantor, any other guarantor, or any other person, and represent an unconditional, absolute, and irrevocable obligation on the part of Guarantor to pay the full amount of the indebtedness when due; (b) Lender is not required to pursue Borrower, any Guarantor, any other guarantor, or any other person, or foreclose or realize on all or any portion of the Collateral, or pursue any other remedies before demanding full payment from Guarantor; and (c) Guarantor shall remain fully liable under this Guaranty even if the Collateral is impaired or discharged or Borrower, any Guarantor, any other guarantor, or any other person is discharged or otherwise relieved of liability under the Loan Documents.

23. **Notice Disclaiming Oral Agreements.**

**RCW 16.36.140 DISCLOSURE: ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**[Remainder of Page Intentionally Left Blank; Signatures Appear on Following Page]**

Dated as of the date set forth above.

**GUARANTOR:**

_Kwansoo Lee_
F38E6C076CD7425...
Name: Kwansoo Lee

_Kwansoo Lee_
F38E6C076CD7425...
Name: Kwansoo Lee DDS PLLC

Pacific Water Technology, LLC
a Washington Limited Liability Company

By: _Kwansoo Lee_
F38E6C076CD7425...
Name: Kwansoo Lee
Its: Member/Manager

*Unconditional Guaranty of Payment and Performance - Water Station Form*    *Signature Page*
ND: 23314.01101 4848-3835-9291v2

Exhibit C to Complaint
Page 37

# EXHIBIT D

# BUSINESS LOAN AND SECURITY AGREEMENT



LOAN NO:  ████ 1558

THIS BUSINESS LOAN AND SECURITY AGREEMENT (**"Agreement"**), dated May 19, 2022 is made by and between Pacific Water Technology, LLC, a Washington limited liability company (**"Borrower"**), whose address is:

> 2305 43rd St SE
> Puyallup, WA 98374-1742
> Attn: Kwansoo Lee

and FIRST FED BANK, a Washington bank corporation, and its successors, participants, and assigns (**"Lender"**), whose address is:

> FIRST FED BANK
> P.O. Box 351
> Port Angeles, WA 98362
> Attn: Kasi O'Leary

**Borrower has applied to Lender for a commercial loan to finance the purchase or refinance of one or more water dispensing Systems (each, a "System") described herein. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement, together with the security interest in the Collateral (defined below) granted by this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole discretion and Lender's application and underwriting criteria, as amended from time to time by Lender; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

        1.      **TERM.** This Agreement shall be effective as of the date first set forth above, and shall continue in full force and effect until such time as the Loan evidenced hereby has been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges.

        2.      **LOAN**. Subject to the terms and conditions of this Loan Agreement, the Note, and all of the other Related Documents (each as defined below), Lender agrees to extend to Borrower a Loan in the principal amount of $1,310,222.21 (the "**Loan**").

        3.      **CONDITIONS PRECEDENT TO LOAN CLOSING.** Lender's obligation to make an Advance of Loan proceeds under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents, including, without limitation, the following conditions:

        3.1.      **Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) this Agreement, (2) the Note; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) the guaranties required hereunder; (6) a Disbursement Request and Authorization; and (7) all Related Documents as Lender may require for the Loan; all fully executed and in form and substance satisfactory to Lender.

        3.2.      **Third-Party Documents**. Borrower shall provide to Lender fully executed copies of the Service and Management Agreement(s) between Borrower and Water Station Management, LLC (the "**Service and Management Agreement**") applicable to the System(s) that are financed by, and that are collateral for, the Loan.

        3.3.      **Deposit Account.** Borrower shall have opened a deposit account with Lender (the "**Deposit Account**") and deposited therein funds in an amount equal to up to thirty percent (30%) of the original invoice price of the System(s)

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

financed by the Loan *plus* the amount necessary to pay two months' principal and interest due under the Loan, each as designated by Lender in its discretion. Borrower acknowledges and agrees that, upon the closing of the Loan hereunder, funds in the Deposit Account will be used to pay the balance of the amount necessary to purchase or refinance the System(s) financed by the Loan.

3.4. **Loan Fee and Other Closing Costs**. Borrower shall have paid to Lender the loan fee and all other closing costs set forth on the Disbursement Request and Authorization executed concurrently herewith.

3.5. **Payment of Any Other Fees and Expenses.** Borrower shall have paid to Lender all other fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

3.6. **Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender, may require.

3.7. **Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

3.8. **No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

4. **GRANT OF SECURITY INTEREST, COLLATERAL DESCRIPTION. In connection with the Loan, Borrower hereby grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.** The word **"Collateral"** as used in this Agreement means all of Borrower's right, title, and interest in and to all of Borrower's property of any nature whatsoever, tangible and intangible, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, and all products, profits, rents, proceeds, and accessions of such property, including, without limitation the personal property described on Exhibit A hereto. In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

4.1. All accessions, attachments, accessories, replacements of and additions to any of the Collateral described herein, whether added now or later.

4.2. All products and produce of any of the property described in this Collateral section.

4.3. All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

4.4. All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

4.5. All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Borrower's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

4.6. All of Borrower's right, title, and interest in and to any and all contracts, agreements, documents, and instruments related to the Collateral, including, without limitation, the Service and Management Agreement(s) related thereto.

5. **REPRESENTATIONS AND WARRANTIES GENERALLY.** Borrower represents and warrants to Lender, as of the date of this Agreement and as of the date of Lender's Advance of Loan proceeds, and at all times any Indebtedness exists:

5.1. **Organization.** Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Washington. Borrower is duly authorized to transact business in all states in which Borrower is doing business, having obtained all necessary filings,

governmental licenses and approvals for each state in which Borrower is doing business. Borrower maintains an office at 2305 43rd St SE, Puyallup WA 98374-1742. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name.

5.2. **Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or the Collateral.

5.3. **Single-Purpose.** Borrower was formed for the sole purpose of owning and operating one or more Systems. Borrower has not, and shall not, engage in any business activity other than owning and operating the System(s).

5.4. **Restricted Persons.** Neither Borrower, nor any person owning any interest in any Borrower, is (or will be) a person with whom Lender is restricted from doing business under regulations of the Office of Foreign Asset Control of the U.S. Department of the Treasury ("**OFAC**") (including, those persons named on OFAC's Specially Designated Nationals and Blocked Persons List) or under any statute, executive order (including, without limitation, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons. In addition, Borrower hereby agrees to provide Lender with any additional information that Lender may deem necessary from time to time to ensure compliance with Lender's OFAC or any other applicable laws requiring Lender to collect customer identification materials, including, without limitation, home addresses, telephone numbers, birthdates, social security and other tax identification numbers, and the like.

6. **BORROWER'S REPRESENTATIONS AND WARRANTIES REGARDING THE COLLATERAL.** With respect to the Collateral, Borrower represents and promises to Lender that:

6.1. **Perfection of Security Interest.** Borrower agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing security agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.**

6.2. **Notices to Lender.** Borrower will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Borrower's name; (2) change in Borrower's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Borrower; (4) change in the authorized signer(s); (5) change in Borrower's principal office address; (6) change in Borrower's state of organization; (7) conversion of Borrower to a new or different type of business entity; or (8) change in any other aspect of Borrower that directly or indirectly relates to any agreements between Borrower and Lender. No change in Borrower's name or state of organization will take effect until after Lender has received notice.

6.3. **Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

6.4. **Location of the Collateral.** Borrower agrees to keep the Collateral at Borrower's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Borrower will deliver to Lender in form satisfactory to Lender a schedule of Collateral locations relating to Borrower's operations, including without limitation the location(s) of all System(s) owned by Borrower.

6.5.     **Removal of the Collateral.** Borrower shall not remove any System from its existing location without Lender's prior written consent. Borrower shall, whenever requested, advise Lender of the exact location of the System(s) owned by Borrower.

6.6.     **Transactions Involving Collateral.** Without Lender's prior written consent, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Borrower shall immediately deliver any such proceeds to Lender.

6.7.     **Title.** Borrower represents and warrants to Lender that Borrower holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

6.8.     **Repairs and Maintenance.** Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

6.9.     **Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

6.10.    **Taxes, Assessments and Liens.** Borrower will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents.

6.11.    **Compliance with Governmental Requirements.** Borrower shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral. Borrower may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

6.12.    **Maintenance of Casualty Insurance.** Borrower shall procure and maintain special form (formerly known as all risk) all risk insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, together with any insurance required by the Service and Management Agreement, each in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Borrower will provide Lender with such loss payable or other endorsements as Lender may require. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

6.13.    **Application of Insurance Proceeds.** Borrower shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $5,000.00, whether or not such casualty or loss is covered by insurance. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Borrower from the proceeds for the reasonable cost of repair or restoration. If Lender does

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Borrower.

6.14.    **Financing Statements.** Borrower authorizes Lender to file one or more UCC financing statements, or alternatively, a copy of this Agreement to perfect Lender's security interest granted hereby. At Lender's request, Borrower additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Collateral. Borrower will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Borrower irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

7.    **AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

7.1.    **Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

7.2.    **Financial Records.** Maintain its books and records in accordance with accounting principles acceptable to Lender, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

7.3.    **Financial Statements.** Furnish Lender with such financial statements and other related information of Borrower or any Guarantor at such frequencies and in such detail as Lender may reasonably request.

7.4.    **Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loan in favor of Lender, executed by each guarantor named below, on Lender's forms, and in the amount and under the conditions set forth in those guaranties.

| Name of Guarantor | Amount |
|---|---|
| Kwansoo Lee | **Unlimited** |
| Kwansoo Lee, DDS, PLLC | **Unlimited** |

7.5.    **Loan Proceeds.** Use all Loan proceeds solely for the purchase or refinance of System(s) that will be owned and operated by Borrower in accordance with the terms of this Agreement.

7.6.    **Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

7.7.    **Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

7.8.    **Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's businesses and operations, and to the use of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

7.9. **Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

7.10. **Single-Purpose Entity.** Engage exclusively in the business of owning and operating the System(s), and in no other business or activity without Lender's prior written consent. Without limiting the foregoing, Borrower will not (i) engage in any business or activity other than the ownership and operation of the System(s), (ii) acquire or own any assets other than the System(s), (iii) own any subsidiary or make any investments in any other entity, (iv) comingle its assets with the assets of any other entity, or (v) make any loans or guaranty the indebtedness of any other person or entity.

7.11. **Service and Management Agreement.** At all times comply with the terms and conditions of the Service and Management Agreement(s) to which Borrower is a party. Furthermore, Borrower shall immediately notify Lender of any breach of or default under the Service and Management Agreement(s), either by Borrower or any other party thereto.

7.12. **Deposit of Funds**. Cause all proceeds of the Service and Management Agreement to be deposited directly into the Deposit Account.

7.13. **Automatic Withdrawal of Funds**. Execute any and all documents requested by Lender to permit, authorize and direct Lender to automatically debit amounts due under the Note or any of the other Loan Documents directly from the Deposit Account without further notice to, or authorization from, Borrower.

8. **RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the Loan to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

9. **BORROWER'S RIGHT TO POSSESSION.** Until default, Borrower may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Borrower shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Borrower shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

10. **LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

11.     **NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

11.1.     **Indebtedness and Liens.** (1) Except for indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of the Collateral or Borrower's assets, or (3) sell with recourse any of Borrower's accounts, except to Lender.

11.2.     **Continuity of Operations.** (1) Engage in any business activities except in accordance with the single-purpose entity covenants set forth herein, (2) cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise, that would result in a breach of the terms of this Agreement or Borrower's inability to make payments under the Loan as and when they become due.

11.3.     **Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

11.4.     **Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

12.     **RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account), including, without limitation, the Deposit Account. This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

13.     **DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

13.1.     **Payment Default.** Borrower fails to make any payment when due under the Loan.

13.2.     **NSF Notification.** Lender, upon initiating any payment from the Deposit Account pursuant to this Agreement, receives an NSF notification or other similar notification that there are insufficient amounts in the Deposit Account to make the required payment.

13.3.     **Other Default.** Borrower fails to comply with any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents.

13.4.     **Default Under Service and Management Agreement.** Borrower fails to comply with the terms of the Service and Management Agreement(s) applicable to the Collateral and Borrower does not remedy such failure within the applicable cure period, if any.

13.5.     **Default in Favor of Third Parties.** Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Loan or perform Borrower's obligations under this Agreement or any Related Document.

13.6.     **False Statements.** Any representation or statement made by Borrower to Lender is false in any material respect.

13.7.     **Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death

of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

13.8. **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan.

13.9. **Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

13.10. **Insecurity.** Lender in good faith believes itself insecure.

14. **RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Washington Uniform Commercial Code. In addition, and without limitation, Lender may exercise any one or more of the following rights and remedies:

14.1. **Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower.

14.2. **Assemble Collateral.** Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Borrower to take possession of and remove the Collateral.

14.3. **Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale, including, without limitation, a private sale to Water Station Management, LLC, or an affiliate thereof, on terms acceptable to Lender it its discretion. In such event, Lender shall endeavor to, but shall have no obligation to, give Borrower reasonable notice of the sale of the Collateral. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

14.4. **Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding or pending foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness.

14.5. **Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral, whether under the Service and Management Agreement or otherwise. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and, regardless of any such transfer, Lender may receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, direct payments be made in accordance with Lender's instructions, endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

14.6. **Assign Service and Management Agreement.** Cause Borrower to execute any and all documents necessary, in Lender's discretion, to assign, transfer, and convey Borrower's interest in the Service and Management Agreement to Lender or its designee and, if Borrower fails to execute any and all such documents within ten (10) days following Lender's demand, exercise the power of attorney granted by this Agreement to cause such assignment, transfer, and conveyance on behalf of Borrower.

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

14.7.    **Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

14.8.    **Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

14.9.    **Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under this Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

15.    **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

15.1.    **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

15.2.    **Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. The foregoing costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

15.3.    **Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington.**

15.4.    **Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of King County, State of Washington.

15.5.    **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, shall constitute a waiver of any of Lender's rights or of any of Borrower's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

15.6.    **Notices.** Subject to applicable law, and except for notice required or allowed by law to be given in another manner, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered in-person, when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the address(es) set forth on the first page of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address.

15.7.    **Participation and Syndication**. Lender may assign its rights and obligations under this Agreement or the Loan, in whole or in part, or sell the Loan or a participation interest in the Loan to any affiliate of Lender or third party. Borrower agrees that Lender may provide any successor, Loan purchaser, or participant in the Loan with copies of any financial

statements, credit reports and other information relating to Borrower, any Guarantor, or the Collateral. Borrower shall provide any successor, purchaser, or participant with such additional information regarding Borrower, any Guarantor, the Collateral, or the Loan as Lender may request.

15.8. **Power of Attorney.** Borrower hereby appoints Lender as Borrower's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement, to demand termination of filings of other secured parties, and to exercise any of the other powers Lender is specifically authorized to exercise on behalf of Borrower hereunder. The power of attorney granted hereby is irrevocable during the term of this Agreement and shall be deemed coupled with an interest. Furthermore, the power of attorney granted hereby may be exercised by Lender in accordance with the terms of this Agreement and the Related Documents without further notice to, or authorization from, Borrower.

15.9. **Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

15.10. **Successors and Assigns.** Borrower may not assign, transfer, or convey all or any portion of its rights hereunder without Lender's prior written consent. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

15.11. **Survival of Representations and Warranties.** All representations, warranties, and agreements made by Borrower in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

15.12. **Time is of the Essence.** Time is of the essence in the performance of this Agreement.

15.13. **Indemnification**. If a claim arises for which Borrower has a duty to defend Lender under this Agreement or any of the other Loan Documents, Lender shall have the right to choose its own legal counsel (at Borrower's expense) and make all decisions relating to its defense, including, without limitation, the litigation strategy and the terms of any settlement.

15.14. **Counterparts.** This Agreement may be signed in one or more counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument.

**15.15. JURY TRIAL WAIVER.** BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY BORROWER, AND BORROWER ACKNOWLEDGES THAT NO PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. BORROWER FURTHER ACKNOWLEDGES THAT BORROWER HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF BORROWER'S OWN FREE WILL, AND THAT BORROWER HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL**.**

15.16. **Errors and Omissions.** Borrower, for and in consideration of the Loan, agrees, if requested by Lender, to fully cooperate in modifying the Loan Documents to adjust for clerical errors, if any, in some or all of the Loan Documents or if deemed necessary or desirable in the reasonable discretion of Lender to enable Lender to sell, convey, seek guaranty or market said Loan to any entity, including but not limited to an investor, Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Government National Mortgage Association, Federal Housing Authority or the Department of Veteran Affairs, or any Municipal Bonding Authority; *provided, however*, that the terms and conditions of such modified Loan Documents

will be materially equal to the Loan Documents as they apply to Borrower and Guarantor. Borrower agrees to comply with all above noted requests by Lender within ten (10) days from date of mailing said requests. Borrower agrees to assume all costs including, by way of illustration and not limitation, actual expenses, reasonable legal fees, and marketing losses for failing to comply with correction requests in above noted time period.

16. **DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

16.1. **Advance.** The word "Advance" means the disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

16.2. **Agreement.** The word "Agreement" means this Business Loan and Security Agreement, as it may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

16.3. **Borrower.** The word "Borrower" means Pacific Water Technology, LLC and includes all co-signers and co-makers signing the Note and its and their respective successors and assigns.

16.4. **Collateral.** The word "Collateral" means the System(s) financed by the Loan and any other property and assets granted as collateral security for the Loan, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, assignment, pledge, chattel mortgage, collateral chattel mortgage, conditional sale, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

16.5. **Deposit Account.** The words "Deposit Account" mean the account opened with Lender and maintained with Lender in accordance with the terms of this Agreement throughout the term of the Loan.

16.6. **Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

16.7. **GAAP.** The word "GAAP" means generally accepted accounting principles.

16.8. **Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

16.9. **Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

16.10. **Indebtedness.** The word "Indebtedness" means the Loan and any other indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

16.11. **Lender.** The word "Lender" means First Fed Bank, its successors, participants and assigns.

16.12. **Loan.** The word "Loan" means the loan in the principal amount of $1,310,222.21 made by Lender to Borrower pursuant to the terms of this Agreement, the Note, and the other Related Documents, as they may be amended and restated from time to time.

16.13. **Note.** The word "Note" means the Note of even date herewith executed by Borrower in the principal amount of $1,310,222.21 together with all renewals, extensions, amendments, or modifications thereof.

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

16.14. **Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; and (3) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing.

16.15. **Related Documents.** The words "Related Documents" mean all promissory notes, guaranties, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

16.16. **Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, assignment, pledge, chattel mortgage, collateral chattel mortgage, conditional sale, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

16.17. **Service and Management Agreement.** The words "Service and Management Agreement" mean the agreement between Borrower and Water Station Management, LLC, an affiliate thereof, or its or their respective successors or assigns, relating to the servicing, management, and operation of the System(s) financed by the Loan.

16.18. **System or Systems.** The words "System" or "Systems" mean the water dispensing systems described as part of the "Collateral" hereunder and financed by the Loan evidenced by this Agreement.

*[Signature page follows.]*

**ORAL AGREEMENTS. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON STATE LAW.**

Executed as of the date first set forth above.

BORROWER:                                          LENDER:

Pacific Water Technology, LLC,                      FIRST FED BANK,
a Washington limited liability company              a Washington bank corporation

By: _____                        By: _____
    Name: Kwansoo Lee                                   Kasi O'Leary
    Its: Member/Manager                                 SVP, Director of Commercial Banking

Exhibit D to Complaint
Page 51

**EXHIBIT A**

**Collateral Description**

Water Station alkaline vending machine model no. M700BVA, serial number   109771
Water Station alkaline vending machine model no. M700BVA, serial number   109772
Water Station alkaline vending machine model no. M700BVA, serial number   109773
Water Station alkaline vending machine model no. M700BVA, serial number   109774
Water Station alkaline vending machine model no. M700BVA, serial number   109775
Water Station alkaline vending machine model no. M700BVA, serial number   109778
Water Station alkaline vending machine model no. M700BVA, serial number   109781
Water Station alkaline vending machine model no. M700BVA, serial number   109782
Water Station alkaline vending machine model no. M700BVA, serial number   109783
Water Station alkaline vending machine model no. M700BVA, serial number   109787
Water Station alkaline vending machine model no. M700BVA, serial number   109788
Water Station alkaline vending machine model no. M700BVA, serial number   109789
Water Station alkaline vending machine model no. M700BVA, serial number   109790
Water Station alkaline vending machine model no. M700BVA, serial number   109791
Water Station alkaline vending machine model no. M700BVA, serial number   109792
Water Station alkaline vending machine model no. M700BVA, serial number   109793
Water Station alkaline vending machine model no. M700BVA, serial number   109794
Water Station alkaline vending machine model no. M700BVA, serial number   109795
Water Station alkaline vending machine model no. M700BVA, serial number   109796
Water Station alkaline vending machine model no. M700BVA, serial number   109797
Water Station alkaline vending machine model no. M700BVA, serial number   109963
Water Station alkaline vending machine model no. M700BVA, serial number   109964
Water Station alkaline vending machine model no. M700BVA, serial number   109965
Water Station alkaline vending machine model no. M700BVA, serial number   109966
Water Station alkaline vending machine model no. M700BVA, serial number   109970
Water Station alkaline vending machine model no. M700BVA, serial number   109971
Water Station alkaline vending machine model no. M700BVA, serial number   109972
Water Station alkaline vending machine model no. M700BVA, serial number   109973
Water Station alkaline vending machine model no. M700BVA, serial number   109974
Water Station alkaline vending machine model no. M700BVA, serial number   109975
Water Station alkaline vending machine model no. M700BVA, serial number   109976
Water Station alkaline vending machine model no. M700BVA, serial number   109977
Water Station alkaline vending machine model no. M700BVA, serial number   109978
Water Station alkaline vending machine model no. M700BVA, serial number   109979

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

Water Station alkaline vending machine model no. M700BVA, serial number 110209
Water Station alkaline vending machine model no. M700BVA, serial number 110210
Water Station alkaline vending machine model no. M700BVA, serial number 110211
Water Station alkaline vending machine model no. M700BVA, serial number 110212
Water Station alkaline vending machine model no. M700BVA, serial number 110213
Water Station alkaline vending machine model no. M700BVA, serial number 110214
Water Station alkaline vending machine model no. M700BVA, serial number 110215
Water Station alkaline vending machine model no. M700BVA, serial number 110216
Water Station alkaline vending machine model no. M700BVA, serial number 110217
Water Station alkaline vending machine model no. M700BVA, serial number 110218
Water Station alkaline vending machine model no. M700BVA, serial number 110219
Water Station alkaline vending machine model no. M700BVA, serial number 110220
Water Station alkaline vending machine model no. M700BVA, serial number 110221
Water Station alkaline vending machine model no. M700BVA, serial number 110222
Water Station alkaline vending machine model no. M700BVA, serial number 110223
Water Station alkaline vending machine model no. M700BVA, serial number 110224
Water Station alkaline vending machine model no. M700BVA, serial number 110260
Water Station alkaline vending machine model no. M700BVA, serial number 110261
Water Station alkaline vending machine model no. M700BVA, serial number 110262
Water Station alkaline vending machine model no. M700BVA, serial number 110263
Water Station alkaline vending machine model no. M700BVA, serial number 110264
Water Station alkaline vending machine model no. M700BVA, serial number 110265
Water Station alkaline vending machine model no. M700BVA, serial number 110266
Water Station alkaline vending machine model no. M700BVA, serial number 110267
Water Station alkaline vending machine model no. M700BVA, serial number 110268
Water Station alkaline vending machine model no. M700BVA, serial number 110269
Water Station alkaline vending machine model no. M700BVA, serial number 110270
Water Station alkaline vending machine model no. M700BVA, serial number 110310
Water Station alkaline vending machine model no. M700BVA, serial number 110311
Water Station alkaline vending machine model no. M700BVA, serial number 110312
Water Station alkaline vending machine model no. M700BVA, serial number 110313
Water Station alkaline vending machine model no. M700BVA, serial number 110314
Water Station alkaline vending machine model no. M700BVA, serial number 110315
Water Station alkaline vending machine model no. M700BVA, serial number 110316
Water Station alkaline vending machine model no. M700BVA, serial number 110317
Water Station alkaline vending machine model no. M700BVA, serial number 110318
Water Station alkaline vending machine model no. M700BVA, serial number 110319
Water Station alkaline vending machine model no. M700BVA, serial number 110320
Water Station alkaline vending machine model no. M700BVA, serial number 110325

Water Station alkaline vending machine model no. M700BVA, serial number 110326
Water Station alkaline vending machine model no. M700BVA, serial number 110329
Water Station alkaline vending machine model no. M700BVA, serial number 110330
Water Station alkaline vending machine model no. M700BVA, serial number 110331
Water Station alkaline vending machine model no. M700BVA, serial number 110332
Water Station alkaline vending machine model no. M700BVA, serial number 110353
Water Station alkaline vending machine model no. M700BVA, serial number 110354
Water Station alkaline vending machine model no. M700BVA, serial number 110355
Water Station alkaline vending machine model no. M700BVA, serial number 110356
Water Station alkaline vending machine model no. M700BVA, serial number 110357
Water Station alkaline vending machine model no. M700BVA, serial number 110358
Water Station alkaline vending machine model no. M700BVA, serial number 110359
Water Station alkaline vending machine model no. M700BVA, serial number 110360
Water Station alkaline vending machine model no. M700BVA, serial number 110361
Water Station alkaline vending machine model no. M700BVA, serial number 110362
Water Station alkaline vending machine model no. M700BVA, serial number 110363
Water Station alkaline vending machine model no. M700BVA, serial number 110364
Water Station alkaline vending machine model no. M700BVA, serial number 110377
Water Station alkaline vending machine model no. M700BVA, serial number 110378
Water Station alkaline vending machine model no. M700BVA, serial number 110379
Water Station alkaline vending machine model no. M700BVA, serial number 110380
Water Station alkaline vending machine model no. M700BVA, serial number 110381
Water Station alkaline vending machine model no. M700BVA, serial number 110382
Water Station alkaline vending machine model no. M700BVA, serial number 110383
Water Station alkaline vending machine model no. M700BVA, serial number 110384
Water Station alkaline vending machine model no. M700BVA, serial number 110385
Water Station alkaline vending machine model no. M700BVA, serial number 110386
Water Station alkaline vending machine model no. M700BVA, serial number 110387
Water Station alkaline vending machine model no. M700BVA, serial number 110405
Water Station alkaline vending machine model no. M700BVA, serial number 110406
Water Station alkaline vending machine model no. M700BVA, serial number 110407
Water Station alkaline vending machine model no. M700BVA, serial number 110408
Water Station alkaline vending machine model no. M700BVA, serial number 110409
Water Station alkaline vending machine model no. M700BVA, serial number 110410
Water Station alkaline vending machine model no. M700BVA, serial number 110411
Water Station alkaline vending machine model no. M700BVA, serial number 110412
Water Station alkaline vending machine model no. M700BVA, serial number 110413
Water Station alkaline vending machine model no. M700BVA, serial number 110414
Water Station alkaline vending machine model no. M700BVA, serial number 110415

Water Station alkaline vending machine model no. M700BVA, serial number    110416
Water Station alkaline vending machine model no. M700BVA, serial number    110417
Water Station alkaline vending machine model no. M700BVA, serial number    110418
Water Station alkaline vending machine model no. M700BVA, serial number    110433
Water Station alkaline vending machine model no. M700BVA, serial number    110434
Water Station alkaline vending machine model no. M700BVA, serial number    110435
Water Station alkaline vending machine model no. M700BVA, serial number    110436
Water Station alkaline vending machine model no. M700BVA, serial number    110437
Water Station alkaline vending machine model no. M700BVA, serial number    110438
Water Station alkaline vending machine model no. M700BVA, serial number    110439
Water Station alkaline vending machine model no. M700BVA, serial number    110440
Water Station alkaline vending machine model no. M700BVA, serial number    110441
Water Station alkaline vending machine model no. M700BVA, serial number    110453
Water Station alkaline vending machine model no. M700BVA, serial number    110454
Water Station alkaline vending machine model no. M700BVA, serial number    110455
Water Station alkaline vending machine model no. M700BVA, serial number    110456
Water Station alkaline vending machine model no. M700BVA, serial number    110460
Water Station alkaline vending machine model no. M700BVA, serial number    110461
Water Station alkaline vending machine model no. M700BVA, serial number    110462
Water Station alkaline vending machine model no. M700BVA, serial number    110463
Water Station alkaline vending machine model no. M700BVA, serial number    110464
Water Station alkaline vending machine model no. M700BVA, serial number    110465
Water Station alkaline vending machine model no. M700BVA, serial number    110466
Water Station alkaline vending machine model no. M700BVA, serial number    110467
Water Station alkaline vending machine model no. M700BVA, serial number    110468
Water Station alkaline vending machine model no. M700BVA, serial number    110469
Water Station alkaline vending machine model no. M700BVA, serial number    110470
Water Station alkaline vending machine model no. M700BVA, serial number    110471
Water Station alkaline vending machine model no. M700BVA, serial number    110472
Water Station alkaline vending machine model no. M700BVA, serial number    110493
Water Station alkaline vending machine model no. M700BVA, serial number    110494
Water Station alkaline vending machine model no. M700BVA, serial number    110495
Water Station alkaline vending machine model no. M700BVA, serial number    110496
Water Station alkaline vending machine model no. M700BVA, serial number    110497
Water Station alkaline vending machine model no. M700BVA, serial number    110498
Water Station alkaline vending machine model no. M700BVA, serial number    110499
Water Station alkaline vending machine model no. M700BVA, serial number    110500
Water Station alkaline vending machine model no. M700BVA, serial number    110501
Water Station alkaline vending machine model no. M700BVA, serial number    110502

Water Station alkaline vending machine model no. M700BVA, serial number    110511
Water Station alkaline vending machine model no. M700BVA, serial number    110512
Water Station alkaline vending machine model no. M700BVA, serial number    110514
Water Station alkaline vending machine model no. M700BVA, serial number    110516
Water Station alkaline vending machine model no. M700BVA, serial number    110517
Water Station alkaline vending machine model no. M700BVA, serial number    110518
Water Station alkaline vending machine model no. M700BVA, serial number    110519
Water Station alkaline vending machine model no. M700BVA, serial number    110520
Water Station alkaline vending machine model no. M700BVA, serial number    110521
Water Station alkaline vending machine model no. M700BVA, serial number    110522
Water Station alkaline vending machine model no. M700BVA, serial number    110523
Water Station alkaline vending machine model no. M700BVA, serial number    110524
Water Station alkaline vending machine model no. M700BVA, serial number    110525
Water Station alkaline vending machine model no. M700BVA, serial number    110527
Water Station alkaline vending machine model no. M700BVA, serial number    110530
Water Station alkaline vending machine model no. M700BVA, serial number    110531
Water Station alkaline vending machine model no. M700BVA, serial number    110533
Water Station alkaline vending machine model no. M700BVA, serial number    110541
Water Station alkaline vending machine model no. M700BVA, serial number    110542
Water Station alkaline vending machine model no. M700BVA, serial number    110543
Water Station alkaline vending machine model no. M700BVA, serial number    110544
Water Station alkaline vending machine model no. M700BVA, serial number    110545
Water Station alkaline vending machine model no. M700BVA, serial number    110546
Water Station alkaline vending machine model no. M700BVA, serial number    110547
Water Station alkaline vending machine model no. M700BVA, serial number    110551
Water Station alkaline vending machine model no. M700BVA, serial number    110552
Water Station alkaline vending machine model no. M700BVA, serial number    110553
Water Station alkaline vending machine model no. M700BVA, serial number    110554
Water Station alkaline vending machine model no. M700BVA, serial number    110555
Water Station alkaline vending machine model no. M700BVA, serial number    110556
Water Station alkaline vending machine model no. M700BVA, serial number    110557
Water Station alkaline vending machine model no. M700BVA, serial number    110558
Water Station alkaline vending machine model no. M700BVA, serial number    110559
Water Station alkaline vending machine model no. M700BVA, serial number    110560
Water Station alkaline vending machine model no. M700BVA, serial number    110561
Water Station alkaline vending machine model no. M700BVA, serial number    110562
Water Station alkaline vending machine model no. M700BVA, serial number    110563
Water Station alkaline vending machine model no. M700BVA, serial number    110564
Water Station alkaline vending machine model no. M700BVA, serial number    110565

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

Water Station alkaline vending machine model no. M700BVA, serial number 110566
Water Station alkaline vending machine model no. M700BVA, serial number 110567
Water Station alkaline vending machine model no. M700BVA, serial number 110573
Water Station alkaline vending machine model no. M700BVA, serial number 110574
Water Station alkaline vending machine model no. M700BVA, serial number 110575
Water Station alkaline vending machine model no. M700BVA, serial number 110576
Water Station alkaline vending machine model no. M700BVA, serial number 110577
Water Station alkaline vending machine model no. M700BVA, serial number 110578
Water Station alkaline vending machine model no. M700BVA, serial number 110579
Water Station alkaline vending machine model no. M700BVA, serial number 110580
Water Station alkaline vending machine model no. M700BVA, serial number 110604
Water Station alkaline vending machine model no. M700BVA, serial number 110605
Water Station alkaline vending machine model no. M700BVA, serial number 110606
Water Station alkaline vending machine model no. M700BVA, serial number 110607
Water Station alkaline vending machine model no. M700BVA, serial number 110608
Water Station alkaline vending machine model no. M700BVA, serial number 110609
Water Station alkaline vending machine model no. M700BVA, serial number 110610
Water Station alkaline vending machine model no. M700BVA, serial number 110611
Water Station alkaline vending machine model no. M700BVA, serial number 110612
Water Station alkaline vending machine model no. M700BVA, serial number 110613
Water Station alkaline vending machine model no. M700BVA, serial number 110614
Water Station alkaline vending machine model no. M700BVA, serial number 110615
Water Station alkaline vending machine model no. M700BVA, serial number 110616
Water Station alkaline vending machine model no. M700BVA, serial number 110617
Water Station alkaline vending machine model no. M700BVA, serial number 110618
Water Station alkaline vending machine model no. M700BVA, serial number 110619
Water Station alkaline vending machine model no. M700BVA, serial number 110620
Water Station alkaline vending machine model no. M700BVA, serial number 110621
Water Station alkaline vending machine model no. M700BVA, serial number 110622
Water Station alkaline vending machine model no. M700BVA, serial number 110623
Water Station alkaline vending machine model no. M700BVA, serial number 110624
Water Station alkaline vending machine model no. M700BVA, serial number 110794
Water Station alkaline vending machine model no. M700BVA, serial number 110795
Water Station alkaline vending machine model no. M700BVA, serial number 110796
Water Station alkaline vending machine model no. M700BVA, serial number 110797
Water Station alkaline vending machine model no. M700BVA, serial number 110798
Water Station alkaline vending machine model no. M700BVA, serial number 110799
Water Station alkaline vending machine model no. M700BVA, serial number 110800
Water Station alkaline vending machine model no. M700BVA, serial number 110801

Water Station alkaline vending machine model no. M700BVA, serial number 110802

Water Station alkaline vending machine model no. M700BVA, serial number 110803

Water Station alkaline vending machine model no. M700BVA, serial number 110804

Water Station alkaline vending machine model no. M700BVA, serial number 110805

Water Station alkaline vending machine model no. M700BVA, serial number 110806

Water Station alkaline vending machine model no. M700BVA, serial number 110807

Water Station alkaline vending machine model no. M700BVA, serial number 110808

Water Station alkaline vending machine model no. M700BVA, serial number 110809

Water Station alkaline vending machine model no. M700BVA, serial number 110810

Water Station alkaline vending machine model no. M700BVA, serial number 110811

Water Station alkaline vending machine model no. M700BVA, serial number 110812

Water Station alkaline vending machine model no. M700BVA, serial number 110813

Water Station alkaline vending machine model no. M700BVA, serial number 110814

Water Station alkaline vending machine model no. M700BVA, serial number 110936

Water Station alkaline vending machine model no. M700BVA, serial number 110937

Water Station alkaline vending machine model no. M700BVA, serial number 110938

Water Station alkaline vending machine model no. M700BVA, serial number 110939

Water Station alkaline vending machine model no. M700BVA, serial number 110940

Water Station alkaline vending machine model no. M700BVA, serial number 110941

Water Station alkaline vending machine model no. M700BVA, serial number 110942

Water Station alkaline vending machine model no. M700BVA, serial number 110943

Water Station alkaline vending machine model no. M700BVA, serial number 110944

Water Station alkaline vending machine model no. M700BVA, serial number 110945

# EXHIBIT E

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

# PROMISSORY NOTE



LOAN NO: ███ 1558

| | |
|---|---|
| **Date:** | May 19, 2022 |
| **Borrower:** | Pacific Water Technology, LLC<br>2305 43rd St SE<br>Puyallup, WA 98374-1742<br>Attn: Kwansoo Lee |
| **Lender:** | FIRST FED BANK<br>PO Box 351<br>Port Angeles, WA 98362 |
| **Loan Amount:** | $1,310,222.21 |
| **Interest Rate:** | Fixed rate of 5-Year FHLB Rate plus Credit Spread, adjusted once on the Adjustment Date, but not less than a Floor Rate of five and ninety-five hundredths (5.95%) per annum. |
| **Maturity Date:** | October 19, 2030 |

FOR VALUE RECEIVED, Pacific Water Technology, LLC, a Washington limited liability company (*"Borrower"*), promises to pay to the order of FIRST FED BANK, a Washington bank corporation, or its successor or assignee (*"Lender"*), at the address set forth above or such other place as Lender may from time to time designate in writing, the sum of ONE MILLION THREE HUNDRED TEN THOUSAND TWO HUNDRED TWENTY TWO AND 21/100THS U.S. DOLLARS (U.S. $1,310,222.21) or so much thereof as may from time to time be disbursed hereunder, in lawful money of the United States of America, together with interest on the unpaid principal balance from time to time outstanding hereunder from the date of disbursement under this Promissory Note (this *"Note"*) until paid at the rate set forth below. This Note is non-revolving.

1. **Loan and Loan Documents.** This Note evidences a loan in the amount set forth above (the *"Loan"*) being made contemporaneously herewith from Lender to Borrower. This Note is made pursuant to and is secured by that certain Business Loan and Security Agreement executed contemporaneously herewith between Borrower and Lender (the *"Loan Agreement"*). The terms (including meanings given to defined terms) and conditions of the Loan Agreement are hereby adopted and incorporated herein to the extent not inconsistent herewith. Among other things, the Loan Agreement grants Lender a first-lien position security interest in the Collateral described and defined therein. The Loan Agreement, this Note, and any other written instruments evidencing, securing, or otherwise governing the Loan are referred to collectively as the *"Loan Documents"*. Borrower hereby agrees to perform and comply with all of the agreements, terms, and conditions of all of the Loan Documents.

2. **Definitions.**

"*5-Year FHLB Rate*" means the interest rate designated by the Federal Home Loan Bank of Des Moines as the regular advance rate for fixed-rate advances of five (5) years as posted on the internet at FHLBDM.com under "Advances" and available to Lender as of the last Business Day immediately preceding the relevant Adjustment Date.

*"Adjustment Date"* means the date that is five (5) years after the date of this Note.

*"Business Day"* means any day on which the applicable Index is published other than Saturday, Sunday, or a day on which national banks are authorized or required by law to be closed in the city where Lender's office, as identified above, is located.

*"Credit Spread"* means three and one-half percent (3.50%).

*"Floor Rate"* means a per annum fixed rate equal to five and ninety-five hundredths (5.95%).

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

**3.** **Interest Rate.** Subject to Section 7 below (regarding the Default Rate), the outstanding principal balance of this Note shall bear interest at a per annum fixed rate equal to the 5-Year FHLB Rate as of the date of this Note *plus* the Credit Spread. Beginning on the Adjustment Date, and continuing through the Maturity Date, the outstanding principal balance of this Note shall bear interest at a per annum rate equal to the 5-Year FHLB Rate plus the Credit Spread. Notwithstanding the foregoing, in no event shall the interest rate applicable to the Loan be less than the Floor Rate.

**4.** **Monthly Payments of Principal and Interest.** Beginning on June 5, 2022 and continuing the same day of each month thereafter until the Maturity Date, Borrower shall make monthly payments of principal and interest, in equal monthly installments calculated by Lender based on one hundred one (101) months amortization period (the *"Amortization Period"*) and such methodology as Lender may deem appropriate, in its sole discretion, with such monthly payments to be recalculated and adjusted on the first of each month following an Adjustment Date at the then applicable interest rate to re-amortize such payment over the remaining portion of the Amortization Period.

**5.** **Maturity Date.** The entire principal balance, all accrued interest, and any other advances made or expenses incurred by Lender that are payable or reimbursable by Borrower hereunder, or under any of the other Loan Documents, shall become immediately due and payable on October 19, 2030 (the *"Maturity Date"*).

**6.** **Payments - General**.

    **6.1.** **Application of Payments.** Unless otherwise required by Lender, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower agrees, however, that upon the occurrence of an Event of Default and until such has been cured, Lender shall have the right, in its sole discretion, to modify the order in which payments are applied, and to apply payments to indebtedness owing under the Loan in a different order than that indicated above.

    **6.2** **Payments from Deposit Account.** All monthly payments must be made through the Borrower's Deposit Account. Lender is hereby authorized to pay any principal, interest, or other amount due under the Loan Documents when and as the same shall become due by automatically debiting funds on deposit in the Deposit Account.

    **6.3** **Computation of Interest**. All interest calculated under this Note shall be computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. Any payment not received by 5:00 p.m. Pacific Time will be treated as having been received by Lender on the next day, and interest shall continue to accrue until the next day.

    **6.4** **Late Charge**. In the event that any installment payment of principal or interest due hereunder is not paid within ten (10) days of the date it is due, Borrower shall pay, in addition to the delinquent payment, a late charge of five percent (5.0%) or $5.00, whichever is greater, of the amount overdue in order to defray the expense incident to handling such delinquent payment.

**7.** **Default Rate**. Following an uncured Event of Default in the payment of any installment of principal or interest when due hereunder, or an uncured Event of Default in the observance or performance of any other obligation hereunder or under any of the other Loan Documents, interest shall accrue hereunder from the date of such uncured Event of Default at an annual interest rate equal to eighteen percent (18%) per annum (the *"Default Rate"*). After the entire principal amount of the Loan shall become due and payable, whether by acceleration, at maturity, or otherwise, this Note shall bear interest at the Default Rate.

**8.** **Prepayment.** Borrower may prepay Borrower's obligations under this Note in full or in part at any time or from time to time; *provided, however*, that except as set forth below, the Loan may be prepaid only upon payment of the applicable prepayment premium provided for below.

    **8.1** **Prepayment Premium.** Prepayments of all or any portion of the principal balance of the Loan, including any involuntary prepayments as described below (excluding, however, prepayments permitted under Section 8.5 below), shall be subject to a prepayment premium during each of the following periods (the "*Prepayment Periods*") of the term of the Loan commencing at closing of the Loan:

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

| Prepayment Periods | Prepayment Premium Calculation As Percentage of Principal Prepaid |
|---|---|
| Through the date that immediately precedes the one-year anniversary of the date of this Note: | Three Percent (3.0%) |
| From the one-year anniversary of the date of this Note through the date that immediately precedes the two-year anniversary of the date of this Note: | Two Percent (2.0%) |
| From the two-year anniversary of the date of this Note through the date that immediately precedes the three-year anniversary of the date of this Note: | One Percent (1.00%) |
| Remaining Term of the Loan: | None |

**8.2      Involuntary Prepayment.**  Involuntary prepayment shall include, but is not limited to, prepayment in the event of a default in connection with acceleration or foreclosure, or any prepayment pursuant to or in connection with any sale under court order or power of sale, whether in judicial or non-judicial foreclosure, bankruptcy, or other insolvency proceeding, any deed in lieu of foreclosure or sale, or any other method or proceeding whatsoever, excepting only prepayment through application of insurance or condemnation proceeds, to which no prepayment premium shall be applicable.  Any prepayment premium owing to Lender shall be due from Borrower in connection with any satisfaction allowed under applicable law relating to any foreclosure proceeding, and shall be due from any other lien holder or person who tenders payment of the amount owed by Borrower under applicable law, including principles of equitable subrogation.  Lender shall be entitled to include in its credit bid at any foreclosure any applicable prepayment premium.  Furthermore, Lender shall not be required to accept any such prepayment, whether from Borrower or any other party paying the Loan, if it does not include the prepayment premium, if applicable.

**8.3      Effect of Prepayment.**  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, they will reduce the principal balance due and may result in Borrower's making fewer payments.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  First Fed Bank, ATTN: Loan Servicing, 105 W 8th St/P.O. Box 351, Port Angeles, WA 98362-0055.**

**8.4      Acknowledgment of Right as Bargained-For Compensation.**  BORROWER ACKNOWLEDGES LENDER'S RIGHT TO RECEIVE A PREPAYMENT PREMIUM IN ACCORDANCE WITH THE TERMS HEREOF AND HEREBY WAIVES ANY RIGHT OR PRIVILEGE TO PREPAY ALL OR ANY PORTION OF THIS NOTE EXCEPT AS SPECIFICALLY PROVIDED HEREIN.  BORROWER FURTHER ACKNOWLEDGES THAT THE PREPAYMENT PREMIUM, AS DUE UNDER THE CIRCUMSTANCES AND AS CALCULATED IN THE MANNER DESCRIBED ABOVE, REPRESENTS THE REASONABLE ESTIMATE OF LENDER AND BORROWER OF A FAIR AVERAGE COMPENSATION FOR THE LOSS THAT LENDER MAY SUSTAIN DUE TO THE PAYMENT OF ANY OF THE INDEBTEDNESS EVIDENCED BY THIS NOTE PRIOR TO ITS DUE DATE, DUE TO, AMONG OTHER REASONS, THE COSTS AND OVERHEAD OF LENDER IN INVESTIGATING AND PLACING THIS LOAN AND IN INVESTIGATING A SUBSTITUTE INVESTMENT OF FUNDS.  SUCH PREPAYMENT PREMIUM SHALL BE PAID WITHOUT PREJUDICE TO THE RIGHT OF LENDER TO COLLECT ANY OTHER AMOUNTS REQUIRED TO BE PAID HEREUNDER OR UNDER ANY OTHER DOCUMENTS EVIDENCING OR SECURING THE LOAN.  BORROWER CONFIRMS THE ACKNOWLEDGMENTS EXPRESSED HEREIN AND DECLARES THAT LENDER'S AGREEMENT TO MAKE THE LOAN IN ACCORDANCE WITH THE LOAN DOCUMENTS CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER, FOR THIS WAIVER AND AGREEMENT.

**8.5      Permitted Prepayment.**  Notwithstanding the foregoing, Borrower may prepay up to twenty percent (20.0%) of the principal balance of the Loan during each of the Prepayment Periods set forth in Section 8.1 without penalty or premium (including the prepayment premium required under Section 8.1). If and to the extent any prepayments exceed twenty percent (20.0%) of the principal balance of the Loan during any Prepayment Period, Borrower shall pay the corresponding prepayment premium set forth in Section 8.1 together with such prepayment(s).

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

**9.** **Business Purpose; Maximum Interest and Fees.** Borrower agrees to the applicable interest rate, plus any other charges to Borrower or benefit received by Lender under the Loan Documents that may be interpreted to be in the nature of interest. Borrower represents and warrants to Lender that the proceeds of this Note shall be used exclusively for commercial, business, or investment purposes, and that none of the proceeds of this Note shall be used by Borrower for personal, family, or household purposes. Notwithstanding any other provision of the Loan Documents, the interest, fees and charges under the Loan Documents shall not exceed the maximum amounts permitted by any applicable law, and should Lender ever receive as interest an amount that would exceed permissible rates, such amount shall be applied to the reduction of the unpaid principal balance and not to the payment of interest. This provision shall supersede every other provision of all the Loan Documents.

**10.** **Acceleration.** Upon the occurrence of an Event of Default resulting from Borrower's failure to pay any amount payable hereunder as and when due or upon the occurrence of any other Event of Default under this Note or under any of the other Loan Documents, Lender may declare, at its sole option and without notice to any party, the entire indebtedness evidenced hereby immediately due and payable in full. Failure to exercise this option or any other right Lender may have shall not constitute a waiver of the right to exercise such option or any other right in the event of any subsequent Event of Default.

**11.** **Costs and Fees of Collection; Interest on Judgments.** Borrower and every other person or entity at any time liable for the payment of the indebtedness evidenced hereby shall also be liable for all costs, expenses, and fees incurred by Lender in collecting any amounts owing hereunder, including, but not limited to, reasonable attorneys' fees. Any judgment recovered by Lender shall bear interest at the Default Rate.

**12.** **Waiver of Presentment.** Borrower and every other person or entity at any time liable for the payment of the indebtedness evidenced hereby each waive diligence, demand, presentment for payment, notice of protest, and notice of nonpayment of this Note. Every such person or entity further consents to any extension of the time of payment hereof or other modification of the terms of payment of this Note, the release of all or any part of the security for this Note, or the release of any party liable for the payment of the indebtedness evidenced hereby at any time and from time to time for any reason whatsoever. Any such extension or release may be made without notice to any of such persons or entities and without discharging their liability.

**13.** **Time is of the Essence.** Time is of the essence of this Note and the performance of each of the agreements and provisions contained herein.

**14.** **Joint and Several Liability.** The liability hereunder of multiple parties identified herein as Borrower shall be joint and several.

**15.** **Applicable Law.** This Note shall be construed in accordance with the laws of the State of Washington, without regard to that state's choice of law rules. Borrower hereby consents to the jurisdiction of the courts of King County, the State of Washington.

**16.** **Successors and Assigns.** Borrower may not assign any of its rights or obligations under this Note without the prior written consent of Lender. Subject to the preceding sentence, this Note shall be binding upon the respective heirs, legal representatives, successors, and assigns of Borrower and shall inure to the benefit of Lender and its successors and assigns, including, without limitation, each successive holder of this Note and any other lenders now or hereafter participating in the Loan.

**17.** **Recourse.** BORROWER ACKNOWLEDGES LIABILITY FOR PAYMENT OF ALL AMOUNTS OWING UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS AND AGREES THAT LENDER DOES NOT HAVE TO FORECLOSE ITS SECURITY INTEREST GRANTED BY THE LOAN AGREEMENT OR ANY OTHER COLLATERAL BEFORE DEMANDING FULL PAYMENT FROM BORROWER.

**18.** **Waiver of Trial by Jury.** Borrower hereby waives, to the fullest extent permitted by applicable law, the right to a trial by jury in any action or proceeding based upon, or related to, the subject matter of this Note. This waiver is knowingly, intentionally, and voluntarily made by Borrower, and Borrower acknowledges that no person acting on behalf of Lender has made any representations of fact to induce this waiver of trial by jury or in any way to modify or nullify its effect. Borrower further acknowledges that Borrower has been represented (or has had the opportunity to be represented) in the signing of this Note and in the making of this waiver by independent legal counsel, selected of Borrower's own free will, and that Borrower has had the opportunity to discuss this waiver with counsel.

**[Remainder of Page Intentionally Left Blank; Signature Appears on Following Page]**

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

19.     **No Oral Agreements.**

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

DATED as of the date set forth above.

**BORROWER**:                     Pacific Water Technology, LLC,
                                  a Washington limited liability company

By: _____
        _kwansoo lee_
        F38F6C076CD7425...

        Name: Kwansoo Lee
        Its: Member/Manager

# EXHIBIT F



**UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE**

This UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE (this *"Guaranty"*), is made as of May 19, 2022 by Kwansoo Lee and Kwansoo Lee, DDS, PLLC (individually and collectively, *"Guarantor"*), for the benefit of FIRST FED BANK, a Washington bank corporation (together with its successors, participants and assigns, "*Lender*").

**RECITALS**

**A.**    Guarantor has requested that Lender make a term loan to Pacific Water Technology, LLC, a Washington limited liability company (*"Borrower"*) in the principal amount of ONE MILLION THREE HUNDRED TEN THOUSAND TWO HUNDRED TWENTY TWO AND 21/100THS U.S. DOLLARS (U.S. $1,310,222.21 (the "*Loan*").

**B.**    The Loan is evidenced by a Promissory Note of even date herewith (the "*Note*"), governed by a Business Loan and Security Agreement between Borrower and Lender of even date herewith (the "*Loan Agreement*") which, among other things, grants Lender a first-lien security interest in the collateral described and defined therein (as defined below, the "*Collateral*").

**C.**    Lender's agreement to make the Loan is conditioned on Guarantor's execution of this Guaranty, and Lender would not make the Loan to Borrower without the agreements of Guarantor set forth herein.  Guarantor will receive direct and tangible financial benefits from the Loan.

**D.**    Capitalized terms used but not defined herein shall have the meanings given to such terms in the Loan Agreement.

**AGREEMENTS**

NOW, THEREFORE, intending to be legally bound, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to induce Lender to enter into the Loan, Guarantor hereby agrees as follows:

**1.**    **Unconditional Guaranty of Payment and Performance.**  Guarantor unconditionally, absolutely, and irrevocably guarantees the following "*Guaranteed Obligations*":

**1.1**    the due and punctual payment of all amounts (collectively herein, the *"Indebtedness"*) payable by Borrower under the Loan Agreement, the Note, and other agreements and instruments that evidence, secure, or otherwise govern the Loan, but excluding the Indemnity Agreement (collectively, the *"Loan Documents"*); and

**1.2**    the prompt payment of all obligations of Borrower to Lender arising from any interest rate hedging program, including, without limitation, any interest rate swap, cap, or such other interest rate protection product, whether now existing or entered into hereafter (each an "*Interest Rate Protection Product*"), including, without limitation, any Cash Settlement Amount or any payments on Early Termination payable by Borrower under any Swap Transaction or Confirmation; *provided, however*, the term "Interest Rate Protection Product" shall not include any interest rate swap, cap, or other interest rate protection product if, at the time Borrower enters into any such product, it is unlawful for Guarantor to guarantee the obligations of Borrower thereunder.  Capitalized terms used in this subsection 1.2 but not otherwise defined in this Guaranty or in the Loan Agreement are defined in the *2006 ISDA Definitions* published by the International Swap and Derivatives Association, Inc.; and

**1.3**    the full, complete and punctual observance, performance and satisfaction of all the obligations, duties, covenants and agreements of Borrower under the Loan Agreement and the other Loan Documents.

**2.**    **Guarantor's Obligations are Absolute.**  This is an absolute, present, and continuing guaranty of payment and performance and not of collection.  This Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any Collateral (defined below) through foreclosure or sale proceedings, as the case may be, under the Loan Agreement or otherwise, or resorting to any other guaranties, and Guarantor hereby waives any right to require Lender to join Borrower or any other Guarantor in any action brought hereunder or to commence any action against or obtain any judgment against Borrower or to pursue any other remedy or enforce any other right.  Guarantor further agrees that nothing contained herein or otherwise shall prevent Lender

from pursuing concurrently or successively all rights and remedies available to Lender at law or in equity or under any of the Loan Documents. Lender's exercise of any of its rights or remedies shall not constitute a discharge of Guarantor's obligations hereunder, it being the purpose and intent of Guarantor that the obligations of Guarantor hereunder shall be absolute, independent, and unconditional under all circumstances whatsoever. None of Guarantor's obligations under this Guaranty nor any of Lender's rights or remedies shall be impaired, modified, changed, or released in any manner whatsoever by any impairment, modification, change, release, or limitation of Borrower's liability under any of the Loan Documents or by reason of the insolvency, bankruptcy, dissolution, liquidation, or reorganization of Borrower or any Guarantor.

3. **Rights of Lender.**

3.1 Guarantor agrees that Lender may deal exclusively with Borrower in all matters relating to the Loan without notice of any kind to or the approval of Guarantor. Specifically, Lender is not required to (a) notify Guarantor of Lender's acceptance of this Guaranty; (b) notify Guarantor when Lender advances Loan proceeds, extends credit to Borrower, or pays any obligations of Borrower; (c) notify Guarantor of any default under the Loan Documents; or (d) make presentment and demand for payment, protest, or notice of demand, protest, dishonor, and nonpayment. It is intended that Guarantor shall remain fully liable regardless of any act or omission by Lender that might otherwise directly or indirectly result, by operation of law or otherwise, in the discharge or release in whole or in part of Borrower, any other guarantor, or any other person, or the discharge, release, or impairment of any collateral now or hereafter held as security for any of the obligations under the Loan Documents (collectively herein, the "*Collateral*").

3.2 Lender shall have the right to set off the unpaid balance of the Guaranteed Obligations against any indebtedness owing to Guarantor by Lender or by any Lender Affiliate, including, without limitation, any obligation under a repurchase agreement or any funds held at any time by Lender or any Lender Affiliate, whether collected or in the process of collection, or in any time or demand deposit account maintained by Guarantor at, or evidenced by any certificate of deposit issued by, Lender or any Lender Affiliate. Guarantor agrees, to the fullest extent it may effectively do so under applicable law, that any holder of a participation in the Note may exercise rights of set-off or counterclaim and other rights with respect to such participation as fully as if such holder of a participation were a direct creditor of Guarantor pursuant to this Agreement in the amount of such participation.

4. **Modifications and Actions by Lender.** Without limiting the generality of the foregoing, Guarantor agrees that Lender may do, or fail to do, any of the following one or more times, without notice to or the approval of Guarantor, without diminishing, altering, or otherwise affecting the liability of Guarantor hereunder, and even though Borrower's financial condition may have deteriorated or Guarantor may object: (a) Lender may renew, extend, or otherwise change the time for payment of the obligations of Borrower to Lender; (b) Lender may increase the amount of the Loan; (c) Lender may modify any other terms of the Loan; (d) Lender may release, surrender, substitute, or exchange any of the Collateral, or take and hold additional or other security for the payment of this Guaranty or any other indebtedness guaranteed, and exchange, enforce, waive, or release any such security; (e) Lender may release Borrower, any Guarantor, or any other guarantor from obligations under the Loan or any guaranty thereof; (f) Lender is not required to marshal assets and Lender may take a deed in lieu of foreclosure or foreclose or realize upon such security and direct the amount or manner of sale thereof as Lender in its discretion may determine; (g) Lender may apply the Collateral to the repayment of any amounts owing to Lender under the Loan Documents in any order Lender may determine in its discretion; (h) Lender may forbear from pursuing Borrower, any Guarantor, or any other guarantor or any other person, or forbear from foreclosing or otherwise realizing upon any of the Collateral; (i) Lender may impair or fail to perfect a security interest in any of the Collateral; (j) Lender may take actions that have the effect of diminishing Guarantor's subrogation rights; and (k) Lender may take any other actions with respect to the terms of or security for the Guaranteed Obligations. Notwithstanding any such action by Lender, Guarantor's obligations hereunder shall remain in full force and effect.

5. **Guarantor Waivers.**

5.1 **Waiver of Suretyship Defenses.** Guarantor hereby waives any defenses based on the action or inaction of Lender that might otherwise be deemed a legal or equitable discharge of a surety, including, without limitation, any defense based on any of the following: (a) the lack of diligence or any delay in enforcing, or any waiver of or failure to enforce, any right or remedy under the Loan Documents; (b) the failure or invalidity of, or any defect in, the Loan Documents; (c) any disability or other defense of Borrower, any Guarantor, any other guarantor, or any other person; (d) the termination from any cause whatsoever of any of the obligations under the Loan Documents, except upon full satisfaction of the Guaranteed Obligations; (e) the loss or impairment of any right of subrogation; (f) any modification of any of the terms and conditions of the Loan Documents in any form whatsoever and without notice to Guarantor; or (g) the foreclosure of the Collateral or any portion thereof, it being intended that this Guaranty shall

survive the realization upon any of the Collateral, including, but not limited to, any nonjudicial foreclosure action and any deed in lieu of foreclosure, to the extent permitted under applicable law.

**5.2     Waiver of Right of Reimbursement.**  Unless and until the Guaranteed Obligations have been fully satisfied, Guarantor hereby waives any right of reimbursement, contribution, recourse, or any other right or remedy of Guarantor against Borrower, any Guarantor, any other guarantor or any other person to recover amounts that Guarantor is obligated to pay under this Guaranty.

**5.3     Waiver of Right of Subrogation.**  Unless and until the Guaranteed Obligations have been fully satisfied, Guarantor hereby waives any right of subrogation, any right to enforce any remedy Lender may have against Borrower, any Guarantor, any other guarantor, or any other person, and any benefit of, and the right to participate in, any of the Collateral.

**6.     Subordination of Debt.**  Any debt of Borrower now or hereafter held by any Guarantor is hereby subordinated to the Indebtedness.  Guarantor shall not seek, accept, or retain for its own account any payment from Borrower on account of any subordinated debt until the entire Indebtedness has been paid in full.  Any payment of such subordinated indebtedness by Borrower to Guarantor before payment in full of the Indebtedness shall be collected, enforced and received by Guarantor as trustee for Lender and promptly paid to Lender in payment of the Indebtedness.

**7.     Anti-Deficiency and One-Form-Of-Action Rules.**

**7.1**     Guarantor understands that certain statutes, commonly referred to as "anti-deficiency" and "one form of action" rules, may prevent or inhibit a lender, after completing a non-judicial foreclosure or accepting a deed in lieu of foreclosure, from obtaining a deficiency judgment against a borrower or from collecting the amount of the deficiency from a guarantor, unless such borrower or guarantor has knowingly waived the application of such statutes and the benefits that it would otherwise receive from such statutes.  This curtailment of a lender's rights to recover a deficiency from a guarantor is based in part on the fact that a lender's election of a non-judicial foreclosure or a deed in lieu of foreclosure from among other possible default remedies impairs or eliminates a guarantor's rights of subrogation and reimbursement against the borrower, the collateral, or any other surety for the borrower's obligations.

**7.2**     Guarantor understands that, unless it waives the protection that such rules would ordinarily confer, these "anti-deficiency" and "one form of action" rules might provide a defense to enforcement of this Guaranty if Lender elects to proceed with a non-judicial foreclosure or to accept a deed in lieu of foreclosure.  Nevertheless, as an inducement for Lender to make the Loan, Guarantor hereby knowingly waives, in advance and to the extent permitted under applicable law, all its rights to rely on the anti-deficiency and "one form of action rules" in connection with the impairment of its subrogation rights, as a defense to this Guaranty. Guarantor hereby acknowledges and agrees that Lender may, in its sole discretion, exercise any right or remedy whatsoever that it may have against Borrower or any security held by Lender, including, without limitation, the right to foreclose upon any collateral for the Loan by judicial or non-judicial sale or to take a deed in lieu of foreclosure, without affecting or impairing in any way the liability of Guarantor hereunder (except to the extent that the Guaranteed Obligations have been fully paid and performed), even if such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Guarantor against Borrower or any security for the Loan.  Guarantor further waives any statutes that provide "fair value" protection by limiting a deficiency judgment to the difference between the property's fair market value (or foreclosure sale price, if greater) and the amount of the obligation being foreclosed.

**8.     Costs and Reasonable Attorneys' Fees.**  Guarantor shall pay all of Lender's expenses incurred in any effort to enforce any terms of this Guaranty, whether or not any suit is filed, including, without limitation, reasonable attorneys' fees and disbursements, foreclosure costs, and title charges.  Such sums shall be immediately due and payable and shall bear interest from the date of disbursement at the Default Rate set forth in the Loan Documents, or the maximum rate that may be collected from Borrower under applicable law, if less.

**9.     Representations and Warranties.**  To induce Lender to make the Loan, each Guarantor makes the representations and warranties to Lender set forth in this Section.  Guarantor acknowledges that, but for the truth and accuracy of the matters covered by the following representations and warranties, Lender would not have agreed to make the Loan.

**9.1**     All representations and warranties relating to Guarantor set forth in the Loan Agreement are true and correct and made and affirmed by Guarantor as though set forth fully herein.

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

**9.2** All balance sheets, net worth statements, bank and brokerage statements, and other financial data with respect to Guarantor that have been given to Lender by or on behalf of that Guarantor fairly and accurately represent the financial condition of that Guarantor as of the respective dates thereof.

**9.3** This Guaranty creates legal, valid, and binding obligations of Guarantor enforceable in accordance with its terms. The execution, delivery, and performance by Guarantor of this Guaranty does not and will not contravene or conflict with (a) any law, order, rule, regulation, writ, injunction, or decree now in effect of any government authority, or court having jurisdiction over Guarantor; (b) any contractual restriction binding on or affecting Guarantor or Guarantor's property or assets that may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty; (c) the instruments creating any trust holding title to any assets included in Guarantor's financial statements; or (d) the organizational or other documents of Guarantor.

**9.4** Except as disclosed in writing to Lender, there is no action, proceeding, or investigation pending or, to the knowledge of Guarantor, threatened or affecting Guarantor, that may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

**9.5** Guarantor is not in default under any agreements that may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

**9.6** Guarantor (a) has a financial interest in Borrower and the financial benefits to Guarantor from the Loan constitute reasonably equivalent value for the execution of this Guaranty; (b) is not insolvent and will not become insolvent as a result of this Guaranty; (c) is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which the property of Guarantor constitutes unreasonably small capital and that would leave Guarantor insolvent; (d) does not intend to or believe that it will incur debts that would be beyond Guarantor's ability to pay as such debts mature; (e) has reviewed and approved all of the terms and conditions of the Loan Documents; and (f) has established adequate means of obtaining, and will obtain from Borrower on a continuing basis, all financial and other information regarding Borrower, any other guarantor, and the Loan, without any obligation on the part of Lender to provide any such information.

All the foregoing representations and warranties shall survive so long as any of the Guaranteed Obligations have not been satisfied. Guarantor hereby agrees to indemnify, defend, and hold Lender free and harmless from and against all loss, cost, liability, damage, and expense, including reasonable attorneys' fees and costs that Lender may sustain by reason of the inaccuracy or breach of any of the foregoing representations and warranties.

**10.** **Insolvency.** So long as any of the Guaranteed Obligations are unpaid and this Guaranty remains in effect, Guarantor agrees to file all claims against Borrower in any bankruptcy or other proceeding in which the filing of claims is required by law relating to indebtedness owed by Borrower to Guarantor and to assign to Lender all rights of Guarantor thereunder up to the amount of such unpaid Guaranteed Obligations. In all such cases the Persons authorized to pay such claims shall pay to Lender the full amount thereof to the full extent necessary to pay the Guaranteed Obligations and Guarantor hereby assigns to Lender all of Guarantor's rights to all such payments to which Guarantor would otherwise be entitled. Notwithstanding the foregoing, and except to the extent that any sums owed by Borrower to Lender under the Loan Documents have been fully satisfied thereby, the liability of Guarantor hereunder shall in no way be affected by (a) the release or discharge of Borrower in any creditors', receivership, bankruptcy or other proceedings; or (b) the impairment, limitation or modification of the liability of Borrower or the estate of Borrower in bankruptcy resulting from the operation of any present or future statute, regulation, or from the decision of any court.

**11.** **Preferences, Fraudulent Conveyances, Etc.** If Lender is required to refund, or voluntarily refunds, any payment received from Borrower because such payment is or may be avoided, invalidated, declared fraudulent, set aside or determined to be void or voidable as a preference, fraudulent conveyance, impermissible setoff or a diversion of trust funds under applicable bankruptcy laws or for any similar reason, including, without limitation, any judgment, order or decree of any court or administrative body having jurisdiction over Lender or any of its property, or any settlement or compromise of any claim effected by Lender with Borrower or any other claimant ("***Rescinded Payment***"), then Guarantor's liability to Lender shall continue in full force and effect, or Guarantor's liability to Lender shall be reinstated, as the case may be, with the same effect and to the same extent as if the Rescinded Payment had not been received by Lender, notwithstanding the cancellation or termination of the Note or any of the other Loan Documents. In addition, Guarantor shall pay or reimburse Lender for all expenses (including all reasonable attorneys' fees, court costs and related disbursements) incurred by Lender in the defense of any claim that a payment received by Lender in respect of all or any part of the Guaranteed Obligations must be refunded. The provisions of this Section shall survive the termination of this Guaranty and any satisfaction and discharge of Borrower by virtue of any payment, court order or any federal or state law.

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

12.     **Community Property.**  Unless Guarantor's obligations hereunder are otherwise limited by a specific annotation either on the first page of this Guaranty or following Guarantor's signature below, any married person who signs this Guaranty as a Guarantor warrants that it is an obligation incurred on behalf of his or her marital community and agrees that this Guaranty shall bind the marital community.

13.     **Lender's Election of Remedies.**  This Guaranty may be enforced against any Guarantor without attempting to collect from Borrower, any other Guarantor, or any other guarantor, or any other person, and without attempting to enforce Lender's rights in any of the Collateral.  Lender may join Guarantor in any suit relating to the Loan Documents or proceed against any Guarantor in a separate action.  Lender shall have the right to exercise its remedies in such order as it determines in its sole discretion.

14.     **Joint and Several Liability.**  The liability of each Guarantor and any other guarantors of the Loan shall be joint and several.

15.     **Guarantor's Ongoing Reporting Obligations**.  Each Guarantor acknowledges that it has read or adequately understands the content of the Loan Documents.  Each Guarantor agrees to promptly, and in any event within five (5) days after Lender's request, provide Lender with financial statements, certifications of liquidity, and other reports and information as required of Guarantor under the Loan Agreement or as requested by Lender from time to time.  Guarantor shall further notify Lender in writing of any change of address, telephone number, fax number, marital status (if an individual), or legal organization (if an entity) within 10 days after such event.

16.     **Guarantor Covenants.**  Guarantor shall perform all covenants of Guarantor under the Loan Documents, including, without limitation, any financial covenants and reporting requirements applicable to Guarantor under the Loan Agreement.

17.     **Notices.**  Any notice, demand, request, or other communication that any party hereto may be required or may desire to give hereunder shall be given in writing to the addresses set forth below and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three Business Days after mailing; (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service; or (d) if by confirmed e-mail transmission on the day of transmission so long as a copy is sent on the same day by overnight courier to the address set forth below:

|  |  |
|---|---|
| **If to Guarantor:** | Kwansoo Lee |
| | 2305 43rd St SE |
| | Puyallup, WA 98374-1742 |
| | Telephone: (253) 448-3213 |
| | E-mail: oosnawk@gmail.com |
| | |
| | Kwansoo Lee, DDS, PLLC |
| | 20709 Mountain Hwy E, Suite 101 |
| | Spanaway, WA 98387-8580 |
| | Telephone: (253) 448-3213 |
| | E-mail:  oosnawk@gmail.com |
| | |
| **If to Lender:** | FIRST FED BANK |
| | PO Box 351 |
| | Port Angeles, WA 98362 |
| | Attn: Kasi O'Leary |
| | Email: kasi.oleary@ourfirstfed.com |

Any party may change its address for notices by notifying the others in writing of the change as set forth herein.

18.     **Assignment.**  The term *"Lender"* shall include any subsequent holder of or participant in any of the Loan Documents.  Lender may assign the Loan Documents in whole or in part and grant participations therein, without notice and without affecting Guarantor's liability under this Guaranty.  Lender may make available to any proposed assignee or participant all credit and

financial data with respect to Guarantor as may be in the possession of Lender. Guarantor agrees to furnish any additional information that any proposed assignee or participant may reasonably request.

**19.** **Applicable Law**. This Agreement shall be construed in accordance with and governed by the laws of the State of Washington, without regard to that state's choice of law rules. The parties consent to the jurisdiction of the courts of King County, the State of Washington.

**20.** **Miscellaneous.** Guarantor agrees as follows: (a) this Guaranty shall be binding upon and enforceable against Guarantor's heirs, legal representatives, successors, and assigns; (b) this Guaranty constitutes the entire understanding between Lender and Guarantor regarding the subject matter hereof, and no course of prior dealing between the parties shall be used to supplement or modify the terms of this Guaranty; (c) this Guaranty may be changed, modified or supplemented only through a writing signed by Guarantor and Lender; (d) if any provision of this Guaranty is invalid, illegal, or unenforceable, such provision shall be considered severed from the rest of this Guaranty and the remaining provisions shall continue in full force and effect as if the invalid provision had not been included; and (e) this Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

**21.** **Waiver of Jury Trial.** GUARANTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS GUARANTY AND THE GUARANTEED OBLIGATIONS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY GUARANTOR, AND GUARANTOR ACKNOWLEDGES THAT NO PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. GUARANTOR FURTHER ACKNOWLEDGES THAT GUARANTOR HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS GUARANTY AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF GUARANTOR'S OWN FREE WILL, AND THAT GUARANTOR HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

**22.** **Independent Obligation.** Guarantor understands and agrees that (a) the obligations under this Guaranty are separate and independent from Borrower, any Guarantor, any other guarantor, or any other person, and represent an unconditional, absolute, and irrevocable obligation on the part of Guarantor to pay the full amount of the indebtedness when due; (b) Lender is not required to pursue Borrower, any Guarantor, any other guarantor, or any other person, or foreclose or realize on all or any portion of the Collateral, or pursue any other remedies before demanding full payment from Guarantor; and (c) Guarantor shall remain fully liable under this Guaranty even if the Collateral is impaired or discharged or Borrower, any Guarantor, any other guarantor, or any other person is discharged or otherwise relieved of liability under the Loan Documents.

**23.** **Notice Disclaiming Oral Agreements.**

**RCW 16.36.140 DISCLOSURE: ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**[Remainder of Page Intentionally Left Blank; Signatures Appear on Following Page]**

DocuSign Envelope ID: 2A9C28BF-B1BC-4B29-B375-01D600BBA88F

Dated as of the date set forth above.

**GUARANTOR:**

DocuSigned by:

*kwansoo lee*

F38F6C076CD7425...

Name: Kwansoo Lee

Kwansoo Lee, DDS, PLLC

DocuSigned by:

*kwansoo lee*

F38F6C076CD7425...

Name: Kwansoo Lee
Its: Member/Manager

---

# EXHIBIT G

ELECTRONICALLY FILED
6/21/2024 9:04 AM
Heidi Percy
County Clerk
Snohomish County, WASH
Case Number: 24-2-02887-31

1

2

3

4

5

6

7        SUPERIOR COURT OF WASHINGTON FOR SNOHOMISH COUNTY

8

9    PACIFIC WATER TECHNOLOGY, LLC,          No. 24-2-02887-31
     SPRUCE WATERS INVESTMENTS, LLC,
     INDIANA WATER TECHNOLOGY, LLC,          FIRST AMENDED COMPLAINT  FOR
10   AR WATER SUPPLY, LLC, BLC WATER          DAMAGES AND INJUNCTIVE RELIEF
     COMPANY, LLC, GRANITE STREET
11   VENTURES, LLC, RUMSON WELLNESS,
     LLC, BROWN FAMILY ENTERPRISES,
12   LLC, KMANDY INVESTMENTS, L.L.C.,
     EVER UPWARD, INC., SUN A WY, LLC,
13   SIRIPI WST, LLC, LIVINGWATER
     STATION, LLC, GRAYFIN VENTURES,
14   LLC, PRASITI WATER INVESTMENTS,
     LLC, JBF CONSULTING SERVICES, LLC,
15   COCO AQUA, LLC, Q & V LLC,
     WATERSTATION TECHNOLOGY OF
16   ROCKVILLE, ARRAVEND, LLC,
     FLATLANDS EQUIPMENT, LLC, C&C
17   INVESTMENT HOLDINGS, LLC, GREAT
     OAK WATER, LIMITED LIABILITY
18   COMPANY, WV WATER TECH, LLC,
     KDAWG CRYPTO, LLC, CULMINATE
19   WATER TECHNOLOGY, LLC, CHUGIT,
     LLC, CHAURISHI RETAIL ENTERPRISES,
20   LLC, PROGRESSIVE PARTNERS, LLC, 210
     SA HOLDING, LLC, WST UTAH LLC,
21   V2S2, LLC, CYBORG HOLDINGS, LLC,
     ASH VENDING, LLC, ADVENTURE DONE
22   RIGHT, LLC, BIG BOY TOOLS LLC,
     ROMAN JAROSIEWICZ, ABBY WYATT
23   GROUP, INC., AIDEN WATERWORKS,
     LLC, HOREB WATER SOLUTIONS, LLC,
24   SILVER OAK H2O, LLC, NS SQ ECO
     WATERS, LLC, JK SEVEN LLC, JEFFREY
25   BROOKE, OED PROPERTIES LLC, JLE

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 1

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

ENTERPRISES, LLC, BE OF SERVICE, LLC, ETANIA, LLC, NIRA ENTERPRISES, LLC, FACTS PROPERTY SERVICES, LLC, IMLSUNSHINE, LLC, REDWATERS, LLC, STARTER HOLDINGS, LLC, HELMUT GIEWAT, MAY AUERBACH, ROYAL RESERVOIRS, LLC, AQUALUX WATER LLC, RCWSTECH1157, LLC, COLEWSTECH, LLC, MAJI 8377, LLC, OAKS WATERSTATION TECH, LLC, SDB H20, LLC, WST, LLC, HALF FULL VENDING, LLC, RDWSTECH3594, LLC, ROSE TRAIL VENTURES, LLC, AND ROSE TRAIL VENTURES 2, LLC, PRAVIN THAKKAR JR, KWANSOO LEE, DDS, TOM ANDERSON, ABBEY ANDERSON, BRIAN CHU, DDS, LARINA CHU, DAVID SCHROEDER, SARAH SCHROEDER, REGINALD FRANKLIN, ANGEL FRANKLIN, DYLAN ROSS, TAYLOR ROSS, CODY BISHOP, DAVID BROWN, KARTHIKA MANDYAM, DAVID BERANEK, SUSAN PINKERTON, RADHIKA SIRIPIREDDY, KARL SCHOENLEBER, JAMES SARTAIN, NIRUPA KESKAR, JOHN FLACK, TRUNG NGUYEN, LI LIANG, TAN QUAN NGUYEN, ASHOKA SHEANH, MATHEW FELLOWS, CHARLES COGGINS, THOMAS WAWERSICH, JASON BLOUGH, MICHELE BLOUGH, KAREN LAVIN, PADMA KANDIKONDA, PAVAN KANDIKONDA, JAMES VILT II, BASANT KUMAR, RADHIKA KAMALLA, MARC HILDEBRAND, DEBRA HILDEBRAND, MERRILL STODDARD, DANIELLE STODDARD, VENKITA SHARMA, TIMOTHY DAILEY, ROBERT HOERY, STEFANI HOERY, SEAN DONE, ANNA DONE, STERLING DAVIS, MARK FLEMING, STACEY FLEMING, BO YANG, STEVEN WELLS, DUSTIN BRAEGER, NAVANEETH KUMAR, WILLIAM WHITE, JEANNETTE WHITE, JEFFREY BROOKE, JOSHUA OED, JAMES ESTES, ADRIA ESTES, MICHAEL BAILEY, KARTHIGA JAYARAM, KARTHIKEYAN RAMPRASATH, ARCHAN TLKOTI, AASHISH PAREKH, JACOB

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

LETOURNEAU, KARLA LETOURNEAU, KONDA REDDY GADI, SREELAKSHMI SIRIPURAM, JOSHUA LEYKAM, PAIGE LEYKAM, HELMUT GIEWAT, DEREN FLESHER, DDS, GARY YOUNG, HEIDI YOUNG, RONALD COLE, DDS, JAMES WALKER, DDS, DUANE OKAMOTO, LINDA OKAMOTO, SCOTT BURAU, DDS, BRAD BURAU, DDS, JOSH MCNARY, ROBERT DOST, DDS,

Plaintiffs,

v.

RYAN R. WEAR and REBECCA A. SWAIN, CREATIVE TECHNOLOGIES, LLC d/b/a WATERSTATION TECHNOLOGY, WST FRANCHISE SYSTEMS LLC, WATER STATION MANAGEMENT, LLC, KEVIN NOONEY and ELIZABETH NOONEY, and the marital community comprised thereof, REFRESHING USA, LLC, SUMMIT MANAGEMENT SERVICES, LLC, IDEAL PROPERTY INVESTMENTS, LLC, REFRESHING CALIFORNIA L.L.C., REFRESHING MONTANA, LLC, REFRESHING MID-ATLANTIC, LLC, REFRESHING CAROLINES, LLC, REFRESHING GREAT LAKES, LLC, WATERSTATION FINANCE COMPANY, LLC, REFRESHING GEORGIA, LLC, CREATIVE TECHNOLOGIES FLORIDA, LLC, REFRESHING FLORIDA, LLC, 2129 ANDREA LANE LLC, 3209 VAN BUREN LLC, ICE & WATER VENDORS, LLC, IDEAL INDUSTRIAL PARK, LLC, IDEAL AZ PROPERTY INVESTMENTS, LLC, K-2 ACQUISITION, LLC, EMERY DEVELOPMENT, LLC, ARIZONA WATER VENDORS INCORPORATED, WST AZ PROPERTIES LLC, 1118 VIRGINIA AVENUE LLC, 11519 SOUTH PETROPARK LLC, TCR PLUMBING, LLC, 3422 W CLARENDON AVE LLC, 1206 HEWITT AVE LLC, WATERSTATION TECHNOLOGY II, LLC, PISTOL, INC., SMOKEY POINT HOLDINGS, LLC, 602 SOUTH MEAN, LLC, 719 EDEN, LLC, 343

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

GROUP LLC, 4300 FOREST LLC, 70 NO
GARDEN, LLC, 204 NWW LLC,
WATERSTATION TECHVENTURE, LLC,
WATER STATION HOLDINGS LLC,
WATERSTATION TECHNOLOGY, LLC,
REFRESHING COLORADO LLC,
ARIZONA VENDORS INC., GOLDEN
STATE VENDING, LLC, REFRESHING
FLORIDA LLC, REFRESHING MIDWEST,
LLC, REFRESHING MIDWEST REAL
ESTATE, LLC, REFRESHING NEW
MEXICO, LLC, REFRESHING NEW
ENGLAND LLC, REFRESHING TEXAS
LLC, REFRESHING OKLAHOMA LLC,
REFRESHING WASHINGTON, LLC,
SMART SODA HOLDINGS, INC.,
VENDPRO, LLC d/b/a ELITEVEND,
HARRISON STREET, LLC, 602 SOUTH
MEADOW LLC, 8825 LLC, UNIBANK, U &
I FINANCIAL CORP., SIMON BAI,
STEPHANIE YOON, D. BENJAMIN LEE,
PETER PARK, FIRST FED BANK, FIRST
NORTHWEST BANKCORP, NORMAN
TONINA, CRAIG CURTIS, JENNIFER
ZACCARDO, CINDY FINNIE, DANA
BEHAR, MATTEW DEINES, SHERILYN
ANDERSON, GABRIEL GALANDA, LYNN
TERWOERDS, LARRY HOUK,
NORTHWEST FINANCIAL SERVICES,
LLC, RICHARD WEAR,

Defendants.

Pacific Water Technology, LLC, Spruce Waters Investments, LLC, Indiana Water
Technology, LLC, AR Water Supply, LLC, BLC Water Company, Granite Street Ventures,
LLC, and Rumson Wellness, LLC, and the other plaintiffs named herein, ("Plaintiffs") by and
through their undersigned attorney, John T. Bender of Corr Cronin LLP, for their Complaint
against Defendants Ryan Wear and Rebecca A. Swain, Creative Technologies, LLC, WST
Franchise Systems LLC, Water Station Management, LLC, Refreshing USA, LLC, and Kevin
Nooney and Elizabeth Nooney, and the marital community comprised thereof, and the other

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 4

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 77

WST Defendants identified in Paragraphs 75-133 below (collectively, "WST") and non-WST Defendants identified in Paragraphs 134-141, allege as follows:

## NATURE OF ACTION

1.	This suit arises out of fraud, civil conspiracy, violations of the Securities Act of Washington, violations of Washington's Consumer Protection Act, breach of contract, and other serious misconduct by the WST Defendants and non-WST Defendants alike.

2.	Ponzi schemes are investment frauds characterized by the organizer's use of new funds to pay the returns of old investors creating the false impression of a thriving, profitable business. In every Ponzi scheme, at some point the organizer is unable to access the new capital that is necessary to continue making the promised payments that are essential for keeping old investors at bay. Operating a Ponzi scheme also depends on the perpetuation of a complex web of lies designed to keep investors in the dark for as long as possible. This is what has happened here.

3.	WST, under the direction and control of Defendant Ryan Wear, raised approximately $130 million from unsuspecting investors who were told they were investing in a growing and profitable water-vending manufacturing and distribution business. WST raised a substantial portion of these funds by using the small business lending system to its advantage, sourcing financing from a select group of partner banks who issued loans to nearly 100 different WST investors.

4.	WST induced investors to invest by representing that the investment would generate steady returns ranging from 12-20%. WST told investors that their capital would be used to purchase water dispensary machines for installation at retail locations throughout the U.S., and that if they were ever dissatisfied with the investment they would receive 100% of their capital back. WST further induced many other investors to finance the investment by

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 5

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 78

assuring them that the revenues generated from their machines would offset the monthly payments necessary to service their loans.

5. In late 2022 and early 2023, WST stopped paying the revenue payments that they had assured Plaintiffs would continue during the life of the investment. Unbeknownst to Plaintiffs, WST's ability to find new liquidity sources needed to continue making payments came to an abrupt end. Ever since, WST has been actively misleading investors about the nature of the liquidity shortfall and has repeatedly sowed false hope about payments resuming to keep investors at bay. As it turns out, most if not all of WST's representations dating back to Plaintiffs' initial investments have been false, misleading, or both. WST has engaged in a deliberate scheme to conceal the true state of its operations and the reasons for its sudden shortfall of cash.

6. While WST had long touted over 17,000 revenue-generating locations, the number of machines in operation is actually far lower. WST misled Plaintiffs about the existence and locations of the machines they were purchasing. WST diverted tens-of-millions of dollars of investor capital to purchase real property in multiple states, to finance other operations, and to personally enrich Wear.

7. Ponzi schemes nearly always entail one or more financial institutions willing to turn a blind eye and/or contribute to the scheme. Here, Unibank and First Fed played a pivotal role in enabling WST's fraud. They combined to issue roughly 90 loans to WST, in the names of investors—funds that were supposed to be used to purchase thousands of operable machines. Unibank and First Fed had superior knowledge, expertise, and access to information that they should have and could have brought to bear to prevent WST's fraud. Instead, both banks made misrepresentations and omissions that deepened the fraud. And, now, despite the role they played in facilitating and profiting from WST's scheme, the banks

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 6

**Corr Cronin llp**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 79

have adopted a hard line in their dealings with the victims of the fraud. To this very day, the banks have refused to take responsibility for their role, and have made clear that they intend to force the victims to backstop the banks' losses—even if that means taking investors' homes and forcing their families into personal bankruptcy.

8.      Every victim of investment fraud faces financial catastrophe; but the ongoing and double-edged nature of the instant case makes the current situation all the more tragic. Plaintiffs, like so many others, have lost their savings. But the cessation of payments has, for many, also meant the lack of resources to service the Unibank and First Fed loans, which has now placed their homes and livelihoods in jeopardy.

9.      The position Plaintiffs and other investors have been placed in is simply unconscionable. Plaintiffs have been severely damaged by WST, the banks, and others—and their injuries are continuing. Defendants have robbed Plaintiffs of their financial security and have put Plaintiffs at great risk of losing their homes and their livelihoods entirely.

10.      Accordingly, Plaintiffs now bring this action to hold Defendants accountable, to recover their investments and other monetary damages to which they are entitled, and to seek all available equitable and or injunctive relief that this Court deems necessary and appropriate.

## **PARTIES**

11.      Pacific Water Technology LLC is a limited liability company registered in Washington and a borrower-investor in WST. Dr. Kwansoo Lee, a resident of Washington, is the owner of Pacific Water Technology, and was also harmed by Defendants.

12.      Spruce Waters Investments LLC is a limited liability company registered in Florida and a borrower-investor in WST. Tom and Abbey Anderson are married. Anderson is the owner of Spruce Waters Investments and the Andersons, residents of Florida, were also

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

harmed by Defendants.

13.     Indiana Water Technology LLC is a limited liability company registered in Indiana and a borrower-investor in WST. David and Sarah Schroeder are married. Schroeder is the owner of Indiana Water Technology and the Schroeders, residents of Indiana, were also harmed by Defendants.

14.     AR Water Supply LLC is a limited liability company registered in Texas and a borrower-investor in WST. Reginald and Angel Franklin are married. Franklin is the owner of AR Water Supply and the Franklins, residents of New York, were also harmed by Defendants.

15.     BLC Water Company LLC is a limited liability company registered in Nevada and a borrower-investor in WST. Dr. Brian Chu is married to Larina Chu and is the owner of BLC Water Company and the Chus, residents of California, were also harmed by Defendants.

16.     Granite Street Ventures LLC is a limited liability company registered in Rhode Island and an investor in WST. Cody Bishop, a resident of Tennessee, is an owner of Granite Street and was also harmed by Defendants.

17.     Rumson Wellness LLC is a limited liability company registered in New Jersey and a borrower-investor in WST. Dylan and Taylor Ross are married. Ross is the owner of Rumson Wellness and the Rosses, residents of New York, were also harmed by Defendants.

18.     Brown Family Enterprises LLC is a limited liability company registered in Oregon and an investor in WST. David Brown, a resident of Oregon, is the owner of Brown Family Enterprises and was also harmed by Defendants.

19.     Kmandy Investments L.L.C. is a limited liability company registered in Texas and a borrower-investor in WST. Karthika Mandyam, a resident of Texas, is the owner of Kmandy Investments and was also harmed by Defendants.

20.     Ever Upward Inc. is a profit corporation registered in Virginia and a borrower-

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

investor in WST. David Beranek, a resident of Virginia, is the owner of Ever Upward and was also harmed by Defendants.

21.     Sun A WY LLC is a limited liability company registered in Wyoming and an investor in WST. Susan Pinkerton, a resident of Florida, is the owner of Sun A WY and was also harmed by Defendants.

22.     Siripi WST LLC is a limited liability company registered in Texas and a borrower-investor in WST. Radhika Siripireddy, a resident of Texas, is the owner of Siripi WST and was also harmed by Defendants.

23.     LivingWater Station LLC is a limited liability company registered in South Carolina and a borrower-investor in WST. Karl Schoenleber, a resident of South Carolina, is the owner of LivingWater and was also harmed by Defendants.

24.     GrayFin Ventures LLC is a limited liability company registered in Texas and a borrower-investor in WST. James Sartain, a resident of Texas, is the owner of GrayFin Ventures and was also harmed by Defendants.

25.     Prasiti Water Investments LLC is a limited liability company registered in     and an investor in WST. Nirupa Kieskar, a resident of Texas, is the owner of Prasiti Water Investments and was also harmed by Defendants.

26.     JBF Consulting Services LLC is a limited liability company registered in Tennessee and a borrower-investor in WST. John Flack, a resident of Tennessee, is the owner of JBF Consulting Services LLC and was also harmed by Defendants.

27.     Coco Aqua LLC is a limited liability company registered in Texas and an investor in WST. Trung Nguyen and Li Liang are married. Nguyen, a resident of Texas, is the owner of Coco Aqua and Nguyen and Liang were also harmed by Defendants.

28.     Arravend LLC is a limited liability company registered in Wyoming and was a

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

borrower-investor in WST. Ashoka Sheanh, a resident of Virginia, is an owner of Arravend and was also harmed by Defendants.

29.     Flatlands Equipment LLC is a limited liability company registered in Kansas and an investor in WST. Mathew Fellows, a resident of Kansas, is the owner of Flatlands Equipment and was also harmed by Defendants.

30.     C&C Investment Holdings LLC is a limited liability company registered in North Carolina, and an investor in WST. Charles Coggins, a resident of North Carolina, is the owner of C&C and was also harmed by Defendants.

31.     Great Oak Water, Limited Liability Company, is a limited liability company registered in Texas and a borrower-investor in WST. Thomas Wawersich, a resident of Texas, is the owner of Great Oak and was also harmed by Defendants.

32.     WV Water Tech LLC is a limited liability company registered in West Virginia and a borrower-investor in WST. Jason Blough and Michele Blough are married. Blough is the owner of WV Water Tech and the Bloughs, residents of West Virgina, were also harmed by Defendants.

33.     Kdawg Crypto LLC is a limited liability company registered in Connecticut and a borrower-investor in WST. Karen Lavin, a resident of Connecticut, is the owner of Kdawg Crypto and was also harmed by Defendants.

34.     Culminate Water Technology, LLC, is a limited liability company registered in Virginia and a borrower-investor in WST. Padma and Pavan Kandikonda are married. Kandikonda is the owner of Culminate and the Kandikondas, residents of Virgina, were also harmed by Defendants.

35.     ChugIt, LLC, is a limited liability company registered in Florida and a borrower-investor in WST. Jim Vilt II, a resident of Tennessee, is the owner of ChugIt and was also

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 10

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 83

harmed by Defendants.

36.     Chaurishi Retail Enterprises, LLC, is a limited liability company registered in Oregon and a borrower-investor in WST. Basant Kumar, a resident of Oregon, is the owner of Chaurishi and was also harmed by Defendants.

37.     Progressive Partners LLC is a limited liability company registered in Virginia and an investor in WST. Radhika Kamalla, a resident of Virginia, is the owner of Progressive Partners and was also harmed by Defendants.

38.     210 SA Holdings LLC is a limited liability company registered in Texas and an investor in WST. Marc and Debra Hildebrand are married. Hildebrand is the owner of 210 SA Holdings and the Hildebrands, residents of Texas, were also harmed by Defendants.

39.     WST Utah LLC is a limited liability company registered in Utah and a borrower-investor in WST. Merrill and Danielle Stoddard are married. Stoddard is the owner of WST Utah and the Stoddards, residents of Utah, were also harmed by Defendants.

40.     V2S2 LLC is a limited liability company registered in Colorado and an investor in WST. Venkita Sharma, a resident of Colorado, is the owner of V2S2 and was also harmed by Defendants.

41.     Cyborg Holdings LLC is a limited liability company registered in Washington and an investor in WST. Timothy Dailey, a resident of Arizona, is the owner of Cyborg Holdings and was also harmed by Defendants.

42.     ASH Vending LLC is a limited liability company registered in Colorado and an investor in WST. Robert Hoery and Stefani Hoery are married. Hoery is the owner of ASH Vending and the Howery's, residents of Colorado, were also harmed by Defendants.

43.     Adventure Done Right LLC is a limited liability company registered in Utah and an investor in WST. Sean Done and Anna Done are married. Done is the owner of

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Adventure Done Right and the Dones, residents of Utah, were also harmed by Defendants.

44. Big Boy Tools LLC is a limited liability company registered in Ohio and a borrower-investor in WST. Sterling Davis, a resident of Indiana, is the owner of Big Boy Tools and was also harmed by Defendants.

45. Roman Jarosiewicz is a resident of Minneapolis and a borrower-investor in WST.

46. Abby Wyatt Group Inc. is a private corporation registered in South Carolina and an investor in WST. Mark and Stacey Fleming are married. Fleming is the owner of Abby Wyatt and the Flemings, residents of South Carolina, were also harmed by Defendants.

47. Aiden Waterworks, LLC, is a limited liability company registered in Michigan and an investor in WST. Bo Yang, a resident of Michigan, is the owner of Aiden Waterworks and was also harmed by Defendants.

48. Horeb Water Solutions, LLC, is a limited liability company registered in Maryland and an investor in WST. Steven Wells, a resident of Pennsylvania, is the owner of Horeb and was also harmed by Defendants.

49. Silver Oak H20 LLC is a limited liability company registered in Colorado and an investor in WST. Dustin Braeger, a resident of Colorado, is the owner of Silver Oak and was also harmed by Defendants.

50. NS SQ ECO Waters LLC, is a limited liability company registered in Illinois and a borrower-investor in WST. Navaneeth Kumar, a resident of Illinois, is the owner of NS SQ ECO Waters and was also harmed by Defendants.

51. JK Seven LLC is a limited liability company registered in Delaware and a borrower-investor in WST. William and Jeannette White are married. White is the owner of JK Seven and the Whites, residents of Texas, were also harmed by Defendants.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 12

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 85

52.     Jeffrey Brooke is a resident of Illinois and an investor in WST.

53.     Oed Properties LLC is a limited liability company registered in Texas and a investor in WST. Joshua Oed, a resident of Texas, is the owner of Oed Properties and was also harmed by Defendants.

54.     JLE Enterprises LLC is a limited liability company registered in Colorado and a borrower-investor in WST. James Estes, a resident of Colorado, is the owner of JLE and was also harmed by Defendants.

55.     Be of Service LLC is a limited liability company registered in Wyoming and a borrower-investor in WST. Michael Bailey, a resident of Texas, is the owner of Be of Service and was also harmed by Defendants.

56.     Etania LLC is a limited liability company registered in Colorado and a borrower-investor in WST. Karthiga Jayaram and Karthikeyan Ramprasath are married. Jayaram is the owner of Etania and Jayaram and Ramprasath, residents of Colorado, were also harmed by Defendants.

57.     Nira Enterprises LLC is a limited liability company registered in Texas and a borrower-investor in WST. Archan Tlkoti, a resident of Texas, is the owner of Nira and was also harmed by Defendants.

58.     Facts Property Services LLC is a limited liability company registered in Arizona and an investor in WST. Aashish Parekh, a resident of Arizona, is the owner of Facts Property and was also harmed by Defendants.

59.     IMLSunshine LLC is a limited liability company registered in Kansas and an investor in WST. Jacob and Karla Letourneau are married. Karla Letourneau is the owner of IMLSunshine and the Letourneaus, residents of Kansas, were also harmed by Defendants.

60.     Redwaters LLC is a limited liability company registered in Illinois and a

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

borrower-investor in WST. Konda Reddy Gadi and Sreelakshmi Siripuram are married. Gadi is the owner of Redwaters and Gadi and Siripuram, residents of Illinois, were also harmed by Defendants.

61.     Starter Holdings LLC is a limited liability company registered in Arizona and an investor in WST. Joshua and Paige Leykam are married. Leykam is the owner of Starter Holdings and the Leykams, residents of Arizona, were also harmed by Defendants.

62.     Helmut Giewat is a resident of Florida and an investor in WST.

63.     Todd and May Auerbach are residents of California and investors in WST.

64.     Royal Reservoirs LLC is a limited liability company registered in Oklahoma and an investor in WST. Dr. Deren Flesher, a resident of Oklahoma, is the owner of Royal Reservoirs and was also harmed by Defendants.

65.     Aqualux Water LLC is a limited liability company registered in Texas and a borrower-investor in WST. Gary Young, a resident of Texas, is the owner of Aqualux and was also harmed by Defendants.

66.     Q & V LLC, WaterStation Technology of Rockville, is a limited liability company registered in Maryland and a borrower-investor in WST. Tan Quan Nguyen, a resident of Maryland, is the owner of Q & V and was also harmed by Defendants.

67.     RCWSTECH1157 LLC and COLEWSTECH LLC are limited liability companies registered in Illinois and borrower-investors in WST. Dr. Ron Cole, a resident of Illinois, is the owner of RCWSTECH1157 and COLEWSTECH and was also harmed by Defendants.

68.     Maji 8377 LLC is a limited liability company registered in Michigan and a borrower-investor in WST. Dr. James Walker, a resident of Michigan, is the owner of Maji 8377 and was also harmed by Defendants.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 14

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 87

69.     Oaks Waterstation Tech LLC is a limited liability company registered in Wyoming and an investor in WST. Duane Okamoto and Linda Okamoto are the owners of Oaks Waterstation and the Okamotos, residents of Washington, were also harmed by Defendants.

70.     SDB H20 LLC is a limited liability company registered in Florida and an investor in WST. Dr. Scott Burau, a resident of Florida, is the owner of SDB H20 and was also harmed by Defendants.

71.     WST LLC is a limited liability company registered in Florida and an investor in WST. Dr. Brad Burau, a resident of Florida, is the owner of WST LLC and was also harmed by Defendants.

72.     Half Full Vending LLC is a limited liability company registered in Texas and a borrower-investor in WST. Josh McNary, a resident of Texas, is the owner of Half Full and was also harmed by Defendants.

73.     RDWSTECH3594 LLC is a limited liability company registered in Michigan and a borrower-investor in WST. Dr. Robert Dost, a resident of Michigan, is the owner of RDWSTECH3594 and was also harmed by Defendants.

74.     Rose Trail Ventures, LLC, and Rose Trail Ventures 2, LLC, are limited liability companies registered in Tennessee and borrower-investors in WST. Pravin Thakkar, a resident of Tennessee, is the owner of Rose Trail Ventures and Rose Trail Ventures 2 and was also harmed by Defendants.

75.     Ryan Wear and Elizabeth Swain reside in Snohomish County, Washington. Wear is a principal, owner, managing agent, and/or control person of various entity-Defendants named in this action.

76.     Creative Technologies, LLC, d/b/a WaterStation Technology, upon information and belief, is a limited liability company owned and controlled by Defendant

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Wear that engages in business activities in Snohomish County.

77.    WST Franchise Systems, LLC, upon information and belief, is a Washington limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

78.    Water Station Management, LLC, upon information and belief, is a Washington limited liability company owned and controlled by Defendant Wear, with a principal place of business in Snohomish County that engages in business activities in Snohomish County.

79.    Kevin Nooney, upon information and belief, resides in King County, Washington, and is married to Elizabeth Nooney. At all relevant time, Defendant Nooney acted for the benefit of his marital community.

80.    Refreshing USA LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

81.    Summit Management Services, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

82.    Ideal Property Investments, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

83.    Refreshing California L.L.C. upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

84.    Refreshing Montana, LLC, upon information and belief, is a limited liability

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

85.     Refreshing Mid-Atlantic, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

86.     Refreshing Carolinas, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

87.     Refreshing Great Lakes, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

88.     WaterStation Finance Company, LLC, upon information and belief, is a limited liability company owned and controlled by Wear that engages in business activities in Snohomish County.

89.     Refreshing Georgia, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

90.     Creative Technologies Florida, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

91.     Refreshing Florida LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

92.     2129 Andrea Lane LLC, upon information and belief, is a limited liability

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

93.     3209 Van Buren. LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

94.     602 South Meadow, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

95.     Ice & Water Vendors LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

96.     Ideal Industrial Park LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

97.     Ideal AZ Property Investments, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

98.     K-2 Acquisition, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

99.     Emery Development, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

100.     Arizona Water Vendors Incorporated, upon information and belief, is a limited

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

liability company owned and controlled by Defendant.

101.    WST AZ Properties, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

102.    1118 Virginia Street, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

103.    11519 South Petropark, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

104.    TCR Plumbing LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

105.    3422 W Clarendon Ave, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

106.    1206 Hewitt Ave LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

107.    WaterStation Technology II, LLC, upon information and belief, is a limited liability company owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

108.    Pistol, Inc., upon information and belief, is a Wyoming corporation owned and controlled by Defendant Wear that engages in business activities in Snohomish County.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 19

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 92

109.     Smokey Point Holdings, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

110.     719 Eden, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

111.     602 South Meadow, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

112.     Group, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

113.     4300 Forest, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

114.     70 NO Garden, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

115.     204 NWW, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

116.     WaterStation Techventure, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

117. Water Station Holdings, LLC, WaterStation Technology, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

118. Refreshing Colorado, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

119. Arizona Vendors Inc., upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

120. Golden State Vending, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

121. Refreshing Florida, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

122. Refreshing Midwest, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

123. Refreshing Midwest Real Estate, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

124. Refreshing New Mexico, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 21

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 94

125.     Refreshing New England, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

126.     Refreshing Texas, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

127.     Refreshing Oklahoma, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

128.     Refreshing Washington, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

129.     Smart Soda Holdings, Inc., upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

130.     VendPro, LLC d/b/a EliteVend, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

131.     Harrison Street, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

132.     602 South Mean, LLC, upon information and belief, is a limited liability company owned, operated, and controlled by Defendant Wear that engages in business activities in Snohomish County.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 22

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 95

133.    Richard Wear is a Washington resident and owner of one or more entity-Defendants and/or valuable assets in this matter.

134.    UniBank is a state chartered commercial bank organized in Washington that, upon information and belief, engages in business activities in Snohomish County. Unibank is a wholly owned subsidiary of Defendant U & I Financial Corp.

135.    U & I Financial Corp. is a profit corporation, organized under the laws of Washington that, upon information and belief, engages in business activities in Snohomish County. U & I is a one-bank holding company which owns and controls all shares of Unibank.

136.    Upon information and belief, Simon Bai, Stephanie Yoon, D. Benjamin Lee, and Peter Park are Washington residents. Bai, Yoon, Lee and Park are officers of Unibank and U & I Financial Corp. and, as of August 2022, were Governors of Unibank and U & I Financial Corp. As of 2023, Park is listed as the sole governor of Unibank and U & I Financial Corp. [1]

137.    First Fed Bank is a state chartered commercial bank organized in Washington that, upon information and belief, engages in business activities in Snohomish County. Upon information and belief, First Fed Bank is a wholly owned subsidiary of First Northwest Bancorp.

---

[1] The Plaintiffs asserting claims against the Defendants identified in Paragraphs 134 through 136 are: Be of Service, LLC, Ever Upward Inc., WV Water Tech, LLC, SDB H20, LLC, WST, LLC, C&C Investment Holdings, LLC, COLEWSTECH, LLC, RCWSTECH 1157, LLC, Big Boy Tools, LLC, RDWSTECH3594, LLC, JLE Enterprises, LLC, JBF Consulting Services, LLC, Abby Wyatt Group, Inc., Culminate Water Technology, LLC, Pacific Water Technology, LLC, Starter Holdings, LLC, Sun A WY, LLC, GrayFin Ventures, LLC, V2S2, LLC, Arravend, LLC, Siripi WST, LLC, NS SQ ECO Waters, LLC, ChugIt, LLC, Horeb Water Solutions, LLC, Michael Bailey, David Beranek, Jason Blough, Michele Blough, Scott Burau DDS, Bradley Burau DDS, Charles Coggins, Ronald Cole DDS, Sterling Davis, Robert Dost DDS, James Estes, Adria Estes, John Flack, Mark Fleming, Stacey Fleming, Helmut Giewat, Roman Jarosiewicz, Padma Kandikonda, Pavan Kandikonda, Kwansoo Lee DDS, Joshua Leykam, Paige Leykam, Josh McNary, Susan Pinkerton, James Sartain, Venkita Sharma, Ashoka Sheanh, Radhika Siripireddy, Navaneeth Kumar, James Vilt II, and Steven Wells.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 23

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

138.    First Northwest Bancorp is a holding company which, upon information and belief, owns and controls all shares of First Fed Bank and engages in business activities in Snohomish County.

139.    Upon information and belief, Norman Tonina, Craig Curtis, Jennifer Zaccardo, Cindy Finnie, Dana Behar, Matthew Deines, Sherilyn Anderson, Gabriel Galanda, and Lynn Terwoerds are Washington residents. At present, Tonina, Curtis, Zaccardo, Finnie, Behar, Deines, Anderson, Galanda, and Terwoerds are officers and Governors of First Northwest Bancorp.[2]

140.    The Defendants listed in Paragraphs 140 and 143 are referred to collectively herein as the "Bank Governor Defendants."

141.    Larry Houk is a Washington resident, and the owner and operator of Northwest Financial Services, LLC. Upon information and belief, Northwest Financial Services LLC conducts business in Snohomish County.

## JURISDICTION AND VENUE

142.    This Court has subject matter jurisdiction pursuant to RCW 2.08.010.

143.    Venue is appropriate pursuant to RCW 4.12.025 and RCW 4.12.010.

## FACTUAL ALLEGATIONS

**A. Wear created WST in or about 2013.**

144.    Ryan Wear formed "WaterStation Technology" in 2013. He has overseen all operations and activities since its founding.

145.    Wear has organized dozens of limited liability companies to carry out various

---

[2] The Plaintiffs asserting claims against the Defendants identified in Paragraphs 137 through 139 are: BLC Water Company, LLC, COLEWSTECH, LLC, RCWSTECH 1157, Royal Reservoirs, LLC, Brian Chu DDS, Chaurishi Retail Enterprises, LLC, Kdawg Crypto, LLC, Pacific Water Technology, LLC, Indiana Water Technology, LLC, Larina Chu, Ronald Cole DDS, Deren Flesher DDS, Basant Kumar, Karen Lavin, Kwansoo Lee, David Schroeder and Sarah Schroeder.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 24

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 97

aspects of the same business. For example, in 2016, Wear formed Water Station Management. In 2017, Wear formed WST Franchise Systems. Wear's companies have repeatedly become delinquent with the Washington Secretary of State.

146. Wear owns or controls 57 active LLCs, at least 20 of which in other states. Many of these entities are either related to WST's business or hold other valuable assets, which, upon information and belief, were diverted from WST and are potential sources of recovery in this action. Many of these entities have been named in this action.

147. Upon information and belief, Wear did not honor the corporate formalities of these entities and operated WST as a single, consolidated enterprise.

**B. Wear and WST induced consumers to invest based upon false and misleading assurances about the security and profitability of the investment.**

148. Dating back to at least 2017, Wear and WST induced hundreds of investors from around the country to invest in unregistered securities that WST marketed and sold as franchise opportunities.

149. Wear and WST employed a variety of tactics to solicit and induce Plaintiffs and others to invest. Wear and WST's marketing efforts were tailored to appeal to a broad range of potential investors, many of whom had little experience in managing or investing in the type of business at issue.

150. Investors relied on Wear, WST and various third parties' superior knowledge and expertise with respect to how best to invest their capital. Wear and WST made numerous false or misleading statements that led investors to believe an investment in WST would be safer and more profitable than it truly was.

151. As set forth in further detail below, the structure of the investment marketed to investors itself was inherently misleading to investors and designed to be that way.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1
2
3
4

152.    To induce Plaintiffs and others to invest, Wear and WST touted itself as a "fast growing manufacturer" of "revolutionary" and "cutting edge" water dispensary machines with tens of thousands operating locations across the U.S.

153.    Wear and WST claimed that the heart of its business was its "patent pending" technology for providing consumers "healthy, alkaline, ionized water" "at a fraction of the cost of its bottled counterpart." Plaintiffs were assured that THEY were investing in a turnkey business with low overhead and positive cash flow that would generate steady revenues each month.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

154.    Investors were told that they would play an active role in the operation of their franchise.

155.    Wear and WST told investors they would have access to a real time "Cloud Portal" and timely and accurate "User Earnings Reports" that would enable them to track the performance of their machines down to the last detail.

156.    Wear and WST assured investors that the combination of its proprietary technology and custom "business model" created a "low overhead, cash flow positive business with great, long-term growth potential."







**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

157. WST assured investors that they would receive valuable rights and services in exchange for investing in its purported franchise. Wear and WST told investors it would supply and install their machines at revenue-generating locations and then service them in exchange for a share of the profits.

158. Wear and WST promised investors annual returns ranging from 12-20% that would be disbursed in regular monthly payments. Wear and WST also assured investors they would receive a "guaranteed buyback" of their machines that would "mitigate [the] risk" of the investment and "improve ROI." Wear and WST similarly told investors that it would reimburse them for 100% of their principal if they were ever dissatisfied with the investment.

159. These assurances – and many others – were false or misleading or both.

**C. WST raised over $100 million from investors from all over the U.S., many of whom were induced to invest with consumer business loans collateralized with their personal assets.**

160. Wear and WST's fundraising efforts were remarkably successful. To amplify their reach to investors all over the country, Wear and WST invested heavily in internet marketing and entered into kickback arrangements with investment advisors and business brokers around the country.

161. Under these kickback agreements, brokers received commissions ranging between 2% and 10% of every dollar they sourced to Wear and WST. In many cases these arrangements were not disclosed.

162. Wear and WST's successful marketing campaign created multiple referral streams from which Wear and WST successfully converted new investment capital on the basis of their many false and misleading representations.

163. Upon information and belief, Wear and WST raised over $100 million from investors throughout the U.S., many of whom were induced to fund the investment with small

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 28

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 101

business loans collateralized with their personal assets.

164. In the majority of cases, Wear and WST induced investors to obtain loans from a select group of small and regional banks of WST's choosing, with whom WST had undisclosed ties, and who paid the funds directly to WST. Wear and WST told investors that the security and profitability of an investment in WST justified pledging their personal assets as collateral. Wear and WST led the investor-borrowers to believe that the monthly revenue payments from the water machines would more than offset their monthly loan payments.

165. The following table summarizes just the principal investments of Plaintiffs:

| Name | Principal Investment |
|---|---|
| Spruce Waters Investments, LLC | $994,500 |
| Indiana Water Technology, LLC | $3,323,500 |
| AR Water Supply, LLC | $3,272,500 |
| Pacific Water Technology, LLC | $3,145,000 |
| BLC Water Company, LLC | $1,003,000 |
| Granite Street Ventures, LLC | $3,102,500 |
| Rumson Wellness, LLC | $1,020,000 |
| Brown Family Enterprises, LLC | $425,000 |
| Kmandy Investments, L.L.C. | $637,500 |
| Ever Upward, Inc. | $280,500 |

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

| | |
|---|---|
| Sun A WY, LLC | $1,003,000 |
| Siripi WST, LLC | $3,408,500 |
| LivingWater Station, LLC | $425,000 |
| GrayFin Ventures, LLC | $850,000 |
| Prasiti Water Investments, LLC | $2,805,000 |
| JBF Consulting Services, LLC | $425,000 |
| Coco Aqua, LLC | $425,000 |
| Q & V, LLC | $484,500 |
| Arravend, LLC | $6,362,500 |
| Flatlands Equipment, LLC | $1,020,000 |
| C&C Investment Holdings, LLC | $850,000 |
| Great Oak Water, Limited Liability Company | $382,500 |
| WV Water Tech, LLC | $1,003,000 |
| Kdawg Crypto, LLC | $425,000 |
| Culminate Water Technology, LLC | $425,000 |
| ChugIt, LLC | $3,575,500 |
| Chaurishi Retail Enterprises, LLC | $425,000 |

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

| | |
|---|---|
| Progressive Partners, LLC | $425,000 |
| 210 SA Holding, LLC | $500,000 |
| WST Utah, LLC | $425,000 |
| V2S2, LLC | $850,000 |
| Cyborg Holdings, LLC | $600,000 |
| Ash Vending, LLC | $850,000 |
| Adventure Done Right, LLC | $425,000 |
| Big Boy Tools, LLC | $2,975,000 |
| Roman Jarosiewicz | $425,000 |
| Abby Wyatt Group, Inc. | $561,000 |
| Aiden Waterworks, LLC | $595,000 |
| Horeb Water Solutions, LLC | $382,500 |
| Silver Oak H20, LLC | $297,500 |
| NS SQ ECO Waters, LLC | $425,000 |
| JK Seven LLC | $280,500 |
| Jeffrey Brooke | 255,000 |
| Oed Properties LLC | 425,000 |
| JLE Enterprises LLC | 425,000 |
| Be of Service LLC | $425,000 |
| Etania, LLC | $459,000 |
| NIRA Enterprises, LLC | $850,000 |

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

| | |
|---|---|
| Facts Property Services, LLC | $425,000 |
| IMLSUNSHINE, LLC | $425,000 |
| Redwaters, LLC | $1,386,000 |
| Starter Holdings, LLC | $425,000 |
| Helmut Giewat | $195,500 |
| May Auerbach | $391,000 |
| Royal Reservoirs, LLC | $433,500 |
| Aqualux Water, LLC | $1,003,000 |
| RCWSTECH1157, LLC, COLEWSTECH, LLC | $4,386,000 |
| Maji 8377, LLC | $1,470,500 |
| Oaks WaterStation Tech, LLC | $850,000 |
| SDB H20, LLC | $1,700,000 |
| WST, LLC | $1,844,500 |
| Half Full Vending, LLC | $382,500 |
| RDWSTECH3594, LLC | $1,598,000 |
| Rose Trail Ventures, LLC, Rose Trail Ventures 2, LLC | $4,998,000 |
| **TOTAL: 76,267,500** | |

166.    The damages Plaintiffs have sustained exceed these sums in an amount to be

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 32

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 105

proven at trial.

### D. Wear and WST structured the investments as the sale of franchise opportunities to use small business loans as a seemingly limitless source of capital—and the banks provided substantial assistance.

167. Wear and WST went to great lengths to structure Plaintiffs' investments to look like the sale of franchise opportunities, but the transactions actually constituted sales of unregistered securities. Upon information and belief, Wear and WST structured the investments as franchise opportunities to leverage the small business lending system as a lucrative funding source.

168. Most of WST's sales of franchises/unregistered securities adhered to a common playbook and consisted of virtually identical paperwork. First, WST would execute a so-called *"purchase order"* that delineated the number of machines to be sold at a particular price. WST then executed so-called *"franchise agreements,"* under which WST was supposed to license investors a lucrative water-vending business model. Next, WST would execute so-called "*service agreements*" with investors, under which WST committed to help install and service the machines that investors had purchased, and then remit monthly revenue payments in exchange for a share of the profits. During the negotiation process, Wear and WST also frequently touted to investors that they were an "SBA approved" franchise, and that WST had close relationships with certain partner banks (including Unibank and First Fed) willing to provide business loans to finance the investment. Unibank and First Fed issued the vast majority of loans to WST investors, issuing collectively close to 90 separate loans further padding the pockets of Wear and WST (Unibank issued over 70 loans and First Fed approximately a dozen).

169. Both Unibank and First Fed are Small Business Administration (SBA) preferred lenders and the law imposes upon them the duty to implement and maintain adequate loan practices, systems, and safeguards. Both Unibank and First Fed are subject to DFI, FDIC, and

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

SBA regulation and rules. In connection with facilitating such a staggering number of investments, each bank engaged in a laundry list of substandard pre- and post-closing loan practices and, as applicable, violations of SBA, FDIC, and industry rules and standards.

170.     Unibank and First Fed's involvement with these securities transactions went well beyond the typical lender-borrower relationship. Unibank and First Fed had specialized knowledge and expertise that the borrower Plaintiffs and their family members relied on in making the decision to invest. The borrower Plaintiffs reasonably and justifiably relied on Unibank and First Fed to guide them through the process and to disclose any material information bearing on the transaction. Unibank and First Fed assumed fiduciary duties to investors while aiding and abetting Wear and WST's activities.

171.     Unibank and First Fed also had superior access to information – such as duplicate machine lists, discussed in more detail below – that put them on notice of Wear and WST's fraud. As discussed in further detail below, the significant duplication rate between the machine lists WST provided for dozens of investors – and that the banks used to file UCC-1s to secure the loans – should have triggered fraud alerts at the banks and halted their reckless lending practices. But it did not.

172.     Both banks also made misrepresentations and/or omissions that misled the borrower Plaintiffs about the relative quality, safety, and propriety of the investment transactions and legal obligations at issue. The banks made misrepresentations and/or omissions about the nature of the transaction that created a false and/or misleading sense that the investment in WST was safer than it truly was. Upon information and belief, Unibank, in particular, made false representations and/or omissions to investors and SBA about the nature of the investments and whether the loans were compliant with the SBA's 7(a) program.

173.     Unibank and First Fed's roles in the WST scheme were also rife with conflicts

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

of interest. Unibank personnel had close personal ties to WST personnel; Unibank personnel even invested in WST themselves, ultimately receiving a full return of their funds. Neither of these facts were ever disclosed.

174. First Fed, in turn, made four to five direct loans to WST and Wear prior to the loans it issued to borrower Plaintiffs. First Fed's loan terms with the company granted the bank intimate access to the inner workings of WST, and all manner of internal financial information. Upon information and belief, First Fed was placed on notice of WST's challenges and/or improprieties early on. First Fed never disclosed to borrower Plaintiffs its direct lending to WST, or what it knew and/or learned about WST's precarious financial condition before issuing nearly a dozen loans to borrower Plaintiffs that it knew or should have known WST could not repay.

175. Defendant Larry Houk and Northwest Funding Services served as both Unibank and First Fed's loan broker of choice for these securities transactions. Even though Houk was supposed to have represented the subject investors' interests, it does not appear Houk actually did anything of the sort. Instead, the banks frequently relied upon Houk to streamline or expedite the underwriting process by gathering certain investor information. While apparently serving as the banks' preferred loan broker, Houk's son was actually employed by WST. This and Houk's kickback arrangements were never disclosed.

176. According to the same playbook, First Fed and Unibank always wired the funds directly to Wear and WST. The borrower Plaintiffs never touched any of the proceeds.

177. Both banks were substantial contributors to the sale of tens-of-millions of dollars' worth of WST's unregistered franchise securities. Each bank made substantial profits by engaging in these transactions, and sale of them on the secondary market. All such profits should be disgorged.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

178.  As noted, by virtue of the reckless violations of standard loan practices committed by their employees, and each bank's substandard systems, processes, and safeguards that should have been in place to protect against fraud, each bank recklessly and unmistakably violated industry standards and rules. The banking failures at these banks were systemic. Indeed, Unibank recently amended its public reports conceding the severe credit risk posed by the WST loans and is currently under DFI investigation. Further, each bank engaged in self-serving, misleading, and deceptive conduct to the detriment of the borrower Plaintiffs. The Banking Defendants and their officers are jointly and severally liable.

**E.  Wear and WST deceived Plaintiffs by selling the same machines to multiple investors and selling machines at locations that, upon inspection, do not exist—and the banks were complicit.**

179.  Upon information and belief, rather than using investor capital for the manufacture, sale, and placement of water vending machines as promised, Wear and WST diverted investor capital to other entities and for other purposes—including the acquisition of a real estate portfolio worth well over $100 million at today's prices.

180.  Wear and WST led investors to believe that their capital would be used to purchase WST's proprietary water-vending machines. As support for this claim, Wear and WST routinely furnished investors (and, in the case of borrower Plaintiffs, the banks) with written lists bearing serial numbers and locations at which investor machines were supposed to be located. Upon analysis, however, the duplication rate between the various equipment lists furnished by WST are *significant*—in many cases more than a third of the entries are duplicates. In the case of borrower Plaintiffs, had the banks adhered to standard underwriting practices, they would have discovered that the machine lists were riddled with duplicate entries, indicating Wear and WST were, at minimum, selling the same machines to different investors. This revelation should have triggered a fraud and, of course, additional action by the banks to prevent

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 36

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 109

fraud. But, astonishingly, that did not occur.

181.     Only First Fed and Unibank had access to equipment lists from many loans they were issuing – indeed, WST would provide the banks with lists for each borrower to support the loan. Thus, only First Fed and Unibank had the opportunity to discover the duplicate entries in time to prevent the fraud. But they were willfully and/or recklessly blind to it.

182.     Had the banks done what they were supposed to do, they would have discovered that the nature of Wear and WST's fraud actually runs deeper. In connection with this case, Upon information and believe, only about 10% of the purported machine "locations" inspected so far actually have machines at that location. In other words, roughly 90% of the machines allegedly sold to investors do not exist at all. Again, had the banks adhered to basic underwriting practices, they would have discovered this information and could have prevented WST's fraud.

183.     But First Fed and Unibank did none of this. Instead, they willingly issued dozens of fraudulent loans to unsuspecting investors, always transferring the funds directly to WST. By doing so, the banks substantially contributed to and enabled WST's scheme.

**F.  Wear and WST have violated the securities and franchise laws in a multitude of ways—and their deception continues to this day.**

184.     The list of all of the ways Plaintiffs allege Wear and WST violated their rights and Washington law is quite long. The following are some examples, some of which also apply to Unibank, First, and Houk:

   a.   Wear and WST provided investment advice to Plaintiffs and other investors though neither Wear nor WST was not registered in Washington to do so.

   b.   Wear and WST misled Plaintiffs and other investors about the safety and profitability of the investment as well as the nature of its growth, assets, and operations.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

c.  Wear and WST failed to screen Plaintiffs and other investors to ensure they were qualified to invest.

d.  Wear and WST deceived Plaintiffs and other investors about the returns they would receive and about the number of machines it had in operation.

e.  Wear and WST deceived Plaintiffs and other investors about how it would use their funds and how many machines they had sold to them.

f.  Wear and WST misled investors about who manufactured the machines.

g.  Wear and WST did not function like or provide the services of a legitimate franchise despite touting the investments as franchise opportunities and signing franchise agreements with investors. Wear and WST never furnished the promised training, software, specifications and standards, or even an operations manual.

h.  Wear and WST never had valuable patent rights in any proprietary technology.

i.  Wear and WST did not grant Plaintiffs and other investors access to real time reporting on the performance of their machines. When such information was purportedly provided it was dysfunctional, inaccurate, and incomplete. When Plaintiffs asked for this or any other information, Wear and WST usually misled them or flat-out lied.

j.  Wear and WST deceived and misled Plaintiffs and other investors about the status and profitability of their investment, and the status of the payments investors and refunds.

k.  Wear and WST did not use investment capital as they assured investors they would do. Instead, they used investor funds for other purposes including the acquisition of real estate.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

185.    In addition, WST made the following non-exclusive list of material omissions that induced Plaintiffs and many other investors to invest:

    a.   WST did not disclose that it was not a registered financial advisor in Washington or any other state;

    b.   WST did not disclose that Plaintiffs were purchasing unregistered securities;

    c.   WST did not disclose that WST Franchise Systems, the alleged franchisor, in reality provided no value or services;

    d.   WST did not disclose the true risks of the transactions;

    e.   WST did not disclose the truth about its ability to manufacture, install, and service the machines;

    f.   WST did not disclose that the "guaranteed buyback" was actually contingent on (a) WST supplying machines, which would not happen, (b) installing them, which did not happen, and (c) generating sufficient cash flow for long enough to fulfill the guaranty, which did not happen;

    g.   WST did not disclose the truth about how investor funds would be used or that it was unable to meet its payment or reimbursement obligations to investors;

    h.   WST did not disclose the true risks and costs of the enterprise;

    i.   WST did not disclose the true number of water-vending machines in operation;

    j.   WST did not disclose that it sold the same machines to multiple investors; and

    k.   WST did not disclose that it encountered liquidity shortages as well as other performance factors that inhibited its ability to actually deliver on its many assurances to investors.

186.    The acts, representations, and omissions alleged herein were material and created a false sense that the investments were safer and more profitable than was actually the

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 39

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 112

case.

187.    Plaintiffs relied on Defendants representations and omissions and were not aware of the true facts and risks when they decided to invest. Plaintiffs would not have invested but for these misrepresentations and omissions.

**G. WST has not paid investors for months and has gone to great lengths to conceal the truth – in a case that bears all of the hallmarks of a Ponzi scheme.**

188.    As of the filing of this Complaint, Wear and WST have been delinquent on investor payments for many months—in many cases for over a year. Wear and WST have failed to demonstrate any concrete ability to repay Plaintiffs at any point in the future.

189.    Plaintiffs first learned that there could be a problem at WST when WST stopped making payments in late 2022. Since then, Wear and WST have engaged in a pattern and practice of concealing the true facts from Plaintiffs and other investors to keep them in the dark and prevent them from asserting their legal rights. Wear and WST have refused to provide investors with material information necessary for them to protect their interests despite many requests by Plaintiffs and other investors. When Wear or WST has shared details, the information has generally been false, ambiguous, and/or misleading.

190.    Since investor payments ended in late 2022 and early 2023, Wear and WST have repeatedly made false assurances about the true financial condition of WST and their ability to repay Plaintiffs the amounts they are owed. Wear and WST have repeatedly planted the seeds of phony optimism, promising over and over again that repayment was just weeks away. For example, in early 2023, Wear and WST told Plaintiffs and other investors that it would enter into purported "buyback" or "refund" agreements to repurchase investor machines – some as quickly as within a few weeks. Despite circulating and even signing dozens of these agreements with Plaintiffs and other investors, Wear and WST never followed through.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 40

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 113

191.    The true reason for Wear and WST's sudden liquidity problems seems clear. Upon information and belief, Wear and WST diverted tens-of-millions of dollars of investor capital, primarily to acquire a real estate portfolio worth over $100 million for the benefit of Wear and his other companies. In addition, Wear and WST engaged in a string of third party transactions dating back to at least 2021 that threaten to permanently prejudice the rights and possible recovery of Plaintiffs and other investors.

192.    While Plaintiffs' investigation is ongoing, they have strong reason to believe that Wear and WST intermingled tens-of-millions of investor capital with the following real property assets:

| Prop. No. | State | Address |
|---|---|---|
| 1. | AZ | 653 E 20th Street, Yuma, AZ, 85365 |
| 2. | AZ | 700 S. Arizona Blvd., Coolidge, AZ, 85128 |
| 3. | AZ | 1930 N 22nd Ave, Phoenix, AZ, 85009 |
| 4. | AZ | 4237 E Magnolia, Phoenix, AZ, 85034 |
| 5. | AZ | 4035 E Magnolia, Phoenix, AZ, 85034 |
| 6. | CA | 530 Opper Street, San Diego, CA, 92029 |
| 7. | CA | 25377 Huntwood Avenue, Hayward, CA, 94544 |
| 8. | FL | 877 Orange Ave., Tallahassee, FL, 32310 |
| 9. | FL | 2129 Andrea Lane, Fort Myers, FL, 33912 |
| 10. | FL | 3209 Van Buren Avenue, Naples FL, 34112 |
| 11. | GA | 1118 Virginia Avenue, Columbus, GA, 31901 |
| 12. | GA | 121-131 Bells Ferry Road, Marietta, GA, 30066 |
| 13. | IL | 1000 Nicholas Ave, Elk Grove, IL 60007 |

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 41

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 114

| | | |
|---|---|---|
| 14. | IL | 14026 S Harrison Avenue, Posen, IL, 60469 |
| 15. | IL | 1400 Greenleaf Ave, Elk Grove Village, IL, 60007 |
| 16. | IL | 8460 Thomas Avenue, Bridgeview, IL, 60455 |
| 17. | NC | 701 Eden Terrace Archdale, NC, 27263 |
| 18. | NM | 875 W Amador, Las Cruces, NM, 88005 |
| 19. | NV | 7925 Arby, Las Vegas, NV, 89113 |
| 20. | OR | 19355 SW Teton Ave, Tualatin, OR, 97062 |
| 21. | TN | 730 Middle Tenn Blvd Murfreesboro, TN, 37129 |
| 22. | TX | 11519 South Petropark Ave, Houston, TX, 77041 |
| 23. | TX | 343 Johnny Clark Road, Longview, TX, 75605 |
| 24. | TX | 204 NW Road, San Antonio, TX, 78237 |
| 25. | TX | 2709 Electronic Lane, Dallas, TX, 75220 |
| 26. | TX | 5167 Veterans Memorial Blvd, Harker Heights, Texas, 76543 |
| 27. | WA | 8825 S 228th Street, Kent, WA 98031 |
| 28. | WA | 27423 (27602) 40th Ave, Stanwood, WA, 98292 |
| 29. | WA | 14925 Smokey Point Blvd., Marysville, WA 98271 |
| 30. | WA | 3811 188th Street NW, Arlington, WA, 98223 |
| 31. | WA | 3200 Shoreline Dr., Camano Island, WA, 98282 |
| 32. | WA | 11410 Beverly Park Rd., Everett, WA, 98204 |
| 33. | WA | 12 Emery Road, Oroville, WA 98844 |
| 34. | WA | 1206 Hewitt Avenue, Everett, WA 98201 |
| 35. | VA | 313 & 315 Ewell Road, Williamsburg, VA, 23188 |

193.    Plaintiffs now bring this action, to recover their funds, through these assets if

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

necessary, and to pursue all other available legal and equitable remedies, including without limitation equitable subordination, piercing of the corporate veil, constructive trust, injunctive relief, and disgorgement or "clawing back" of funds diverted to other persons or entities or for personal gain.

### H. The banks continue to seek to enforce the fraudulently induced loans despite their direct culpability and facilitation of the WST scheme.

194.    As noted, First and Unibank played a major role in the WST scheme by facilitating nearly 90 loans to WST investors due to reckless lending practices and breaches of fiduciary duty. The subject loan agreements and related guaranty and collateral agreements were part and parcel to the offer and sale of WST's unregistered securities and are unenforceable on the basis of mutual or unilateral mistake, RCW 21.20, and other legal and equitable doctrines.

195.    However, First Fed and Unibank refuse to take responsibility and continue to seek to enforce the subject loans against Plaintiffs and other investors. Because WST stopped making payments to investors many months ago, the borrower Plaintiffs have been forced to choose between continuing to pay the banks thousands of dollars each month out of their remaining savings, declaring personal bankruptcy, or facing a lawsuit brought by the bank and, in many cases, the potential loss of their family homes.

196.    Despite their clear culpability in facilitating the WST scheme, the banks continue to require the borrower Plaintiffs to make payments under threat of litigation if they ever stop making payments. Indeed, both First Fed and Unibank have already sued individual borrowers that had to stop making payments as a result of the WST fraud.

197.    Plaintiffs experienced significant mental and emotional distress once payments from WST suddenly stopped in late 2022 and early 2023. Their distress has only been increased

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 43

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 116

by First Fed and Unibank's insistence that the investor-borrowers continue making payments under the threat of being sued for default or losing their homes to the banks. Faced with this situation, most borrower Plaintiffs continued making payments even if that meant total exhaustion of their life savings. These payments, like other payments by the borrower Plaintiffs to their respective banks, totaling millions of dollars, were induced by the fraud—and made at a time when WST was assuring investors that payments would resume shortly and that there would be no long-term problem. These payments were also made before the borrower Plaintiffs learned that WST was a likely fraud, and, of course, before learning of their respective claims against the banks despite the banks many failures to disclose material facts. Therefore, all such funds should be immediately returned. To date, the banks have improperly retained possession of the borrower Plaintiffs' funds.

198.     The banks past and ongoing conduct has inflicted and is inflicting the borrower Plaintiffs with serious harm. The borrower Plaintiffs and their guarantors and/or pledgers seek this Court's assistance in restraining the banks from further collection action and ultimately resolving the matter in a fair and equitable manner.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## VIOLATIONS OF CHAPTER 19.100 RCW

199.     Plaintiffs reallege and incorporate all allegations of this Complaint.

200.     As alleged herein, WST raised tens-of-millions of dollars from Plaintiffs and other investors through the offer and sale of franchise opportunities subject to RCW 19.100.

201.     WST offered and sold franchise opportunities that were not registered with the State of Washington.

202.     WST required franchise investors to enter into written franchise agreements

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

with WST and to agree to pay franchise fees.

203.    As alleged herein, WST made untrue statements of material fact and/or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading. In addition, WST employed devices, schemes, and artifices to defraud Plaintiffs; and have engaged in acts, practices, and courses of conduct that operate as a fraud or deceit upon Plaintiffs in connection with the subject transaction(s) and after.

204.    Wear and WST's statements, assurances, and omissions alleged herein induced Plaintiffs to invest their personal capital and/or finance the investment through consumer business loans, in many cases from banks with whom WST had close ties. Later, WST concealed its misconduct and induced Plaintiffs to delay seeking the full return of their funds and otherwise assert their legal rights. WST is responsible for perpetuating a continuing fraud and misrepresentation. Upon information and belief, WST worked in concert with and/or were aided and abetted by others who may be added to this claim and Plaintiffs reserve the right to do so based upon further discovery.

205.    WST induced Plaintiffs to enter into purported written agreements with WST and third parties (such as Celtic Bank, First Federal Bank, and Unibank) that are void and/or should be rescinded. Plaintiffs reincorporate the express statements and omissions set forth above that induced Plaintiffs and other investors to invest, and maintain their investments, and every other material misrepresentation and omissions that were made, as well as those that will be identified in discovery.

206.    WST made the assurances and omissions alleged herein to induce Plaintiffs to invest and/or with reason to expect that Plaintiffs would act or refrain from acting to assert their rights. To the extent required, WST's statements and omissions were material and

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 45

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 118

justifiably relied upon by Plaintiffs.

207.     WST's untrue representations and/or omissions induced Plaintiffs to invest in the franchise securities at issue, and maintain their investments, and/or put off taking action to protect themselves, causing Plaintiffs to suffer damages in an amount to be proven at trial.

208.     WST acted knowingly or recklessly in that, among other things, they failed to ascertain and disclose the true facts to Plaintiffs even though those facts were available to it. Plaintiffs actually and justifiably relied upon the statements and omissions made by Wear and WST in investing in WST and maintaining their investments in WST.

209.     DFI commenced an administrative investigation of Wear and WST in 2021, and at least one of the banks at some point thereafter, which continues to this day. As applicable, the statute of limitations has been tolled and/or extended by statute, by Defendants' conduct, and, later, by agreement.

210.     By virtue of Defendants' violations of RCW 19.100 *et seq.*, Plaintiffs are entitled to all remedies available under RCW 19.100 and Washington law, including, without limitation, equitable relief, rescission, constructive trust, actual damages in an amount proven at trial, and treble damages in the amount of three times their actual damages, as well as attorney's fees and costs.

## SECOND CAUSE OF ACTION

## VIOLATIONS OF CHAPTER 21.20 RCW

211.     Plaintiffs reallege and incorporate all allegations of this Complaint.

212.     The transactions Plaintiffs were induced to enter into with WST and Unibank and First Fed were unregistered securities transactions under Washington law. These transactions consisted of purchase orders, franchise agreements, service agreements and the disputed loan documents and agreements as part of a single securities transaction.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 46

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 119

213.     As alleged herein, Defendants made untrue statements of material fact and/or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading. In addition, Wear and WST employed devices, schemes, and artifices to defraud Plaintiffs; and Defendants have engaged in acts, practices, and courses of conduct that operates as a fraud or deceit upon Plaintiffs in connection with the subject transaction(s) and after.

214.     Defendants' representations, assurances, and omissions alleged herein induced Plaintiffs to invest their personal capital and/or finance the investment through consumer business loans, in many cases from banks with whom WST said it had strong ties such as First Fed and Unibank. Defendants' representations, assurances, and/or omissions induced the borrower Plaintiffs to pay First Fed and Unibank substantial sums prior to or at closing and continuing thereafter, even after WST's payments to them ceased.

215.     Defendants' misrepresentations and/or omissions concerned, among other things, the quality and safety of the investment in WST. They were material because a reasonable person would attach importance to them in determining whether to engage in the investment transaction at issue, because the maker had reason to know Plaintiffs considered the matter important, and/or the misrepresentation or omission constituted an ambiguous representation capable of false interpretation.

216.     Defendants knew or should have known that their misrepresentations and/or omissions would induce Plaintiffs to act or refrain from acting to their detriment. Defendants knew or should have known that their representations were false and/or were ignorant of the truth and/or reckless in ascertaining the truth or falsity of their representations. Defendants' non-disclosures of material information where they had a duty to speak were tantamount to an affirmative misrepresentation. By way of example, WST told Plaintiffs they would become

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 47

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 120

owners of individual machines located all over the country and furnished machine lists for multiple investors to Unibank and First Fed during the pre-closing process which showed, at minimum, that WST was selling duplicate machines to multiple investors. Only Defendants had access to this information.

217.     Defendants owed Plaintiffs fiduciary duties and were on notice that Plaintiffs were acting on the basis of mistake as to undisclosed facts. First Fed and Unibank assumed fiduciary duties to the borrower Plaintiffs through words and conduct that induced the borrower Plaintiffs to relax their vigilance that they would have otherwise exercised. Plaintiffs were justified in relying on Defendants, as applicable, by virtue of their respective positions in the transactions and Defendants' knowledge, expertise, and superior access to information.

218.     Plaintiffs incorporate the statements, assurances, conduct and omissions set forth above as if set forth in full herein in support of their claims sounding in fraud. In brief, Defendants' false statements pertained to the relative quality, safety, propriety, and intentions regarding the investment transactions and legal obligations at issue. Defendants' various statements and assurances created the false sense that the investment in WST was safer and of a quality beyond what it truly was. And as applicable to borrower Plaintiffs, Defendants' respective statements and assurances created the false sense that financing the investment with consumer business loans was safer and more secure than it truly was under the circumstances. Moreover, Defendants' omissions and affirmative conduct likewise created a false impression that the investment of personal capital in WST and/or financing the investment with consumer business loans was safer or of a quality beyond what it truly was under the circumstances.

219.     Upon information and belief, Wear and WST committed a continuing fraud

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

and concealment and were aided and abetted by Unibank and First Fed, who had constructive knowledge and/or were deliberately ignorant and yet substantially assisted Wear and WST's scheme. Defendants' acts and omissions concealed their misconduct and induced Plaintiffs to delay asserting their legal rights. Defendants induced Plaintiffs to enter into alleged franchise transactions and, as applicable, written loan agreements and third party guaranties and other collateral agreements on the basis of their fraudulent misrepresentations, omissions and misleading conduct.

220. WST concealed its misconduct and induced Plaintiffs to delay seeking the full return of their funds and otherwise assert their legal rights. First Fed and Unibank concealed material facts and conflicts of interest. Defendants are responsible for perpetuating a continuing fraud and misrepresentation. Upon information and belief, WST worked in concert with and/or were aided and abetted by others who Plaintiffs reserve the right to add to this claim upon further discovery. As applicable, the statute of limitations has been tolled and/or extended by Defendants' conduct, and, later, by agreement.

221. Defendants induced Plaintiffs to enter into purported written agreements with WST and Unibank and First Fed, as applicable, that are void and/or should be rescinded. Plaintiffs reincorporate the representations and omissions set forth above that induced Plaintiffs and other investors to invest, and maintain their investments, and every other material misrepresentation and omissions alleged herein, as well as those that will be identified in discovery.

222. Defendants acted knowingly or recklessly in that, among other things, they failed to ascertain and disclose the true facts to Plaintiffs even though those facts were available.

223. Defendants' misrepresentations and/or omissions induced Plaintiffs to invest

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

in the securities at issue, and maintain their investments, and/or put off taking action to protect themselves, causing Plaintiffs to suffer damages in an amount to be proven at trial.

224.    Wear, WST, Unibank, and First Fed (and or their agents, parents, and affiliates as applicable) are liable as sellers of unregistered securities and they and their personnel acted as unregistered securities brokers, advisors, and sales persons, and violated the suitability rule under RCW 21.20.

225.    WST and Wear and, as applicable to the borrower defendants, Unibank, and First Fed, and potentially other third parties, are primarily, secondarily, and jointly and severally liable to Plaintiffs (as applicable) for their deceptive acts and omissions, and for the offer and sale of unregistered securities. Plaintiffs are entitled to all rights and remedies provided by Washington law and RCW 21.20, including, without limitation, rescission and return of their investment funds, together with interest, costs, and reasonable attorneys' fees, legal and equitable subordination, and constructive trust. To the extent required, Plaintiffs hereby tender back to Wear and WST and, as applied to the borrower Plaintiffs, Unibank and First Fed, all securities purchased. Plaintiffs are entitled to all remedies and damages available under RCW 21.20 and Washington law in an amount to be proven at trial.

226.    Furthermore, Wear and the Bank Governor Defendants are liable as officers, directors and control persons pursuant to RCW 21.20.430. They are jointly and severally liable to the borrower Plaintiffs for the damages caused by their respective banks' violations of RCW 21.20 in an amount to be proven at trial, including but not limited to all sums received and retained from the borrower Plaintiffs by the subject banks.

## **THIRD CAUSE OF ACTION**

### **VIOLATIONS OF WASHINGTON CONSUMER PROTECTION ACT**

227.    The borrower Plaintiffs reallege and incorporate all allegations of this

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 50

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 123

Complaint.

228.    WST, Wear, Unibank, and First Fed engaged in unfair or deceptive acts or practices in connection with the offer and sale of franchises and/or securities and lending in the state of Washington. Defendants' unfair or deceptive acts or practices continued after the point of sale.

229.    WST, Wear, Unibank, and First Fed's unfair or deceptive acts or practices occurred in trade or commerce, affect the public interest, and continue to this very day.

230.    The borrower Plaintiffs have been injured in their business and property, as Defendants accepted investor funds both before and after closing, and have failed to return these funds or otherwise deal with them in a fair and honest manner after the subject transactions were executed. Unibank and First Fed continue to demand payments from borrower Plaintiffs despite their clear facilitation of and culpability in the WST scheme.

231.    WST, Wear, Unibank, and First Fed's unfair or deceptive acts or practices are ongoing and are a proximate cause of Plaintiffs' injuries. Wear and WST concealed their misconduct, inducing Plaintiffs to delay seeking the return of their funds and otherwise assert their legal rights. As applicable, the statute of limitations has been tolled and/or extended by Defendants' conduct, and, later, by agreement.

232.    WST, Wear, Unibank, and First Fed have committed per se violations of RCW 19.86, including but not limited to violations of RCW 21.20 and RCW 19.100.

233.    Plaintiffs have been damaged in an amount to be proven at trial. Plaintiffs are entitled to all remedies available under Washington law, including treble damages, attorney's fees, equitable relief, constructive trust, and general and emotional distress damages.

**CORR CRONIN** LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## FOURTH CAUSE OF ACTION

## FRAUD AND DECEIT / FRAUDULENT INDUCEMENT /

## FRAUDULENT CONCEALMENT / CONTINUING FRAUD / AIDING AND

## ABETTING

234.    Plaintiffs reallege and incorporate all allegations of this Complaint.

235.    Defendants made false representations and/or nondisclosures through words and/or conduct that were material to, and induced, Plaintiffs' decision to invest as applicable.

236.    Defendants' misrepresentations and/or omissions concerned, among other things, the quality and safety of the investment in WST. They were material because a reasonable person would attach importance to them in determining whether to engage in the investment transaction at issue, because the maker had reason to know Plaintiffs considered the matter important, and/or the misrepresentation or omission constituted an ambiguous representation capable of false interpretation.

237.    Defendants knew or should have known that their misrepresentations and/or omissions would induce Plaintiffs to act or refrain from acting to their detriment. Defendants knew or should have known that their representations were false and/or were ignorant of the truth and/or reckless in ascertaining the truth or falsity of their representations. Defendants' non-disclosures of material information where they had a duty to speak were tantamount to an affirmative misrepresentation. By way of example, WST told Plaintiffs they would become owners of individual machines located all over the country and furnished machine lists for multiple investors to Unibank and First Fed during the pre-closing process which showed, at minimum, that WST was selling duplicate machines to multiple investors. Only Defendants had access to this information.

238.    Defendants owed Plaintiffs fiduciary duties and were on notice that Plaintiffs

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 52

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 125

were acting on the basis of mistake as to undisclosed facts. First Fed and Unibank assumed fiduciary duties to the borrower Plaintiffs through words and conduct that induced the borrower Plaintiffs to relax their vigilance that they would have otherwise exercised. Plaintiffs were justified in relying on Defendants, as applicable, by virtue of their respective positions in the transactions and Defendants' knowledge, expertise, and superior access to information.

239.    Plaintiffs incorporate the statements, assurances, conduct and omissions set forth above as if set forth in full herein in support of their claims sounding in fraud. In brief, Defendants' false statements pertained to the relative quality, safety, propriety, and intentions regarding the investment transactions and legal obligations at issue. Defendants' various statements and assurances created the false sense that the investment in WST was safer and of a quality beyond what it truly was. And as applicable to borrower Plaintiffs, Defendants' respective statements and assurances created the false sense that financing the investment with consumer business loans was safer and more secure than it truly was under the circumstances. Moreover, Defendants' omissions and affirmative conduct likewise created a false impression that the investment of personal capital in WST and/or financing the investment with consumer business loans was safer or of a quality beyond what it truly was under the circumstances.

240.    Upon information and belief, Wear and WST committed a continuing fraud and concealment and were aided and abetted by Unibank and First Fed, who had constructive knowledge and/or were deliberately ignorant and yet substantially assisted Wear and WST's scheme. Defendants' acts and omissions concealed their misconduct and induced Plaintiffs to delay asserting their legal rights. Defendants induced Plaintiffs to enter into alleged franchise transactions and, as applicable, written loan agreements and third party guaranties and other

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

collateral agreements on the basis of their fraudulent misrepresentations, omissions and misleading conduct. As applicable, the statute of limitations has been tolled and/or extended by Defendants' conduct, and, later, by agreement.

241.    Plaintiffs are entitled to all rights and remedies provided by Washington law, including, without limitation, rescission and general and economic damages in an amount to be proven at trial, legal and equitable subordination, together with interest, costs, and reasonable attorneys' fees. Plaintiffs further seek a constructive trust on all fraudulently transferred assets and ill-gotten gains.

## FIFTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY AND NEGLIGENCE

242.    Plaintiffs reallege and incorporate all allegations of this Complaint.

243.    Through their statements and conduct, WST, First Fed, Unibank, Houk, and NWFS assumed fiduciary, quasi-fiduciary and/or extra-contractual common law duties to Plaintiffs with respect to the investments at issue herein by virtue of their acts, omissions, superior knowledge, expertise, and superior access to information.

244.    Defendants breached their assumed duties to Plaintiffs proximately causing them harm.

245.    Plaintiffs have been damaged in an amount to be proven at trial. Plaintiffs are entitled to all remedies under Washington law on account of Defendants' breach of fiduciary and assumed legal duties including constructive trust and general and emotional damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

246.    Plaintiffs reallege and incorporate all allegations of this Complaint.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 54

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 127

247.    Wear, WST, First Fed, and Unibank are also liable under the law of negligent misrepresentation.

248.    The investment transactions at issue were transactions in which these Defendants had a pecuniary interest. They supplied information to guide Plaintiffs in making the decision to transact, as applicable, in connection with such transactions. Defendants' false statements pertained to the relative quality, safety, propriety, and even their intentions regarding the investment transactions and legal obligations at issue.

249.    Defendants knew or should have known that the information was supplied to guide Plaintiffs in their business transactions and were negligent in obtaining or communicating the false information.

250.    Plaintiffs relied on the false information supplied by Defendants as applicable and their reliance was reasonable.

251.    Defendants also violated duties to disclose by virtue of (a) Defendants' fiduciary or quasi-fiduciary duties, (b) Defendants' knowledge of facts which were peculiarly within the knowledge of Defendants and not readily obtainable by Plaintiffs, (c) particular Plaintiffs lack of relevant business experience, (d) Plaintiffs' reliance on Defendants' specialized knowledge and experience, and/or (e) the existence of an independent statutory or legal duty.

252.    The false information communicated by Defendants proximately caused Plaintiffs' damages in an amount to be proven respectively at trial. Plaintiffs are entitled to all legal and equitable remedies available under Washington law including without limitation general damages, damages for emotional distress, and constructive trust.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**SEVENTH CAUSE OF ACTION**

**CIVIL CONSPIRACY**

253.     Plaintiffs reallege and incorporate all allegations of this Complaint.

254.     Upon information and belief, Defendants developed a plan or scheme to engage in the acts and omissions alleged herein, Defendants combined to accomplish an unlawful purpose and/or a lawful purpose by unlawful means. Defendants committed overt acts in furtherance of this scheme as alleged herein. Defendants further entered into express or implied agreements to accomplish the object of said conspiracy. Defendants worked in concert with and/or were aided and abetted by third parties.

255.     Defendants are jointly and severally liable to Plaintiffs for damages and attorneys' fees and costs, in an amount to be proven at trial, for any conspiracy that existed. Plaintiffs are entitled to all legal and equitable remedies by virtue of Defendants' conspiracy including constructive trust.

**EIGHTH CAUSE OF ACTION**

**VIOLATIONS OF CHAPTER 19.40 RCW**

256.     Plaintiffs reallege and incorporate all allegations of this Complaint.

257.     Upon information and belief, Defendants Wear, WST and First Fed have engaged in one or more transactions between themselves, affiliates, including Defendant Ideal Property Investments, LLCs, and/or others, without fair consideration or reasonably equivalent value, and to hinder, delay, or secrete funds away from Plaintiffs, who are creditors of such Defendants and who are entitled to repayment.

258.     WST was not paying its debts, was insolvent at the time and/or became insolvent as a result of such transfer.

259.     Such transaction(s) were undertaken with the requisite "intent" for purposes of

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 56

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 129

RCW 19.40.041 and .051.

260.    The transfers of assets alleged herein were voidable transfer under Ch. 19.40 RCW and thus should be voided to the extent necessary to satisfy Plaintiffs' claims.

261.    Plaintiffs seek all available remedies under Chapter 19.40 RCW, including, without limitation:

    a.  Money damages for the value of the asset transferred in the amount necessary to satisfy Plaintiffs' claims in an amount to be proven at trial;

    b.  Avoidance of the transfer to the extent necessary to satisfy Plaintiffs' claims;

    c.  Attachment or any other provisional remedy against the asset transferred or other property of the transferee as available under applicable law;

    d.  Temporary, preliminary, and permanent injunctive relief;

    e.  Appointment of a receiver to take charge of the asset transferred or other property of the transferee; and

    f.  Any other relief the circumstances may require, including damages payable by the Sunset Buyers to fully compensate Plaintiffs for their losses.

262.    Plaintiffs reserve the right to supplement and request that their claims under RCW 19.40 be conformed to the evidence obtained in discovery and admissible at trial. Plaintiffs seek a constructive trust on all fraudulently transferred assets and ill-gotten gains.

## NINTH CAUSE OF ACTION

## MONEY HAD AND RECEIVED / CONVERSION

263.    Plaintiffs reallege and incorporate all allegations of this Complaint.

264.    Plaintiffs collectively invested their savings with WST. The borrower Plaintiffs have in addition paid substantial sums to First Fed and Unibank in the form of down payments, fees, monthly payments, interest, penalties, and other loan related payments.

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 57

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

265.     Defendants received, benefited from, and have wrongfully retained Plaintiffs' funds despite Plaintiffs' demands.

266.     Plaintiffs are entitled to restoration of the amount of money conferred to Defendants, and all other relief afforded by Washington law, in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

### UNJUST ENRICHMENT / RESTITUTION

267.     Plaintiffs reallege and incorporate all allegations of this Complaint.

268.     Plaintiffs collectively invested their savings with WST. The borrower Plaintiffs have in addition paid substantial sums to First Fed and Unibank in the form of down payments, fees, monthly payments, interest, penalties, and other loan related payments.

269.     WST and the banks received, benefited from, and have wrongfully retained Plaintiffs' funds despite Plaintiffs' demands.

270.     Plaintiffs are entitled to restoration of the value of the benefits conferred and or restitution in the amount to be proven at trial, and all other relief afforded by Washington law, including but not limited to equitable subordination and constructive trust in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION (IN THE ALTERNATIVE)

### BREACH OF CONTRACT / BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING / ANTICIPATORY REPUDIATION

271.     Plaintiffs reallege and incorporate all allegations of this Complaint.

272.     This cause of action is pled in the alternative to Causes of Action One through Ten insofar as any of the written purchase orders, franchise agreements, buyback agreements, service agreements, loan agreements, guaranties, security agreements, or any other related

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 58

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 131

agreements, as applicable, are deemed valid and enforceable, and Plaintiffs make an election to proceed on a breach of contract theory at trial. Plaintiffs reserve all rights to make this election before trial:

273. To the extent such agreements are deemed validly formed and enforceable, WST has repudiated and breached its agreements with Plaintiffs by, among other things, failing to perform all material terms of said agreements, including, but not limited to, failing to remit the payments promised to Plaintiffs and failing to promptly cure defective performance.

274. WST and the banks also violated the duty of good faith and fair dealing, as well as verbal and implied agreements, related to such agreements and breached extrinsic promises and assurances to Plaintiffs related to WST's promised performance of the subject purchase orders, franchise agreements, buyback agreements, and service agreements.

275. To the extent such agreements are deemed validly formed and enforceable, WST has anticipatorily repudiated said agreements. Among other things, WST has failed to tender and deliver the machines that were originally paid for, failed to present and/or deliver the machines upon demand, and stopped making the promised payments for many months— in some cases for over a year. Further, WST has expressly or impliedly confirmed its inability to make such payments or resume making such payments or other performance with its obligations under said agreements. WST's repudiation has substantially impaired the value of such agreements and caused Plaintiffs substantial harm.

276. Plaintiffs have complied with or substantially complied with in good faith any and all notice of default provisions under any applicable agreement under the circumstances and/or the requirement to comply with such conditions has been waived by anticipatory breach or applicable legal or equitable basis. Any and all agreements have been breached,

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

repudiated and/or anticipatorily repudiated by WST.

277.    Plaintiffs are entitled to all available damages and remedies under Washington at law for breach of contract, in an amount and of a nature proven at trial, including but not limited to rescission and return of their principal investments plus interest, expectation damages, consequential losses, constructive trust, and incidental damages.

## TWELFTH CAUSE OF ACTION

### PROMISSORY ESTOPPEL / IMPLIED CONTRACT

278.    Plaintiffs reallege and incorporate all allegations of this Complaint.

279.    Defendants are liable to Plaintiffs under the law of estoppel and implied contract.

280.    Defendants made promises to Plaintiffs that they should have reasonably expected to make Plaintiffs change their position. Plaintiffs reasonably relied on these promises and changed their positions as a result of such promises. Injustice can only be avoided by enforcing Defendants' promises.

281.    Plaintiffs are entitled all legal and equitable remedies, protections, and/or rulings available under the law of estoppel including damages in an amount to be proven at trial and constructive trust.

## THIRTEENTH CAUSE OF ACTION

### VARIOUS STATE LAW CLAIMS (IN THE ALTERNATIVE)

282.    Plaintiffs reallege and incorporate all allegations of this Complaint.

283.    Alternatively, Defendants are liable to Plaintiffs under the law of the states in which Plaintiffs are residents based upon the facts alleged herein and facts developed in discovery.

284.    Based on the litany of misrepresentations, omissions, unfair or deceptive

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

conduct, failure to register financial products and/or register as a broker or salesperson, breaches of fiduciary duty, breaches of common law and contractual duties alleged herein, and other violations alleged herein, each Plaintiff hereby asserts in the alternative any and all claims, rights, remedies, damages, and/or protections that they have under the securities laws, consumer protection laws, franchise laws, tort law, law of contracts, and/or common law of their following residential states without limitation: Arizona, California, Colorado, Connecticut, Florida, Kansas, Illinois, Indiana, Maryland, Michigan, Minnesota, North Carolina, New York, Oregon, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and West Virginia.

285.    In addition to claims and remedies under such state's common law, such state laws include, without limitation, the following: Ariz. Revised Statutes, Title 44, Chapters 1, 8-10, 12-1, and applicable rules; Cal. Penal Code § 496, Cal. Business and Professions Code § 17200, Civil Code §§ 1573, 1750-1784, Cal. Civil Procedure Sections 10399.8, 3372, and/or 3294, Cal. Corp. Code 31000 et seq., and Cal. Corporate Securities Law of 1968, and applicable rules; Col. Revised Statutes, Title 6, Part 1, Title 51-54, and applicable rules; Conn. General Statutes, Title 21a, Title 36b, and applicable rules; Florida Securities and Investor Protection Act, and applicable rules; Kan. Statutes, Chapter 17, Article 12a, Chapter 50, Articles 6, 10, and applicable rules; Ill. Consumer Fraud and Deceptive Business Practices Act, Illinois Securities Law, and Illinois Franchise Disclosure Law, and applicable rules; Indiana Code, Title 24, Chapters .05 and 8, and Indiana Uniform Securities Act, and applicable rules; Maryl. Code, Titles 11 and 13, and applicable rules; Mich. Consumer Protection Act, Mich. Uniform Securities Act, and Mich. Franchise Investment Law, and applicable rules; Minn. Code, Chapters 80A, 80C, 325F.69, and applicable rules; North Carolina Securities Act, Consumer Protection Act, and applicable rules; NY General Business

**Corr Cronin llp**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Law § 349, New York Code Rules and Regulations Title 13, and applicable rules; Or. Unlawful Trade Practices Act, Or. Securities Law, and Or. Franchise Act, and applicable rules; Ok. Consumer Protection Act, Ok. Uniform Securities Act, and applicable rules; S.C. Consumer Protection Code, S.C. Uniform Securities Law, and applicable rules; Tennessee Consumer Protection Act, Tennessee Securities Act, and applicable rules; Tex. Uniform Deceptive Trade Practices Act, Tex. Securities Act, and applicable rules; Utah Consumer Sales Protection Act, Utah Business Opportunity Disclosure Act, Utah Uniform Securities Act, and applicable rules; Virginia Consumer Protection Act, Virginia Securities Act, and Virginia Retail Franchising Act, and applicable rules; W.V. Consumer Credit and Protection Act, W.V. Uniform Securities Act, and applicable rules; Pennsylvania Unfair Trade Practices and Consumer Protection Law, and applicable rules, Pennsylvania Securities Act, and applicable rules.

286.     As set for herein, Plaintiffs are entitled all legal and equitable remedies, and rights and protections, afforded by the laws of these states, in an amount and nature to be proven at trial, and, to the extent required, in accord with their pre-trial election.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court award the following relief:

1.     For orders conforming Plaintiffs' claims to the evidence developed in discovery;

2.     For any and all legal or equitable remedies available under applicable law;

3.     For awards of economic and non-economic damages and equitable relief against Defendants in an amount and of a nature to be determined at trial;

4.     For prejudgment interest on any portion of the damages award that is for a

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 62

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 135

liquidated amount;

5.     For awards of all remedies available under RCW 21.20 and/or RCW 19.100, including without limitation rescission, money damages in an amount to be proven at trial, and attorney's fees and costs;

6.     For temporary, preliminary, and permanent injunctive relief staying further disputed loan payments to Unibank and First Fed and preventing the banks from defaulting or accelerating the loans in the borrower Plaintiffs' names pending the outcome of this litigation;

7.     For orders finding the disputed agreements - including loan agreements, guaranties, and other loan documents of the borrower Plaintiffs - void, invalid, rescinded, and/or unenforceable under applicable law;

8.     For temporary, preliminary, and permanent injunctive relief enjoining and restraining Wear, WST, and WST's representatives, officers, agents, affiliates, owners, or successors, from continuing to engage in the unlawful conduct complained of herein, including transferring any funds or assets away from or between Defendants, or otherwise hindering or delaying the recovery of assets, and/or appointing a receiver;

9.     For all available remedies under Chapter 19.40 RCW, including, without limitation:

a. Money damages for the value of the assets transferred in the amount necessary to satisfy Plaintiffs' claims and in an amount to be proven at trial;

b. Avoidance of transfers to the extent necessary to satisfy Plaintiffs' claims;

c. Attachment or any other provisional remedy against assets transferred or other property as available under applicable law;

d. Temporary, preliminary, and permanent injunctive relief enjoining and

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

restraining further disposition by Defendants of assets and other property sufficient to satisfy Plaintiffs' claims;

    e.   Appointment of a receiver to take charge of the asset transferred or other property of the transferee; and

    f.   Any other relief the circumstances may require, including damages payable by Defendants or third parties.

10.    For alter ego liability / piercing the corporate veil as applicable;

11.    For joint and several liability under applicable law;

12.    For an award of attorneys' fees and costs incurred in this action;

13.    For restitution, rescission, and legal or equitable subordination in favor of Plaintiffs' claims;

14.    The imposition of a constructive trust on WST and Ryan Wear's assets and ill-gotten gains, including any and all real estate in Wear or any Wear entity's name;

15.    Civil penalties under applicable statutes;

16.    Damages for emotional distress, mental anguish, and any other general damages;

17.    Disgorgement of ill-gotten gains and unjust enrichment;

18.    Punitive and treble damages;

19.    Subordination of competing priority interests;

20.    Any and all remedies available to Plaintiffs under applicable foreign state law;

21.    Leave to amend to add additional claims and Defendants based on further discovery; and

22.    For such other and further relief as the Court deems just, equitable, or warranted by law.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

DATED this 21st day of June, 2024.

CORR CRONIN LLP

*s/John T. Bender*
John T. Bender, WSBA No. 49658
Kristen Barnhart, WSBA No. 51135
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, WA  98104-1001
Telephone: 206-625-8600
Email: jbender@corrcronin.com,
*Counsel for Plaintiffs*

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 65

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Exhibit G to Complaint
Page 138

# <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies as follows that on the below date, I caused a true and

correct copy of the foregoing document to be served on the following parties via electronic

mail:

Patrick L. Vail, WSBA No. 34513
PATRICK L. VAIL, PLLC
1000 2 Avenue, Suite 1770
Seattle, WA 98104
(206) 624-5824 Phone
(206) 694-4601 Fax
pvail@pvaillaw.com
ljduenas@pvaillaw.com
*Attorneys for Defendants*

Joel Ard, WSBA No. 40104
ARD LAW GROUP PLLC
PO Box 11633
Bainbridge Island, WA 98110-5633
Phone: (206) 701-9243
joel@ard.law
*Attorney for the Nooney Parties*

Nathan Riordan, WSBA No. 33926
600 Stewart St Ste 1300
Seattle, WA 98101-1255
Phone: (206) 903-0401
nate@wrlawgroup.com
*Attorney for Defendants*

Aimee S. Willig, WSBA #22859
Armand J. Kornfeld, WSBA #17214
BUSH KORNFELD LLP LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
jkornfeld@bskd.com
awillig@bskd.com
*Attorneys for Plaintiffs*

FIRST AMENDED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF – 66

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

DATED:  June 21, 2024, at Seattle, Washington.

_s/ Tia Uy_
Tia Uy, Legal Assistant
tuy@corrcronin.com

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900