# EXHIBIT W

ØŠÒÖ
GEGⅠÁRⱲÞÁÉÍÁFFIⱧFFÁĐĔT
SⱭⱣⱭÖⱯÖⱮWⱣⱽÝ
ÙⱮÚÒÜⱭⱯIⱭÖⱮWÜⱽÄÕŠÒÜS
ÒⱧⱿⱭŠÒÖ
ÔⱭŒⱮÒ̀ÅⱲÄⱢGIⱧEℲGⱠÎ̀ÏℲEℲ̀ÁⱮÒŒ

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| FIRST FED BANK, a Washington state commercial bank, | No. |
| Plaintiff, | **COMPLAINT FOR MONIES DUE** |
| v. | |
| FOUNDERS MOSAIC PARTNERS LLC, a Indiana limited liability company; and TYLER SADEK and NATALIE SADEK, | |
| Defendants. | |

COMES NOW First Fed Bank, a Washington state commercial bank ("First Fed"), the Plaintiff in the above-captioned action, and for its claims for relief against Defendants Founders Mosaic Partners LLC, an Indiana limited liability company ("Borrower"), and Tyler Sadek and Natalie Sadek (collectively, the "Guarantors"), alleges as follows:

## I.    PARTIES, JURISDICTION AND VENUE

1.1    First Fed is a Washington state commercial bank with its headquarters in Port Angeles, Washington.  First Fed is duly qualified to bring this action, having met all legal prerequisites.

1.2    Borrower is and was at all times material hereto an Indiana limited liability company, that has transacted business in King County, Washington.

1.3    On information and belief, Guarantors are and were at all times material hereto residents of Indianapolis, Indiana.

COMPLAINT FOR MONIES DUE - 1

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

134777.0017/9773726.2

1.4     Venue and jurisdiction are proper in that the parties contractually agreed to the jurisdiction and venue of the Superior Court of the State of Washington for King County.

## II.     FACTUAL BACKGROUND

2.1     First Fed realleges and incorporates by reference paragraphs 1.1 through 1.4 of its Complaint as though fully set forth herein.

2.2     First Fed extended a commercial loan to Borrower ("Loan"), governed by the terms and conditions of a Business Loan and Security Agreement dated as of September 28, 2021 (as amended, restated, or otherwise modified from time to time, the "Loan Agreement"), by and between First Fed and Borrower.  A true and correct copy of the Loan Agreement is attached hereto as Exhibit A and incorporated herein by reference.

2.3     The Loan is evidenced, in part, by a Promissory Note dated as of September 28, 2021, executed by Borrower and payable to the order of First Fed, in the stated principal amount of One Million One Hundred Fifteen Thousand Six Hundred Twenty-Five Dollars ($1,115,625.00) (as amended, restated, or otherwise modified from time to time, the "Note"), plus interest as set forth therein.  A true and correct copy of the Note is attached hereto as Exhibit B and incorporated herein by reference.

2.4     Under the terms of the Note, Borrower promised and agreed to timely make regular monthly payments of principal and interest on the Note on the fifth day of each month, commencing November 5, 2021.

2.5     In the event of default, the Note provides for a late charge equal to five percent (5%) of the delinquent payment amount, and default interest at a rate equal to eighteen percent (18%) per annum.

2.6     The Loan Agreement, Note, Guaranty (as defined below), and all other documents, instruments, amendments, modifications, and agreements relating to, and expressly referencing the Loan shall collectively be referred to herein as the "Loan Documents."

COMPLAINT FOR MONIES DUE - 2

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

134777.0017/9773726.2

2.7    Guarantors each personally, absolutely, and unconditionally guaranteed Borrower's obligations to First Fed under the Loan Documents pursuant to that certain Unconditional Guaranty of Payment and Performance dated as of September 28, 2021 (the "Guaranty"). A true and correct copy of the Guaranty is attached hereto as <u>Exhibit C</u> and incorporated herein by reference.

2.8    The Loan Documents entitle First Fed to recover its attorneys' fees, costs, and expenses incurred in enforcing the obligations thereunder.

## III.    DEFAULTS AND ACCELERATION

3.1    First Fed realleges and incorporates by reference paragraphs 1.1 through 2.8 of its Complaint as though fully set forth herein.

3.2    Borrower defaulted on its obligations under the Loan Documents in that it failed to make the requisite payments when due, despite demand. Specifically, Borrower failed to make the monthly payment due and owing under the Note on February 5, 2024, and all subsequent monthly payments due thereafter.

3.3    Guarantors defaulted on their obligations under the Guaranty insofar as they failed to satisfy the amounts due and owing under the Loan Documents.

3.4    As a result of the aforementioned defaults, First Fed accelerated the Loan obligation, and all amounts owing under the Loan Documents are immediately due and payable. A true and correct copy of First Fed's Notice of Default, Acceleration, and Reservation of Rights dated as of May 8, 2024, is attached hereto as <u>Exhibit D</u> and incorporated herein by reference.

3.5    All amounts owing under the Loan Documents bear interest at the contractual default rate of eighteen percent (18%) per annum from May 20, 2024, until paid in full.

## IV.    CLAIM FOR MONIES DUE

4.1    First Fed realleges and incorporates by reference paragraphs 1.1 through 3.5 of its Complaint as though fully set forth herein.

COMPLAINT FOR MONIES DUE - 3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

1    4.2    Borrower and Guarantors are indebted to First Fed under the Loan Documents

2 for the unpaid principal balance of $922,154.89, plus accrued and unpaid interest through June

3 3, 2024, in the amount of $27,188.09, and late charges of $2,471.52 (collectively, the

4 "Accelerated Obligation"), together with attorneys' fees, costs and expenses, and additional

5 prejudgment interest from June 4, 2024, until the date of judgment.

6    4.3    First Fed is entitled to post-judgment interest on the entire judgment amount at

7 the contractual default rate.

8                  **V.    ATTORNEYS' FEES AND COSTS**

9    5.1    First Fed realleges and incorporates by reference paragraphs 1.1 through 4.3 of

10 its Complaint as though fully set forth herein.

11    5.2    First Fed is entitled to its attorneys' fees, costs, and expenses incurred in

12 enforcing the Loan Documents.

13    WHEREFORE, First Fed prays for judgment against Defendants as follows:

14    1.    For judgment against Borrower and Guarantors, jointly and severally, in the

15 amount of the Accelerated Obligation, plus additional prejudgment interest from the date

16 hereof, until the date of judgment.

17    2.    For judgment against Borrower and Guarantors, jointly and severally, for First

18 Fed's attorneys' fees, costs, and expenses incurred in enforcing the Loan Documents.

19    3.    That the total judgment amount bears interest on the declining balance at the

20 contractual default rate of eighteen percent (18%) per annum from the date of entry of the

21 judgment until paid in full.

22    4.    For such other and further relief as the Court deems just and proper.

23    DATED this 5th day of June, 2024.

24                  LANE POWELL PC

25

26                  By /s/ Gregory R. Fox
                        Gregory R. Fox, WSBA No. 30559
27                      Andrew G. Yates, WSBA No. 34239
                        Attorneys for Plaintiff First Fed Bank

COMPLAINT FOR MONIES DUE - 4

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

134777.0017/9773726.2

# EXHIBIT A

# BUSINESS LOAN AND SECURITY AGREEMENT



LOAN NO: ███1386

THIS BUSINESS LOAN AND SECURITY AGREEMENT (**"Agreement"**), dated September 28, 2021 is made by and between Founders Mosaic Partners LLC an Indiana Limited Liability Company (**"Borrower"**), whose address is:

> Founders Mosaic Partners LLC
> 1104 N Keystone Ave.
> Indianapolis, IN 46201
> Attn: Tyler Sadek

and FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF PORT ANGELES, a Washington chartered stock savings bank, and its successors, participants, and assigns (**"Lender"**), whose address is:

> FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF PORT ANGELES
> P.O. Box 351
> Port Angeles, WA 98362
> Attn: Jason Gill

**Borrower has applied to Lender for a commercial loan to finance the purchase or refinance of one or more water dispensing Systems (each, a "System") described herein. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement, together with the security interest in the Collateral (defined below) granted by this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole discretion and Lender's application and underwriting criteria, as amended from time to time by Lender; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

1.     **TERM.** This Agreement shall be effective as of the date first set forth above, and shall continue in full force and effect until such time as the Loan evidenced hereby has been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges.

2.     **LOAN**. Subject to the terms and conditions of this Loan Agreement, the Note, and all of the other Related Documents (each as defined below), Lender agrees to extend to Borrower a Loan in the principal amount of $1,115,625.00 (the "**Loan**").

3.     **CONDITIONS PRECEDENT TO LOAN CLOSING.** Lender's obligation to make an Advance of Loan proceeds under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents, including, without limitation, the following conditions:

    3.1.     **Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) this Agreement, (2) the Note; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) the guaranties required hereunder; (6) a Disbursement Request and Authorization; and (7) all Related Documents as Lender may require for the Loan; all fully executed and in form and substance satisfactory to Lender.

    3.2.     **Third-Party Documents**. Borrower shall provide to Lender fully executed copies of the Service and Management Agreement(s) between Borrower and Water Station Management, LLC (the "**Service and Management Agreement**") applicable to the System(s) that are financed by, and that are collateral for, the Loan.

    3.3.     **Deposit Account.** Borrower shall have opened a deposit account with Lender (the "**Deposit**

**Account**") and deposited therein funds in an amount equal to up to thirty percent (30%) of the original invoice price of the System(s) financed by the Loan *plus* the amount necessary to pay two months' principal and interest due under the Loan, each as designated by Lender in its discretion. Borrower acknowledges and agrees that, upon the closing of the Loan hereunder, funds in the Deposit Account will be used to pay the balance of the amount necessary to purchase or refinance the System(s) financed by the Loan.

3.4. **Loan Fee and Other Closing Costs**. Borrower shall have paid to Lender the loan fee and all other closing costs set forth on the Disbursement Request and Authorization executed concurrently herewith.

3.5. **Payment of Any Other Fees and Expenses.** Borrower shall have paid to Lender all other fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

3.6. **Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender, may require.

3.7. **Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

3.8. **No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

4. **GRANT OF SECURITY INTEREST, COLLATERAL DESCRIPTION. In connection with the Loan, Borrower hereby grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.** The word **"Collateral"** as used in this Agreement means all of Borrower's right, title, and interest in and to all of Borrower's property of any nature whatsoever, tangible and intangible, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, and all products, profits, rents, proceeds, and accessions of such property, including, without limitation the personal property described on Exhibit A hereto. In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

4.1. All accessions, attachments, accessories, replacements of and additions to any of the Collateral described herein, whether added now or later.

4.2. All products and produce of any of the property described in this Collateral section.

4.3. All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

4.4. All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

4.5. All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Borrower's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

4.6. All of Borrower's right, title, and interest in and to any and all contracts, agreements, documents, and instruments related to the Collateral, including, without limitation, the Service and Management Agreement(s) related thereto.

5. **REPRESENTATIONS AND WARRANTIES GENERALLY.** Borrower represents and warrants to Lender, as of the date of this Agreement and as of the date of Lender's Advance of Loan proceeds, and at all times any Indebtedness exists:

5.1. **Organization.** Borrower is a Limited Liability Company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Indiana. Borrower is duly authorized

to transact business in all states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Borrower maintains an office at 1104 N Keystone Ave. Indianapolis, IN 46201. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name.

      5.2.    **Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or the Collateral.

      5.3.    **Single-Purpose.** Borrower was formed for the sole purpose of owning and operating one or more Systems. Borrower has not, and shall not, engage in any business activity other than owning and operating the System(s).

      5.4.    **Restricted Persons.** Neither Borrower, nor any person owning any interest in any Borrower, is (or will be) a person with whom Lender is restricted from doing business under regulations of the Office of Foreign Asset Control of the U.S. Department of the Treasury ("**OFAC**") (including, those persons named on OFAC's Specially Designated Nationals and Blocked Persons List) or under any statute, executive order (including, without limitation, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons. In addition, Borrower hereby agrees to provide Lender with any additional information that Lender may deem necessary from time to time to ensure compliance with Lender's OFAC or any other applicable laws requiring Lender to collect customer identification materials, including, without limitation, home addresses, telephone numbers, birthdates, social security and other tax identification numbers, and the like.

    6.    **BORROWER'S REPRESENTATIONS AND WARRANTIES REGARDING THE COLLATERAL.** With respect to the Collateral, Borrower represents and promises to Lender that:

      6.1.    **Perfection of Security Interest.** Borrower agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing security agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.**

      6.2.    **Notices to Lender.** Borrower will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Borrower's name; (2) change in Borrower's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Borrower; (4) change in the authorized signer(s); (5) change in Borrower's principal office address; (6) change in Borrower's state of organization; (7) conversion of Borrower to a new or different type of business entity; or (8) change in any other aspect of Borrower that directly or indirectly relates to any agreements between Borrower and Lender. No change in Borrower's name or state of organization will take effect until after Lender has received notice.

      6.3.    **Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

      6.4.    **Location of the Collateral.** Borrower agrees to keep the Collateral at Borrower's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Borrower will deliver to Lender in form satisfactory to Lender a schedule of Collateral locations relating to Borrower's operations, including without limitation the location(s) of all System(s) owned by Borrower.

6.5.    **Removal of the Collateral.** Borrower shall not remove any System from its existing location without Lender's prior written consent. Borrower shall, whenever requested, advise Lender of the exact location of the System(s) owned by Borrower.

6.6.    **Transactions Involving Collateral.** Without Lender's prior written consent, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Borrower shall immediately deliver any such proceeds to Lender.

6.7.    **Title.** Borrower represents and warrants to Lender that Borrower holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

6.8.    **Repairs and Maintenance.** Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

6.9.    **Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

6.10.    **Taxes, Assessments and Liens.** Borrower will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents.

6.11.    **Compliance with Governmental Requirements.** Borrower shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral. Borrower may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

6.12.    **Maintenance of Casualty Insurance.** Borrower shall procure and maintain special form (formerly known as all risk) all risk insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, together with any insurance required by the Service and Management Agreement, each in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Borrower will provide Lender with such loss payable or other endorsements as Lender may require. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

6.13.    **Application of Insurance Proceeds.** Borrower shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $5,000.00, whether or not such casualty or loss is covered by insurance. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Borrower from the proceeds for the reasonable cost of repair or restoration. If Lender does

not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Borrower.

      6.14.    **Financing Statements.** Borrower authorizes Lender to file one or more UCC financing statements, or alternatively, a copy of this Agreement to perfect Lender's security interest granted hereby. At Lender's request, Borrower additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Collateral. Borrower will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Borrower irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

      7.    **AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

      7.1.    **Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

      7.2.    **Financial Records.** Maintain its books and records in accordance with accounting principles acceptable to Lender, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

      7.3.    **Financial Statements.** Furnish Lender with such financial statements and other related information of Borrower or any Guarantor at such frequencies and in such detail as Lender may reasonably request.

      7.4.    **Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loan in favor of Lender, executed by each guarantor named below, on Lender's forms, and in the amount and under the conditions set forth in those guaranties.

| Name of Guarantor | Amount |
| --- | --- |
| Natalie Sadek | **Unlimited** |
| Tyler Sadek | **Unlimited** |

      7.5.    **Loan Proceeds.** Use all Loan proceeds solely for the purchase or refinance of System(s) that will be owned and operated by Borrower in accordance with the terms of this Agreement.

      7.6.    **Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

      7.7.    **Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

      7.8.    **Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's businesses and operations, and to the use of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

7.9. **Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

7.10. **Single-Purpose Entity.** Engage exclusively in the business of owning and operating the System(s), and in no other business or activity without Lender's prior written consent. Without limiting the foregoing, Borrower will not (i) engage in any business or activity other than the ownership and operation of the System(s), (ii) acquire or own any assets other than the System(s), (iii) own any subsidiary or make any investments in any other entity, (iv) comingle its assets with the assets of any other entity, or (v) make any loans or guaranty the indebtedness of any other person or entity.

7.11. **Service and Management Agreement.** At all times comply with the terms and conditions of the Service and Management Agreement(s) to which Borrower is a party. Furthermore, Borrower shall immediately notify Lender of any breach of or default under the Service and Management Agreement(s), either by Borrower or any other party thereto.

7.12. **Deposit of Funds**. Cause all proceeds of the Service and Management Agreement to be deposited directly into the Deposit Account.

7.13. **Automatic Withdrawal of Funds**. Execute any and all documents requested by Lender to permit, authorize and direct Lender to automatically debit amounts due under the Note or any of the other Loan Documents directly from the Deposit Account without further notice to, or authorization from, Borrower.

8. **RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A)  increase the cost to Lender for extending or maintaining the Loan to which this Agreement relates, (B)  reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

9. **BORROWER'S RIGHT TO POSSESSION.** Until default, Borrower may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Borrower shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Borrower shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

10. **LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

11.    **NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

11.1.    **Indebtedness and Liens.** (1) Except for indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of the Collateral or Borrower's assets, or (3) sell with recourse any of Borrower's accounts, except to Lender.

11.2.    **Continuity of Operations.** (1) Engage in any business activities except in accordance with the single-purpose entity covenants set forth herein, (2) cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise, that would result in a breach of the terms of this Agreement or Borrower's inability to make payments under the Loan as and when they become due.

11.3.    **Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

11.4.    **Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

12.    **RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account), including, without limitation, the Deposit Account. This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

13.    **DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

13.1.    **Payment Default.** Borrower fails to make any payment when due under the Loan.

13.2.    **NSF Notification.** Lender, upon initiating any payment from the Deposit Account pursuant to this Agreement, receives an NSF notification or other similar notification that there are insufficient amounts in the Deposit Account to make the required payment.

13.3.    **Other Default.** Borrower fails to comply with any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents.

13.4.    **Default Under Service and Management Agreement.** Borrower fails to comply with the terms of the Service and Management Agreement(s) applicable to the Collateral and Borrower does not remedy such failure within the applicable cure period, if any.

13.5.    **Default in Favor of Third Parties.** Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Loan or perform Borrower's obligations under this Agreement or any Related Document.

13.6.    **False Statements.** Any representation or statement made by Borrower to Lender is false in any material respect.

13.7.    **Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death

of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

13.8. **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan.

13.9. **Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

13.10. **Insecurity.** Lender in good faith believes itself insecure.

14. **RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Washington Uniform Commercial Code. In addition, and without limitation, Lender may exercise any one or more of the following rights and remedies:

14.1. **Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower.

14.2. **Assemble Collateral.** Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Borrower to take possession of and remove the Collateral.

14.3. **Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale, including, without limitation, a private sale to Water Station Management, LLC, or an affiliate thereof, on terms acceptable to Lender it its discretion. In such event, Lender shall endeavor to, but shall have no obligation to, give Borrower reasonable notice of the sale of the Collateral. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

14.4. **Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding or pending foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness.

14.5. **Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral, whether under the Service and Management Agreement or otherwise. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and, regardless of any such transfer, Lender may receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, direct payments be made in accordance with Lender's instructions, endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

14.6. **Assign Service and Management Agreement.** Cause Borrower to execute any and all documents necessary, in Lender's discretion, to assign, transfer, and convey Borrower's interest in the Service and Management Agreement to Lender or its designee and, if Borrower fails to execute any and all such documents within ten (10) days following Lender's demand, exercise the power of attorney granted by this Agreement to cause such assignment, transfer, and conveyance on behalf of Borrower.

14.7.     **Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

14.8.     **Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

14.9.     **Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under this Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

15.     **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

15.1.     **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

15.2.     **Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. The foregoing costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

15.3.     **Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington.**

15.4.     **Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Clallam County, State of Washington.

15.5.     **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, shall constitute a waiver of any of Lender's rights or of any of Borrower's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

15.6.     **Notices.** Subject to applicable law, and except for notice required or allowed by law to be given in another manner, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered in-person, when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the address(es) set forth on the first page of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address.

15.7.     **Participation and Syndication**. Lender may assign its rights and obligations under this Agreement or the Loan, in whole or in part, or sell the Loan or a participation interest in the Loan to any affiliate of Lender or third party. Borrower agrees that Lender may provide any successor, Loan purchaser, or participant in the Loan with copies of any financial

statements, credit reports and other information relating to Borrower, any Guarantor, or the Collateral. Borrower shall provide any successor, purchaser, or participant with such additional information regarding Borrower, any Guarantor, the Collateral, or the Loan as Lender may request.

       15.8.    **Power of Attorney.** Borrower hereby appoints Lender as Borrower's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement, to demand termination of filings of other secured parties, and to exercise any of the other powers Lender is specifically authorized to exercise on behalf of Borrower hereunder. The power of attorney granted hereby is irrevocable during the term of this Agreement and shall be deemed coupled with an interest. Furthermore, the power of attorney granted hereby may be exercised by Lender in accordance with the terms of this Agreement and the Related Documents without further notice to, or authorization from, Borrower.

       15.9.    **Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

       15.10.    **Successors and Assigns.** Borrower may not assign, transfer, or convey all or any portion of its rights hereunder without Lender's prior written consent. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

       15.11.    **Survival of Representations and Warranties.** All representations, warranties, and agreements made by Borrower in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

       15.12.    **Time is of the Essence.** Time is of the essence in the performance of this Agreement.

       15.13.    **Indemnification**.  If a claim arises for which Borrower has a duty to defend Lender under this Agreement or any of the other Loan Documents, Lender shall have the right to choose its own legal counsel (at Borrower's expense) and make all decisions relating to its defense, including, without limitation, the litigation strategy and the terms of any settlement.

       15.14.    **Counterparts.** This Agreement may be signed in one or more counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument.

       **15.15.**    **JURY TRIAL WAIVER.**  BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY BORROWER, AND BORROWER ACKNOWLEDGES THAT NO PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT.  BORROWER FURTHER ACKNOWLEDGES THAT BORROWER HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF BORROWER'S OWN FREE WILL, AND THAT BORROWER HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL**.**

       15.16.    **Errors and Omissions.** Borrower, for and in consideration of the Loan, agrees, if requested by Lender, to fully cooperate in modifying the Loan Documents to adjust for clerical errors, if any, in some or all of the Loan Documents or if deemed necessary or desirable in the reasonable discretion of Lender to enable Lender to sell, convey, seek guaranty or market said Loan to any entity, including but not limited to an investor, Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Government National Mortgage Association, Federal Housing Authority or the Department of Veteran Affairs, or any Municipal Bonding Authority; *provided, however*, that the terms and conditions of such modified Loan Documents

DocuSign Envelope ID: 1CC0C580-A0F1-451C-9339-303A9FE06FCF

will be materially equal to the Loan Documents as they apply to Borrower and Guarantor. Borrower agrees to comply with all above noted requests by Lender within ten (10) days from date of mailing said requests. Borrower agrees to assume all costs including, by way of illustration and not limitation, actual expenses, reasonable legal fees, and marketing losses for failing to comply with correction requests in above noted time period.

16. **DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

16.1. **Advance.** The word "Advance" means the disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

16.2. **Agreement.** The word "Agreement" means this Business Loan and Security Agreement, as it may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

16.3. **Borrower.** The word "Borrower" means Founders Mosaic Partners LLC and includes all co-signers and co-makers signing the Note and its and their respective successors and assigns.

16.4. **Collateral.** The word "Collateral" means the System(s) financed by the Loan and any other property and assets granted as collateral security for the Loan, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, assignment, pledge, chattel mortgage, collateral chattel mortgage, conditional sale, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

16.5. **Deposit Account.** The words "Deposit Account" mean the account opened with Lender and maintained with Lender in accordance with the terms of this Agreement throughout the term of the Loan.

16.6. **Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

16.7. **GAAP.** The word "GAAP" means generally accepted accounting principles.

16.8. **Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

16.9. **Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

16.10. **Indebtedness.** The word "Indebtedness" means the Loan and any other indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

16.11. **Lender.** The word "Lender" means First Federal Savings & Loan Association of Port Angeles, its successors, particpants and assigns.

16.12. **Loan.** The word "Loan" means the loan in the principal amount of $1,115,625.00 made by Lender to Borrower pursuant to the terms of this Agreement, the Note, and the other Related Documents, as they may be amended and restated from time to time.

16.13. **Note.** The word "Note" means the Note of even date herewith executed by Borrower in the principal amount of $1,115,625.00 together with all renewals, extensions, amendments, or modifications thereof.

16.14. **Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; and (3) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing.

16.15. **Related Documents.** The words "Related Documents" mean all promissory notes, guaranties, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

16.16. **Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, assignment, pledge, chattel mortgage, collateral chattel mortgage, conditional sale, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

16.17. **Service and Management Agreement.** The words "Service and Management Agreement" mean the agreement between Borrower and Water Station Management, LLC, an affiliate thereof, or its or their respective successors or assigns, relating to the servicing, management, and operation of the System(s) financed by the Loan.

16.18. **System or Systems.** The words "System" or "Systems" mean the water dispensing systems described as part of the "Collateral" hereunder and financed by the Loan evidenced by this Agreement.

*[Signature page follows.]*

**ORAL AGREEMENTS. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON STATE LAW.**

Executed as of the date first set forth above.

**BORROWER:**                                                          **LENDER:**

Founders Mosaic Partners LLC                           FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF
an Indiana Limited Liability Company                  PORT ANGELES,
                                                                             a Washington chartered stock savings bank

By: _Tyler Sadek_____                          By: _Jason Gill_____
    Name: Tyler Sadek                                            Jason Gill
    Its: Member, Manager                                         Authorized Representative


By: _Natalie Sadek_____
Name: Natalie Sadek
Its: Member/Manager

---

**EXHIBIT A**

**Collateral Description**

Water Station alkaline vending machine model no. WST700, serial number 109842

Water Station alkaline vending machine model no. WST700, serial number 109843

Water Station alkaline vending machine model no. WST700, serial number 109844

Water Station alkaline vending machine model no. WST700, serial number 109845

Water Station alkaline vending machine model no. WST700, serial number 109846

Water Station alkaline vending machine model no. WST700, serial number 109847

Water Station alkaline vending machine model no. WST700, serial number 109848

Water Station alkaline vending machine model no. WST700, serial number 109849

Water Station alkaline vending machine model no. WST700, serial number 109850

Water Station alkaline vending machine model no. WST700, serial number 109851

Water Station alkaline vending machine model no. WST700, serial number 109852

Water Station alkaline vending machine model no. WST700, serial number 109853

Water Station alkaline vending machine model no. WST700, serial number 109854

Water Station alkaline vending machine model no. WST700, serial number 109855

Water Station alkaline vending machine model no. WST700, serial number 109856

Water Station alkaline vending machine model no. WST700, serial number 109857

Water Station alkaline vending machine model no. WST700, serial number 109858

Water Station alkaline vending machine model no. WST700, serial number 109859

Water Station alkaline vending machine model no. WST700, serial number 109860

Water Station alkaline vending machine model no. WST700, serial number 109861

Water Station alkaline vending machine model no. WST700, serial number 109862

Water Station alkaline vending machine model no. WST700, serial number 109863

Water Station alkaline vending machine model no. WST700, serial number 109864

Water Station alkaline vending machine model no. WST700, serial number 109865

DocuSign Envelope ID: 1CC0C580-A0F1-451C-9339-303A9FE06FCF

Water Station alkaline vending machine model no. WST700, serial number 109866

Water Station alkaline vending machine model no. WST700, serial number 109867

Water Station alkaline vending machine model no. WST700, serial number 110079

Water Station alkaline vending machine model no. WST700, serial number 110080

Water Station alkaline vending machine model no. WST700, serial number 110081

Water Station alkaline vending machine model no. WST700, serial number 110082

Water Station alkaline vending machine model no. WST700, serial number 110083

Water Station alkaline vending machine model no. WST700, serial number 110084

Water Station alkaline vending machine model no. WST700, serial number 110085

Water Station alkaline vending machine model no. WST700, serial number 110086

Water Station alkaline vending machine model no. WST700, serial number 110087

Water Station alkaline vending machine model no. WST700, serial number 110088

Water Station alkaline vending machine model no. WST700, serial number 110089

Water Station alkaline vending machine model no. WST700, serial number 110090

Water Station alkaline vending machine model no. WST700, serial number 110091

Water Station alkaline vending machine model no. WST700, serial number 110092

Water Station alkaline vending machine model no. WST700, serial number 110093

Water Station alkaline vending machine model no. WST700, serial number 110094

Water Station alkaline vending machine model no. WST700, serial number 110095

Water Station alkaline vending machine model no. WST700, serial number 110096

Water Station alkaline vending machine model no. WST700, serial number 110097

Water Station alkaline vending machine model no. WST700, serial number 110098

Water Station alkaline vending machine model no. WST700, serial number 110099

Water Station alkaline vending machine model no. WST700, serial number 110100

Water Station alkaline vending machine model no. WST700, serial number 110101

Water Station alkaline vending machine model no. WST700, serial number 110102

Water Station alkaline vending machine model no. WST700, serial number 110103

Water Station alkaline vending machine model no. WST700, serial number 110104

DocuSign Envelope ID: 1CC0C580-A0F1-451C-9339-303A9FE06FCF

Water Station alkaline vending machine model no. WST700, serial number 110139

Water Station alkaline vending machine model no. WST700, serial number 110140

Water Station alkaline vending machine model no. WST700, serial number 110141

Water Station alkaline vending machine model no. WST700, serial number 110142

Water Station alkaline vending machine model no. WST700, serial number 110143

Water Station alkaline vending machine model no. WST700, serial number 110144

Water Station alkaline vending machine model no. WST700, serial number 110145

Water Station alkaline vending machine model no. WST700, serial number 110146

Water Station alkaline vending machine model no. WST700, serial number 110147

Water Station alkaline vending machine model no. WST700, serial number 110148

Water Station alkaline vending machine model no. WST700, serial number 110149

Water Station alkaline vending machine model no. WST700, serial number 110150

Water Station alkaline vending machine model no. WST700, serial number 110151

Water Station alkaline vending machine model no. WST700, serial number 110152

Water Station alkaline vending machine model no. WST700, serial number 110153

Water Station alkaline vending machine model no. WST700, serial number 110154

Water Station alkaline vending machine model no. WST700, serial number 110155

Water Station alkaline vending machine model no. WST700, serial number 110156

Water Station alkaline vending machine model no. WST700, serial number 110157

Water Station alkaline vending machine model no. WST700, serial number 110158

Water Station alkaline vending machine model no. WST700, serial number 110159

Water Station alkaline vending machine model no. WST700, serial number 110160

Water Station alkaline vending machine model no. WST700, serial number 110161

Water Station alkaline vending machine model no. WST700, serial number 110162

Water Station alkaline vending machine model no. WST700, serial number 110163

Water Station alkaline vending machine model no. WST700, serial number 110164

Water Station alkaline vending machine model no. WST700, serial number 110692

Water Station alkaline vending machine model no. WST700, serial number 110693

DocuSign Envelope ID: 1CC0C580-A0F1-451C-9339-303A9FE06FCF

Water Station alkaline vending machine model no. WST700, serial number 110694

Water Station alkaline vending machine model no. WST700, serial number 110695

Water Station alkaline vending machine model no. WST700, serial number 110696

Water Station alkaline vending machine model no. WST700, serial number 110697

Water Station alkaline vending machine model no. WST700, serial number 110698

Water Station alkaline vending machine model no. WST700, serial number 110699

Water Station alkaline vending machine model no. WST700, serial number 110700

Water Station alkaline vending machine model no. WST700, serial number 110701

Water Station alkaline vending machine model no. WST700, serial number 110702

Water Station alkaline vending machine model no. WST700, serial number 110703

Water Station alkaline vending machine model no. WST700, serial number 110704

Water Station alkaline vending machine model no. WST700, serial number 110705

Water Station alkaline vending machine model no. WST700, serial number 110706

Water Station alkaline vending machine model no. WST700, serial number 110707

Water Station alkaline vending machine model no. WST700, serial number 110708

Water Station alkaline vending machine model no. WST700, serial number 110709

Water Station alkaline vending machine model no. WST700, serial number 110710

Water Station alkaline vending machine model no. WST700, serial number 110711

Water Station alkaline vending machine model no. WST700, serial number 110712

Water Station alkaline vending machine model no. WST700, serial number 110713

Water Station alkaline vending machine model no. WST700, serial number 110714

Water Station alkaline vending machine model no. WST700, serial number 110715

Water Station alkaline vending machine model no. WST700, serial number 110716

Water Station alkaline vending machine model no. WST700, serial number 110717

Water Station alkaline vending machine model no. WST700, serial number 110859

Water Station alkaline vending machine model no. WST700, serial number 110860

Water Station alkaline vending machine model no. WST700, serial number 110861

Water Station alkaline vending machine model no. WST700, serial number 110862

Water Station alkaline vending machine model no. WST700, serial number 110863

Water Station alkaline vending machine model no. WST700, serial number 110864

Water Station alkaline vending machine model no. WST700, serial number 110865

Water Station alkaline vending machine model no. WST700, serial number 110866

Water Station alkaline vending machine model no. WST700, serial number 110867

Water Station alkaline vending machine model no. WST700, serial number 110868

Water Station alkaline vending machine model no. WST700, serial number 110869

Water Station alkaline vending machine model no. WST700, serial number 110870

Water Station alkaline vending machine model no. WST700, serial number 110871

Water Station alkaline vending machine model no. WST700, serial number 110872

Water Station alkaline vending machine model no. WST700, serial number 110873

Water Station alkaline vending machine model no. WST700, serial number 110874

Water Station alkaline vending machine model no. WST700, serial number 110875

Water Station alkaline vending machine model no. WST700, serial number 110876

Water Station alkaline vending machine model no. WST700, serial number 110877

Water Station alkaline vending machine model no. WST700, serial number 110878

Water Station alkaline vending machine model no. WST700, serial number 110879

Water Station alkaline vending machine model no. WST700, serial number 110880

Water Station alkaline vending machine model no. WST700, serial number 110881

Water Station alkaline vending machine model no. WST700, serial number 110882

Water Station alkaline vending machine model no. WST700, serial number 110883

Water Station alkaline vending machine model no. WST700, serial number 110884

Water Station alkaline vending machine model no. WST700, serial number 110885

Water Station alkaline vending machine model no. WST700, serial number 110886

Water Station alkaline vending machine model no. WST700, serial number 110887

Water Station alkaline vending machine model no. WST700, serial number 110888

Water Station alkaline vending machine model no. WST700, serial number 110889

Water Station alkaline vending machine model no. WST700, serial number 110890

Water Station alkaline vending machine model no. WST700, serial number 110891

Water Station alkaline vending machine model no. WST700, serial number 110892

Water Station alkaline vending machine model no. WST700, serial number 110893

Water Station alkaline vending machine model no. WST700, serial number 110894

Water Station alkaline vending machine model no. WST700, serial number 110895

Water Station alkaline vending machine model no. WST700, serial number 110896

Water Station alkaline vending machine model no. WST700, serial number 110897

Water Station alkaline vending machine model no. WST700, serial number 110898

Water Station alkaline vending machine model no. WST700, serial number 110899

Water Station alkaline vending machine model no. WST700, serial number 110900

Water Station alkaline vending machine model no. WST700, serial number 110901

Water Station alkaline vending machine model no. WST700, serial number 110902

Water Station alkaline vending machine model no. WST700, serial number 110903

Water Station alkaline vending machine model no. WST700, serial number 110904

Water Station alkaline vending machine model no. WST700, serial number 110905

Water Station alkaline vending machine model no. WST700, serial number 110906

Water Station alkaline vending machine model no. WST700, serial number 110907

Water Station alkaline vending machine model no. WST700, serial number 110908

Water Station alkaline vending machine model no. WST700, serial number 110909

Water Station alkaline vending machine model no. WST700, serial number 110910

Water Station alkaline vending machine model no. WST700, serial number 111916

Water Station alkaline vending machine model no. WST700, serial number 111917

Water Station alkaline vending machine model no. WST700, serial number 111918

Water Station alkaline vending machine model no. WST700, serial number 111919

Water Station alkaline vending machine model no. WST700, serial number 111920

Water Station alkaline vending machine model no. WST700, serial number 111921

Water Station alkaline vending machine model no. WST700, serial number 111922

Water Station alkaline vending machine model no. WST700, serial number 111923

Water Station alkaline vending machine model no. WST700, serial number 111924

Water Station alkaline vending machine model no. WST700, serial number 111925

Water Station alkaline vending machine model no. WST700, serial number 111926

Water Station alkaline vending machine model no. WST700, serial number 111927

Water Station alkaline vending machine model no. WST700, serial number 111928

Water Station alkaline vending machine model no. WST700, serial number 111929

Water Station alkaline vending machine model no. WST700, serial number 111930

Water Station alkaline vending machine model no. WST700, serial number 111931

Water Station alkaline vending machine model no. WST700, serial number 111932

Water Station alkaline vending machine model no. WST700, serial number 111933

Water Station alkaline vending machine model no. WST700, serial number 111934

# EXHIBIT B

DocuSign Envelope ID: 1CC0C580-A0F1-451C-9339-303A9FE06FCF

# PROMISSORY NOTE



LoanNote LOAN NO: ███1386

| | |
|---|---|
| **Date:** | September 28, 2021 |
| **Borrower:** | Founders Mosaic Partners LLC<br>1104 N Keystone Ave.<br>Indianapolis, IN 46201<br>Attn: Tyler Sadek |
| **Lender:** | FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF PORT ANGELES<br>PO Box 351<br>Port Angeles, WA 98362 |
| **Loan Amount:** | $1,115,625.00 |
| **Interest Rate:** | Fixed rate of 5-Year FHLB Rate plus Credit Spread, adjusted once on the Adjustment Date, but not less than a Floor Rate of five and ninety-five hundredths (5.95%) per annum. |
| **Maturity Date:** | September 28, 2031 |

FOR VALUE RECEIVED, Founders Mosaic Partners LLC an Indiana Limited Liability Company (*"Borrower"*), promises to pay to the order of FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF PORT ANGELES, a Washington chartered stock savings bank, or its successor or assignee (*"Lender"*), at the address set forth above or such other place as Lender may from time to time designate in writing, the sum of One Million One Hundred Fifteen Thousand Six Hundred Twenty-Five Dollars AND 00/100THS U.S. DOLLARS (U.S. $1,115,625.00) or so much thereof as may from time to time be disbursed hereunder, in lawful money of the United States of America, together with interest on the unpaid principal balance from time to time outstanding hereunder from the date of disbursement under this Promissory Note (this *"Note"*) until paid at the rate set forth below. This Note is non-revolving.

1.    **Loan and Loan Documents.** This Note evidences a loan in the amount set forth above (the *"Loan"*) being made contemporaneously herewith from Lender to Borrower. This Note is made pursuant to and is secured by that certain Business Loan and Security Agreement executed contemporaneously herewith between Borrower and Lender (the *"Loan Agreement"*). The terms (including meanings given to defined terms) and conditions of the Loan Agreement are hereby adopted and incorporated herein to the extent not inconsistent herewith. Among other things, the Loan Agreement grants Lender a first-lien position security interest in the Collateral described and defined therein. The Loan Agreement, this Note, and any other written instruments evidencing, securing, or otherwise governing the Loan are referred to collectively as the *"Loan Documents"*. Borrower hereby agrees to perform and comply with all of the agreements, terms, and conditions of all of the Loan Documents.

2.    **Definitions.**

"*5-Year FHLB Rate*" means the interest rate designated by the Federal Home Loan Bank of Des Moines as the regular advance rate for fixed-rate advances of five (5) years as posted on the internet at FHLBDM.com under "Advances" and available to Lender as of the last Business Day immediately preceding the relevant Adjustment Date.

*"Adjustment Date"* means the date that is five (5) years after the date of this Note.

*"Business Day"* means any day on which the applicable Index is published other than Saturday, Sunday, or a day on which national banks are authorized or required by law to be closed in the city where Lender's office, as identified above, is located.

*"Credit Spread"* means three and one-half percent (3.50%).

*"Floor Rate"* means a per annum fixed rate equal to five and ninety-five hundredths (5.95%).

**3.** **Interest Rate.** Subject to Section 7 below (regarding the Default Rate), the outstanding principal balance of this Note shall bear interest at a per annum fixed rate equal to the 5-Year FHLB Rate as of the date of this Note *plus* the Credit Spread. Beginning on the Adjustment Date, and continuing through the Maturity Date, the outstanding principal balance of this Note shall bear interest at a per annum rate equal to the 5-Year FHLB Rate plus the Credit Spread. Notwithstanding the foregoing, in no event shall the interest rate applicable to the Loan be less than the Floor Rate.

**4.** **Monthly Payments of Principal and Interest.** Beginning on November 5, 2021 and continuing the same day of each month thereafter until the Maturity Date, Borrower shall make monthly payments of principal and interest, in equal monthly installments calculated by Lender based on a ten (10) year amortization period (the ***"Amortization Period"***) and such methodology as Lender may deem appropriate, in its sole discretion, with such monthly payments to be recalculated and adjusted on the first of each month following an Adjustment Date at the then applicable interest rate to re-amortize such payment over the remaining portion of the Amortization Period.

**5.** **Maturity Date.** The entire principal balance, all accrued interest, and any other advances made or expenses incurred by Lender that are payable or reimbursable by Borrower hereunder, or under any of the other Loan Documents, shall become immediately due and payable on September 28, 2031 (the ***"Maturity Date"***).

**6.** **Payments - General**.

**6.1.** **Application of Payments.** Unless otherwise required by Lender, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower agrees, however, that upon the occurrence of an Event of Default and until such has been cured, Lender shall have the right, in its sole discretion, to modify the order in which payments are applied, and to apply payments to indebtedness owing under the Loan in a different order than that indicated above.

**6.2** **Payments from Deposit Account.** All monthly payments must be made through the Borrower's Deposit Account. Lender is hereby authorized to pay any principal, interest, or other amount due under the Loan Documents when and as the same shall become due by automatically debiting funds on deposit in the Deposit Account.

**6.3** **Computation of Interest**. All interest calculated under this Note shall be computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. Any payment not received by 5:00 p.m. Pacific Time will be treated as having been received by Lender on the next day, and interest shall continue to accrue until the next day.

**6.4** **Late Charge**. In the event that any installment payment of principal or interest due hereunder is not paid within ten (10) days of the date it is due, Borrower shall pay, in addition to the delinquent payment, a late charge of five percent (5.0%) or $5.00, whichever is greater, of the amount overdue in order to defray the expense incident to handling such delinquent payment.

**7.** **Default Rate**. Following an uncured Event of Default in the payment of any installment of principal or interest when due hereunder, or an uncured Event of Default in the observance or performance of any other obligation hereunder or under any of the other Loan Documents, interest shall accrue hereunder from the date of such uncured Event of Default at an annual interest rate equal to eighteen percent (18%) per annum (the ***"Default Rate"***). After the entire principal amount of the Loan shall become due and payable, whether by acceleration, at maturity, or otherwise, this Note shall bear interest at the Default Rate.

**8.** **Prepayment.** Borrower may prepay Borrower's obligations under this Note in full or in part at any time or from time to time; *provided, however*, that except as set forth below, the Loan may be prepaid only upon payment of the applicable prepayment premium provided for below.

**8.1** **Prepayment Premium.** Prepayments of all or any portion of the principal balance of the Loan, including any involuntary prepayments as described below (excluding, however, prepayments permitted under Section 8.5 below), shall be subject to a prepayment premium during each of the following periods (the "***Prepayment Periods***") of the term of the Loan commencing at closing of the Loan:

| Prepayment Periods | Prepayment Premium Calculation As Percentage of Principal Prepaid |
|---|---|
| Through the date that immediately precedes the one-year anniversary of the date of this Note: | Three Percent (3.0%) |
| From the one-year anniversary of the date of this Note through the date that immediately precedes the two-year anniversary of the date of this Note: | Two Percent (2.0%) |
| From the two-year anniversary of the date of this Note through the date that immediately precedes the three-year anniversary of the date of this Note: | One Percent (1.00%) |
| Remaining Term of the Loan: | None |

**8.2      Involuntary Prepayment.**  Involuntary prepayment shall include, but is not limited to, prepayment in the event of a default or in connection with acceleration or foreclosure, or any prepayment pursuant to or in connection with any sale under court order or power of sale, whether in judicial or non-judicial foreclosure, bankruptcy, or other insolvency proceeding, any deed in lieu of foreclosure or sale, or any other method or proceeding whatsoever, excepting only prepayment through application of insurance or condemnation proceeds, to which no prepayment premium shall be applicable.  Any prepayment premium owing to Lender shall be due from Borrower in connection with any satisfaction allowed under applicable law relating to any foreclosure proceeding, and shall be due from any other lien holder or person who tenders payment of the amount owed by Borrower under applicable law, including principles of equitable subrogation.  Lender shall be entitled to include in its credit bid at any foreclosure any applicable prepayment premium.  Furthermore, Lender shall not be required to accept any such prepayment, whether from Borrower or any other party paying the Loan, if it does not include the prepayment premium, if applicable.

**8.3      Effect of Prepayment.**  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, they will reduce the principal balance due and may result in Borrower's making fewer payments.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  First Federal Savings & Loan Association of Port Angeles, ATTN: Loan Servicing, 105 W 8th St/P.O. Box 351, Port Angeles, WA 98362-0055.**

**8.4      Acknowledgment of Right as Bargained-For Compensation.**  BORROWER ACKNOWLEDGES LENDER'S RIGHT TO RECEIVE A PREPAYMENT PREMIUM IN ACCORDANCE WITH THE TERMS HEREOF AND HEREBY WAIVES ANY RIGHT OR PRIVILEGE TO PREPAY ALL OR ANY PORTION OF THIS NOTE EXCEPT AS SPECIFICALLY PROVIDED HEREIN.   BORROWER FURTHER ACKNOWLEDGES THAT THE PREPAYMENT PREMIUM, AS DUE UNDER THE CIRCUMSTANCES AND AS CALCULATED IN THE MANNER DESCRIBED ABOVE, REPRESENTS THE REASONABLE ESTIMATE OF LENDER AND BORROWER OF A FAIR AVERAGE COMPENSATION FOR THE LOSS THAT LENDER MAY SUSTAIN DUE TO THE PAYMENT OF ANY OF THE INDEBTEDNESS EVIDENCED BY THIS NOTE PRIOR TO ITS DUE DATE, DUE TO, AMONG OTHER REASONS, THE COSTS AND OVERHEAD OF LENDER IN INVESTIGATING AND PLACING THIS LOAN AND IN INVESTIGATING A SUBSTITUTE INVESTMENT OF FUNDS.   SUCH PREPAYMENT PREMIUM SHALL BE PAID WITHOUT PREJUDICE TO THE RIGHT OF LENDER TO COLLECT ANY OTHER AMOUNTS REQUIRED TO BE PAID HEREUNDER OR UNDER ANY OTHER DOCUMENTS EVIDENCING OR SECURING THE LOAN.   BORROWER CONFIRMS THE ACKNOWLEDGMENTS EXPRESSED HEREIN AND DECLARES THAT LENDER'S AGREEMENT TO MAKE THE LOAN IN ACCORDANCE WITH THE LOAN DOCUMENTS CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER, FOR THIS WAIVER AND AGREEMENT.

**8.5      Permitted Prepayment.**  Notwithstanding the foregoing, Borrower may prepay up to twenty percent (20.0%) of the principal balance of the Loan during each of the Prepayment Periods set forth in Section 8.1 without penalty or premium (including the prepayment premium required under Section 8.1). If and to the extent any prepayments exceed twenty percent (20.0%) of the principal balance of the Loan during any Prepayment Period, Borrower shall pay the corresponding prepayment premium set forth in Section 8.1 together with such prepayment(s).

DocuSign Envelope ID: 1CC0C580-A0F1-451C-9339-303A9FE06FCF

**9.     Business Purpose; Maximum Interest and Fees.**  Borrower agrees to the applicable interest rate, plus any other charges to Borrower or benefit received by Lender under the Loan Documents that may be interpreted to be in the nature of interest. Borrower represents and warrants to Lender that the proceeds of this Note shall be used exclusively for commercial, business, or investment purposes, and that none of the proceeds of this Note shall be used by Borrower for personal, family, or household purposes. Notwithstanding any other provision of the Loan Documents, the interest, fees and charges under the Loan Documents shall not exceed the maximum amounts permitted by any applicable law, and should Lender ever receive as interest an amount that would exceed permissible rates, such amount shall be applied to the reduction of the unpaid principal balance and not to the payment of interest.  This provision shall supersede every other provision of all the Loan Documents.

**10.     Acceleration.**  Upon the occurrence of an Event of Default resulting from Borrower's failure to pay any amount payable hereunder as and when due or upon the occurrence of any other Event of Default under this Note or under any of the other Loan Documents, Lender may declare, at its sole option and without notice to any party, the entire indebtedness evidenced hereby immediately due and payable in full.  Failure to exercise this option or any other right Lender may have shall not constitute a waiver of the right to exercise such option or any other right in the event of any subsequent Event of Default.

**11.     Costs and Fees of Collection; Interest on Judgments.**  Borrower and every other person or entity at any time liable for the payment of the indebtedness evidenced hereby shall also be liable for all costs, expenses, and fees incurred by Lender in collecting any amounts owing hereunder, including, but not limited to, reasonable attorneys' fees.  Any judgment recovered by Lender shall bear interest at the Default Rate.

**12.     Waiver of Presentment.**  Borrower and every other person or entity at any time liable for the payment of the indebtedness evidenced hereby each waive diligence, demand, presentment for payment, notice of protest, and notice of nonpayment of this Note.  Every such person or entity further consents to any extension of the time of payment hereof or other modification of the terms of payment of this Note, the release of all or any part of the security for this Note, or the release of any party liable for the payment of the indebtedness evidenced hereby at any time and from time to time for any reason whatsoever.  Any such extension or release may be made without notice to any of such persons or entities and without discharging their liability.

**13.     Time is of the Essence.**  Time is of the essence of this Note and the performance of each of the agreements and provisions contained herein.

**14.     Joint and Several Liability.**  The liability hereunder of multiple parties identified herein as Borrower shall be joint and several.

**15.     Applicable Law.**  This Note shall be construed in accordance with the laws of the State of Washington, without regard to that state's choice of law rules.  Borrower hereby consents to the jurisdiction of the courts of King County, the State of Washington.

**16.     Successors and Assigns.**  Borrower may not assign any of its rights or obligations under this Note without the prior written consent of Lender.  Subject to the preceding sentence, this Note shall be binding upon the respective heirs, legal representatives, successors, and assigns of Borrower and shall inure to the benefit of Lender and its successors and assigns, including, without limitation, each successive holder of this Note and any other lenders now or hereafter participating in the Loan.

**17.     Recourse.**  BORROWER ACKNOWLEDGES LIABILITY FOR PAYMENT OF ALL AMOUNTS OWING UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS AND AGREES THAT LENDER DOES NOT HAVE TO FORECLOSE ITS SECURITY INTEREST GRANTED BY THE LOAN AGREEMENT OR ANY OTHER COLLATERAL BEFORE DEMANDING FULL PAYMENT FROM BORROWER.

**18.     Waiver of Trial by Jury.**  Borrower hereby waives, to the fullest extent permitted by applicable law, the right to a trial by jury in any action or proceeding based upon, or related to, the subject matter of this Note.  This waiver is knowingly, intentionally, and voluntarily made by Borrower, and Borrower acknowledges that no person acting on behalf of Lender has made any representations of fact to induce this waiver of trial by jury or in any way to modify or nullify its effect.  Borrower further acknowledges that Borrower has been represented (or has had the opportunity to be represented) in the signing of this Note and in the making of this waiver by independent legal counsel, selected of Borrower's own free will, and that Borrower has had the opportunity to discuss this waiver with counsel.

**[Remainder of Page Intentionally Left Blank; Signature Appears on Following Page]**

19.     **No Oral Agreements.**

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

DATED as of the date set forth above.

**BORROWER**:                                   Founders Mosaic Partners LLC
                                                an Indiana Limited Liability Company

                                          By: _____
                                              *Tyler Sadek*
                                              394BFC616B2241D...
                                              Name: Tyler Sadek
                                              Its: Member/Manager

                                          By: _____
                                              *Natalie Sadek*
                                              5C65922845E4447...
                                              Name: Natalie Sadek
                                              Its: Member/Manager

# EXHIBIT C

# UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

This UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE (this ***"Guaranty"***), is made as of September 28, 2021 by Tyler Sadek and Natalie Sadek (individually and collectively, ***"Guarantor"***), for the benefit of FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF PORT ANGELES, a Washington chartered stock savings bank (together with its successors, participants and assigns, "***Lender***").

## RECITALS

**A.** Guarantor has requested that Lender make a term loan to Founders Mosaic Partners LLC, an Indiana Limited Liability Company (***"Borrower"***) in the principal amount of One Million One Hundred Fifteen Thousand Six Hundred Twenty- Five Dollars AND 00/100THS U.S. DOLLARS (U.S. $1,115,625.00 (the "***Loan***").

**B.** The Loan is evidenced by a Promissory Note of even date herewith (the "***Note***"), governed by a Business Loan and Security Agreement between Borrower and Lender of even date herewith (the "***Loan Agreement***") which, among other things, grants Lender a first-lien security interest in the collateral described and defined therein (as defined below, the "***Collateral***").

**C.** Lender's agreement to make the Loan is conditioned on Guarantor's execution of this Guaranty, and Lender would not make the Loan to Borrower without the agreements of Guarantor set forth herein. Guarantor will receive direct and tangible financial benefits from the Loan.

**D.** Capitalized terms used but not defined herein shall have the meanings given to such terms in the Loan Agreement.

## AGREEMENTS

NOW, THEREFORE, intending to be legally bound, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to induce Lender to enter into the Loan, Guarantor hereby agrees as follows:

**1.** **Unconditional Guaranty of Payment and Performance.** Guarantor unconditionally, absolutely, and irrevocably guarantees the following "***Guaranteed Obligations***":

**1.1** the due and punctual payment of all amounts (collectively herein, the ***"Indebtedness"***) payable by Borrower under the Loan Agreement, the Note, and other agreements and instruments that evidence, secure, or otherwise govern the Loan, but excluding the Indemnity Agreement (collectively, the ***"Loan Documents"***); and

**1.2** the prompt payment of all obligations of Borrower to Lender arising from any interest rate hedging program, including, without limitation, any interest rate swap, cap, or such other interest rate protection product, whether now existing or entered into hereafter (each an "***Interest Rate Protection Product***"), including, without limitation, any Cash Settlement Amount or any payments on Early Termination payable by Borrower under any Swap Transaction or Confirmation; *provided, however*, the term "Interest Rate Protection Product" shall not include any interest rate swap, cap, or other interest rate protection product if, at the time Borrower enters into any such product, it is unlawful for Guarantor to guarantee the obligations of Borrower thereunder. Capitalized terms used in this subsection 1.2 but not otherwise defined in this Guaranty or in the Loan Agreement are defined in the *2006 ISDA Definitions* published by the International Swap and Derivatives Association, Inc.; and

**1.3** the full, complete and punctual observance, performance and satisfaction of all the obligations, duties, covenants and agreements of Borrower under the Loan Agreement and the other Loan Documents.

**2.** **Guarantor's Obligations are Absolute.** This is an absolute, present, and continuing guaranty of payment and performance and not of collection. This Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any Collateral (defined below) through foreclosure or sale proceedings, as the case may be, under the Loan Agreement or otherwise, or resorting to any other guaranties, and Guarantor hereby waives any right to require Lender to join Borrower or any other Guarantor in any action brought hereunder or to commence any action against or obtain any judgment against Borrower or to pursue

DocuSign Envelope ID: 1CC0C580-A0F1-451C-9339-303A9FE06FCF

any other remedy or enforce any other right. Guarantor further agrees that nothing contained herein or otherwise shall prevent Lender from pursuing concurrently or successively all rights and remedies available to Lender at law or in equity or under any of the Loan Documents. Lender's exercise of any of its rights or remedies shall not constitute a discharge of Guarantor's obligations hereunder, it being the purpose and intent of Guarantor that the obligations of Guarantor hereunder shall be absolute, independent, and unconditional under all circumstances whatsoever. None of Guarantor's obligations under this Guaranty nor any of Lender's rights or remedies shall be impaired, modified, changed, or released in any manner whatsoever by any impairment, modification, change, release, or limitation of Borrower's liability under any of the Loan Documents or by reason of the insolvency, bankruptcy, dissolution, liquidation, or reorganization of Borrower or any Guarantor.

3. **Rights of Lender.**

3.1 Guarantor agrees that Lender may deal exclusively with Borrower in all matters relating to the Loan without notice of any kind to or the approval of Guarantor. Specifically, Lender is not required to (a) notify Guarantor of Lender's acceptance of this Guaranty; (b) notify Guarantor when Lender advances Loan proceeds, extends credit to Borrower, or pays any obligations of Borrower; (c) notify Guarantor of any default under the Loan Documents; or (d) make presentment and demand for payment, protest, notice of demand, protest, dishonor, and nonpayment. It is intended that Guarantor shall remain fully liable regardless of any act or omission by Lender that might otherwise directly or indirectly result, by operation of law or otherwise, in the discharge or release in whole or in part of Borrower, any other guarantor, or any other person, or the discharge, release, or impairment of any collateral now or hereafter held as security for any of the obligations under the Loan Documents (collectively herein, the "*Collateral*").

3.2 Lender shall have the right to set off the unpaid balance of the Guaranteed Obligations against any indebtedness owing to Guarantor by Lender or by any Lender Affiliate, including, without limitation, any obligation under a repurchase agreement or any funds held at any time by Lender or any Lender Affiliate, whether collected or in the process of collection, or in any time or demand deposit account maintained by Guarantor at, or evidenced by any certificate of deposit issued by, Lender or any Lender Affiliate. Guarantor agrees, to the fullest extent it may effectively do so under applicable law, that any holder of a participation in the Note may exercise rights of set-off or counterclaim and other rights with respect to such participation as fully as if such holder of a participation were a direct creditor of Guarantor pursuant to this Agreement in the amount of such participation.

4. **Modifications and Actions by Lender.** Without limiting the generality of the foregoing, Guarantor agrees that Lender may do, or fail to do, any of the following one or more times, without notice to or the approval of Guarantor, without diminishing, altering, or otherwise affecting the liability of Guarantor hereunder, and even though Borrower's financial condition may have deteriorated or Guarantor may object: (a) Lender may renew, extend, or otherwise change the time for payment of the obligations of Borrower to Lender; (b) Lender may increase the amount of the Loan; (c) Lender may modify any other terms of the Loan; (d) Lender may release, surrender, substitute, or exchange any of the Collateral, or take and hold additional or other security for the payment of this Guaranty or any other indebtedness guaranteed, and exchange, enforce, waive, or release any such security; (e) Lender may release Borrower, any Guarantor, or any other guarantor from obligations under the Loan or any guaranty thereof; (f) Lender is not required to marshal assets and Lender may take a deed in lieu of foreclosure or foreclose or realize upon such security and direct the amount or manner of sale thereof as Lender in its discretion may determine; (g) Lender may apply the Collateral to the repayment of any amounts owing to Lender under the Loan Documents in any order Lender may determine in its discretion; (h) Lender may forbear from pursuing Borrower, any Guarantor, or any other guarantor or any other person, or forbear from foreclosing or otherwise realizing upon any of the Collateral; (i) Lender may impair or fail to perfect a security interest in any of the Collateral; (j) Lender may take actions that have the effect of diminishing Guarantor's subrogation rights; and (k) Lender may take any other actions with respect to the terms of or security for the Guaranteed Obligations. Notwithstanding any such action by Lender, Guarantor's obligations hereunder shall remain in full force and effect.

5. **Guarantor Waivers.**

5.1 **Waiver of Suretyship Defenses.** Guarantor hereby waives any defenses based on the action or inaction of Lender that might otherwise be deemed a legal or equitable discharge of a surety, including, without limitation, any defense based on any of the following: (a) the lack of diligence or any delay in enforcing, or any waiver of or failure to enforce, any right or remedy under the Loan Documents; (b) the failure or invalidity of, or any defect in, the Loan Documents; (c) any disability or other defense of Borrower, any Guarantor, any other guarantor, or any other person; (d) the termination from any cause whatsoever of any of the obligations under the Loan Documents, except upon full satisfaction of the Guaranteed Obligations; (e) the loss or impairment of any right of subrogation; (f) any modification of any of the terms and conditions of the Loan Documents in any form whatsoever and

without notice to Guarantor; or (g) the foreclosure of the Collateral or any portion thereof, it being intended that this Guaranty shall survive the realization upon any of the Collateral, including, but not limited to, any nonjudicial foreclosure action and any deed in lieu of foreclosure, to the extent permitted under applicable law.

**5.2    Waiver of Right of Reimbursement.**  Unless and until the Guaranteed Obligations have been fully satisfied, Guarantor hereby waives any right of reimbursement, contribution, recourse, or any other right or remedy of Guarantor against Borrower, any Guarantor, any other guarantor or any other person to recover amounts that Guarantor is obligated to pay under this Guaranty.

**5.3    Waiver of Right of Subrogation.**  Unless and until the Guaranteed Obligations have been fully satisfied, Guarantor hereby waives any right of subrogation, any right to enforce any remedy Lender may have against Borrower, any Guarantor, any other guarantor, or any other person, and any benefit of, and the right to participate in, any of the Collateral.

**6.    Subordination of Debt.**  Any debt of Borrower now or hereafter held by any Guarantor is hereby subordinated to the Indebtedness.  Guarantor shall not seek, accept, or retain for its own account any payment from Borrower on account of any subordinated debt until the entire Indebtedness has been paid in full.  Any payment of such subordinated indebtedness by Borrower to Guarantor before payment in full of the Indebtedness shall be collected, enforced and received by Guarantor as trustee for Lender and promptly paid to Lender in payment of the Indebtedness.

**7.    Anti-Deficiency and One-Form-Of-Action Rules.**

**7.1**    Guarantor understands that certain statutes, commonly referred to as "anti-deficiency" and "one form of action" rules, may prevent or inhibit a lender, after completing a non-judicial foreclosure or accepting a deed in lieu of foreclosure, from obtaining a deficiency judgment against a borrower or from collecting the amount of the deficiency from a guarantor, unless such borrower or guarantor has knowingly waived the application of such statutes and the benefits that it would otherwise receive from such statutes.  This curtailment of a lender's rights to recover a deficiency from a guarantor is based in part on the fact that a lender's election of a non-judicial foreclosure or a deed in lieu of foreclosure from among other possible default remedies impairs or eliminates a guarantor's rights of subrogation and reimbursement against the borrower, the collateral, or any other surety for the borrower's obligations.

**7.2**    Guarantor understands that, unless it waives the protection that such rules would ordinarily confer, these "anti-deficiency" and "one form of action" rules might provide a defense to enforcement of this Guaranty if Lender elects to proceed with a non-judicial foreclosure or to accept a deed in lieu of foreclosure.  Nevertheless, as an inducement for Lender to make the Loan, Guarantor hereby knowingly waives, in advance and to the extent permitted under applicable law, all its rights to rely on the anti-deficiency and "one form of action rules" in connection with the impairment of its subrogation rights, as a defense to this Guaranty. Guarantor hereby acknowledges and agrees that Lender may, in its sole discretion, exercise any right or remedy whatsoever that it may have against Borrower or any security held by Lender, including, without limitation, the right to foreclose upon any collateral for the Loan by judicial or non-judicial sale or to take a deed in lieu of foreclosure, without affecting or impairing in any way the liability of Guarantor hereunder (except to the extent that the Guaranteed Obligations have been fully paid and performed), even if such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Guarantor against Borrower or any security for the Loan.  Guarantor further waives any statutes that provide "fair value" protection by limiting a deficiency judgment to the difference between the property's fair market value (or foreclosure sale price, if greater) and the amount of the obligation being foreclosed.

**8.    Costs and Reasonable Attorneys' Fees.**  Guarantor shall pay all of Lender's expenses incurred in any effort to enforce any terms of this Guaranty, whether or not any suit is filed, including, without limitation, reasonable attorneys' fees and disbursements, foreclosure costs, and title charges.  Such sums shall be immediately due and payable and shall bear interest from the date of disbursement at the Default Rate set forth in the Loan Documents, or the maximum rate that may be collected from Borrower under applicable law, if less.

**9.    Representations and Warranties.**  To induce Lender to make the Loan, each Guarantor makes the representations and warranties to Lender set forth in this Section.  Guarantor acknowledges that, but for the truth and accuracy of the matters covered by the following representations and warranties, Lender would not have agreed to make the Loan.

**9.1**    All representations and warranties relating to Guarantor set forth in the Loan Agreement are true and

correct and made and affirmed by Guarantor as though set forth fully herein.

**9.2** All balance sheets, net worth statements, bank and brokerage statements, and other financial data with respect to Guarantor that have been given to Lender by or on behalf of that Guarantor fairly and accurately represent the financial condition of that Guarantor as of the respective dates thereof.

**9.3** This Guaranty creates legal, valid, and binding obligations of Guarantor enforceable in accordance with its terms. The execution, delivery, and performance by Guarantor of this Guaranty does not and will not contravene or conflict with (a) any law, order, rule, regulation, writ, injunction, or decree now in effect of any government authority, or court having jurisdiction over Guarantor; (b) any contractual restriction binding on or affecting Guarantor or Guarantor's property or assets that may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty; (c) the instruments creating any trust holding title to any assets included in Guarantor's financial statements; or (d) the organizational or other documents of Guarantor.

**9.4** Except as disclosed in writing to Lender, there is no action, proceeding, or investigation pending or, to the knowledge of Guarantor, threatened or affecting Guarantor, that may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

**9.5** Guarantor is not in default under any agreements that may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

**9.6** Guarantor (a) has a financial interest in Borrower and the financial benefits to Guarantor from the Loan constitute reasonably equivalent value for the execution of this Guaranty; (b) is not insolvent and will not become insolvent as a result of this Guaranty; (c) is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which the property of Guarantor constitutes unreasonably small capital and that would leave Guarantor insolvent; (d) does not intend to or believe that it will incur debts that would be beyond Guarantor's ability to pay as such debts mature; (e) has reviewed and approved all of the terms and conditions of the Loan Documents; and (f) has established adequate means of obtaining, and will obtain from Borrower on a continuing basis, all financial and other information regarding Borrower, any other guarantor, and the Loan, without any obligation on the part of Lender to provide any such information.

All the foregoing representations and warranties shall survive so long as any of the Guaranteed Obligations have not been satisfied. Guarantor hereby agrees to indemnify, defend, and hold Lender free and harmless from and against all loss, cost, liability, damage, and expense, including reasonable attorneys' fees and costs that Lender may sustain by reason of the inaccuracy or breach of any of the foregoing representations and warranties.

**10. Insolvency.** So long as any of the Guaranteed Obligations are unpaid and this Guaranty remains in effect, Guarantor agrees to file all claims against Borrower in any bankruptcy or other proceeding in which the filing of claims is required by law relating to indebtedness owed by Borrower to Guarantor and to assign to Lender all rights of Guarantor thereunder up to the amount of such unpaid Guaranteed Obligations. In all such cases the Persons authorized to pay such claims shall pay to Lender the full amount thereof to the full extent necessary to pay the Guaranteed Obligations and Guarantor hereby assigns to Lender all of Guarantor's rights to all such payments to which Guarantor would otherwise be entitled. Notwithstanding the foregoing, and except to the extent that any sums owed by Borrower to Lender under the Loan Documents have been fully satisfied thereby, the liability of Guarantor hereunder shall in no way be affected by (a) the release or discharge of Borrower in any creditors', receivership, bankruptcy or other proceedings; or (b) the impairment, limitation or modification of the liability of Borrower or the estate of Borrower in bankruptcy resulting from the operation of any present or future statute, regulation, or from the decision of any court.

**11. Preferences, Fraudulent Conveyances, Etc.** If Lender is required to refund, or voluntarily refunds, any payment received from Borrower because such payment is or may be avoided, invalidated, declared fraudulent, set aside or determined to be void or voidable as a preference, fraudulent conveyance, impermissible setoff or a diversion of trust funds under applicable bankruptcy laws or for any similar reason, including, without limitation, any judgment, order or decree of any court or administrative body having jurisdiction over Lender or any of its property, or any settlement or compromise of any claim effected by Lender with Borrower or any other claimant ("***Rescinded Payment***"), then Guarantor's liability to Lender shall continue in full force and effect, or Guarantor's liability to Lender shall be reinstated, as the case may be, with the same effect and to the same extent as if the Rescinded Payment had not been received by Lender, notwithstanding the cancellation or termination of the Note or any of the other Loan Documents. In addition, Guarantor shall pay or reimburse Lender for all expenses (including all reasonable attorneys' fees, court costs and related disbursements) incurred by Lender in the defense of any claim that a payment received by Lender in respect of all or any part of the

Guaranteed Obligations must be refunded. The provisions of this Section shall survive the termination of this Guaranty and any satisfaction and discharge of Borrower by virtue of any payment, court order or any federal or state law.

**12.    Community Property.** Unless Guarantor's obligations hereunder are otherwise limited by a specific annotation either on the first page of this Guaranty or following Guarantor's signature below, any married person who signs this Guaranty as a Guarantor warrants that it is an obligation incurred on behalf of his or her marital community and agrees that this Guaranty shall bind the marital community.

**13.    Lender's Election of Remedies.** This Guaranty may be enforced against any Guarantor without attempting to collect from Borrower, any other Guarantor, or any other guarantor, or any other person, and without attempting to enforce Lender's rights in any of the Collateral. Lender may join Guarantor in any suit relating to the Loan Documents or proceed against any Guarantor in a separate action. Lender shall have the right to exercise its remedies in such order as it determines in its sole discretion.

**14.    Joint and Several Liability.** The liability of each Guarantor and any other guarantors of the Loan shall be joint and several.

**15.    Guarantor's Ongoing Reporting Obligations**. Each Guarantor acknowledges that it has read or adequately understands the content of the Loan Documents. Each Guarantor agrees to promptly, and in any event within five (5) days after Lender's request, provide Lender with financial statements, certifications of liquidity, and other reports and information as required of Guarantor under the Loan Agreement or as requested by Lender from time to time. Guarantor shall further notify Lender in writing of any change of address, telephone number, fax number, marital status (if an individual), or legal organization (if an entity) within 10 days after such event.

**16.    Guarantor Covenants.** Guarantor shall perform all covenants of Guarantor under the Loan Documents, including, without limitation, any financial covenants and reporting requirements applicable to Guarantor under the Loan Agreement.

**17.    Notices.** Any notice, demand, request, or other communication that any party hereto may be required or may desire to give hereunder shall be given in writing to the addresses set forth below and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three Business Days after mailing; (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service; or (d) if by confirmed e-mail transmission on the day of transmission so long as a copy is sent on the same day by overnight courier to the address set forth below:

|                         |                                   |
|-------------------------|-----------------------------------|
| **If to Guarantor:**    | Tyler Sadek                       |
|                         | 1104 N Keystone Ave.              |
|                         | Indianapolis, IN 46201            |
|                         | Telephone:  317-790-8462          |
|                         | E-mail:  tyler.sadek@gmail.com    |
|                         |                                   |
|                         | Natalie Sadek                     |
|                         | 1104 N Keystone Ave..             |
|                         | Indianapolis, IN 46201            |
|                         | Telephone:  317-626-3490          |
|                         | E-mail:  natalie.sadek@gmail.com  |
|                         |                                   |
| **If to Lender:**       | FIRST FEDERAL                     |
|                         | PO Box 351                        |
|                         | Port Angeles, WA 98362            |
|                         | Attn:  Jason Gill                 |
|                         | Email:  Jason.gill@ourfirstfed.com |

Any party may change its address for notices by notifying the others in writing of the change as set forth herein.

DocuSign Envelope ID: 1CC0C580-A0F1-451C-9339-303A9FE06FCF

**18.** **Assignment.** The term **"Lender"** shall include any subsequent holder of or participant in any of the Loan Documents. Lender may assign the Loan Documents in whole or in part and grant participations therein, without notice and without affecting Guarantor's liability under this Guaranty. Lender may make available to any proposed assignee or participant all credit and financial data with respect to Guarantor as may be in the possession of Lender. Guarantor agrees to furnish any additional information that any proposed assignee or participant may reasonably request.

**19.** **Applicable Law**. This Agreement shall be construed in accordance with and governed by the laws of the State of Washington, without regard to that state's choice of law rules. The parties consent to the jurisdiction of the courts of King County, the State of Washington.

**20.** **Miscellaneous.** Guarantor agrees as follows: (a) this Guaranty shall be binding upon and enforceable against Guarantor's heirs, legal representatives, successors, and assigns; (b) this Guaranty constitutes the entire understanding between Lender and Guarantor regarding the subject matter hereof, and no course of prior dealing between the parties shall be used to supplement or modify the terms of this Guaranty; (c) this Guaranty may be changed, modified or supplemented only through a writing signed by Guarantor and Lender; (d) if any provision of this Guaranty is invalid, illegal, or unenforceable, such provision shall be considered severed from the rest of this Guaranty and the remaining provisions shall continue in full force and effect as if the invalid provision had not been included; and (e) this Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

**21.** **Waiver of Jury Trial.** GUARANTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS GUARANTY AND THE GUARANTEED OBLIGATIONS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY GUARANTOR, AND GUARANTOR ACKNOWLEDGES THAT NO PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. GUARANTOR FURTHER ACKNOWLEDGES THAT GUARANTOR HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS GUARANTY AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF GUARANTOR'S OWN FREE WILL, AND THAT GUARANTOR HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

**22.** **Independent Obligation.** Guarantor understands and agrees that (a) the obligations under this Guaranty are separate and independent from Borrower, any Guarantor, any other guarantor, or any other person, and represent an unconditional, absolute, and irrevocable obligation on the part of Guarantor to pay the full amount of the indebtedness when due; (b) Lender is not required to pursue Borrower, any Guarantor, any other guarantor, or any other person, or foreclose or realize on all or any portion of the Collateral, or pursue any other remedies before demanding full payment from Guarantor; and (c) Guarantor shall remain fully liable under this Guaranty even if the Collateral is impaired or discharged or Borrower, any Guarantor, any other guarantor, or any other person is discharged or otherwise relieved of liability under the Loan Documents.

**23.** **Notice Disclaiming Oral Agreements.**

**RCW 16.36.140 DISCLOSURE: ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**[Remainder of Page Intentionally Left Blank; Signatures Appear on Following Page]**

Dated as of the date set forth above.

**GUARANTOR:**

Tyler Sadek

394BEC610B52241D

Name: Tyler Sadek

Natalie Sadek

5C6E022B45E4447

Name: Natalie Sadek

# EXHIBIT D



GREGORY R. FOX
206.223.7129
foxg@lanepowell.com

May 8, 2024

**VIA EMAIL AND OVERNIGHT DELIVERY**

Tarek E. Mercho
Mercho Caughey
828 East 64th Street
Indianapolis, IN 46220
tk@merchocaughey.com

Founders Mosaic Partners LLC
1104 N Keystone Ave
Indianapolis, IN 46201
Attn: Tyler Sadek

Re:     *Notice of Default, Acceleration, and Reservation of Rights*
        Loan No. x1386 (the "***Loan***")

Dear Mr. Mercho and Mr. Sadek:

This office and the undersigned represent First Fed Bank, a Washington state bank corporation ("***Lender***"), in connection with the above-referenced commercial Loan extended to Founders Mosaic Partners LLC, an Indiana limited liability company ("***Borrower***"), evidenced, in part, by that certain Promissory Note dated as of September 28, 2021, executed by Borrower and payable to the order of Lender, in the stated principal amount of One Million One Hundred Fifteen Thousand Six Hundred Twenty-Five Dollars ($1,115,625.00) (as amended, restated, or otherwise modified from time to time, the "***Note***"), and governed by the terms and conditions of that certain Business Loan and Security Agreement by and between Borrower and Lender of even date therewith (as amended, restated, or otherwise modified from time to time, the "***Loan Agreement***," together with all other documents, instruments, and agreements executed in connection with the Loan, the "***Loan Documents***").  Tyler Sadek and Natalie Sadek (the "***Guarantors***," and together with Borrower, the "***Credit Parties***") each personally, absolutely and unconditionally guaranteed all of Borrower's obligations to Lender pursuant to that certain Unconditional Guaranty of Payment and Performance dated as of September 28, 2021 (collectively, the "***Guaranty***").  The Loan is secured by all of Borrower's now owned or hereafter acquired assets, including, without limitation, the machines described on <u>Exhibit A</u> to the Loan Agreement (collectively, the "***Collateral***"), pursuant to and as more fully described in the Loan Agreement.  Capitalized terms used but not defined in this letter shall have the meanings given in the Loan Documents.

The Loan Documents require that Credit Parties comply with the terms, obligations, covenants, and conditions set forth therein, including, without limitation, payment of all debts and obligations under the Loan Documents when due. In particular, Borrower promised and agreed to timely make monthly payments of principal and interest on the Note on the fifth day of each month, commencing November 5, 2021, and continuing each month thereafter until the maturity date.

Borrower is in default under the Loan Documents on account of its failure to make the monthly payment due and owing on February 5, 2024, and each subsequent month thereafter (collectively, the "***Existing Defaults***"), in the aggregate amount of $49,430.92 (together with late fees of $1,853.64, and estimated attorneys' fees, costs and expenses incurred to date in the amount of $3,130.00, the "***Arrearage***"), and there are insufficient funds in Borrower's Deposit Account from which to debit such payment(s) as contemplated by <u>Section 6.2</u> of the Note. The Existing Defaults constitute an Event of Default under the Loan Documents, entitling Lender to accelerate Borrower's obligations under the Note and Loan Agreement, impose the contractual default rate, and exercise its rights and remedies against Credit Parties and the Collateral.

Lender hereby provides formal notice of default under the Loan Documents and demands immediate payment of the Arrearage. In the event Borrower fails to cure the Arrearage or make satisfactory payment arrangements on or before **<u>Monday, May 20, 2024</u>**, the Loan obligation shall automatically accelerate and bear interest at the contractual default rate of eighteen percent (18%) from and after such date, without further notice or demand of any kind, and the entire principal balance of $922,154.89, plus all accrued and unpaid interest, late charges, prepayment premiums, and fees, costs and expenses (together with all attorneys' fees, costs and expenses Lender has or may in the future incur in enforcing the Loan Documents, and interest at the contractual default rate, the "***Accelerated Obligation***"), shall be immediately due and payable.

In such event, Lender intends to exercise its rights and remedies under the Loan Documents and applicable law, including, without limitation, commencement of litigation against Credit Parties to collect the Accelerated Obligation. Commencement of suit will significantly increase the amount of Credit Parties' indebtedness through the addition of court costs, attorneys' fees and related expenses. Any delay by Lender in exercising its rights and remedies at this time is not intended to constitute, nor shall it be deemed to constitute, a waiver of said rights and remedies, all of which are hereby expressly reserved and may be exercised at any time.

Notwithstanding the Existing Defaults and any acceleration of the Loan obligation, Lender may, in its sole discretion, accept partial payments under the Loan Documents and such acceptance shall not act as a waiver of any acceleration or default, nor prevent Lender from exercising any right, remedy, or power available under the Loan Documents or applicable law. Any such payment(s) may be applied to the outstanding Loan obligation in such order and with

such frequency as Lender may determine in its sole and absolute discretion. Lender's acceptance of a partial payment from Borrower in one instance shall not obligate Lender to accept a partial payment from Borrower in any other instance.

Please be advised that Lender may, from time to time, generate automated billing statements or other statements that are forwarded to Borrower or to other persons or entities on a monthly or other periodic basis. The forwarding to Borrower of any billing statement, including any billing statement that purports to state amounts due and owing by Borrower that are different from the amounts owed, may not be relied upon by Borrower and do not result in any waiver of Lender's rights as set forth herein, all of which are reserved in their entirety.

The Loan Documents remain in full force and effect in accordance with their original terms. Nothing contained herein, any other correspondence, any oral or written communications between any Credit Party and Lender, or the acceptance and application of partial payments in accordance with the Loan Documents, shall establish any modification or course of dealing between Credit Parties and Lender that is inconsistent with the express terms of the Loan Documents. Lender does not waive, and does not forbear, with respect to any one or more of its respective rights and remedies under the Loan Documents and applicable law. Failure by Lender to exercise any rights and remedies at this time is not intended to constitute, nor shall it be deemed to constitute, a waiver of said rights and remedies, all of which are hereby expressly reserved and may be exercised at any time. Any agreement by Lender, including any agreement to forbear, modify the Loan Documents or waive any rights or remedies, must be in writing and signed by Lender; no oral or implied agreement of any kind will be recognized or enforceable.

Please contact the undersigned at FoxG@lanepowell.com; 206-223-7129 to discuss the matters set forth herein.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

Sincerely,

LANE POWELL PC

Gregory R. Fox

cc:    First Fed Bank, via email (Kasi.OLeary@ourfirstfed.com)
       Tyler Sadek and Natalie Sadek, via overnight delivery (1104 N Keystone Ave., Indianapolis, IN 46201)